# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

STATE OF MISSOURI, et al.,

Plaintiffs-Appellees/Cross-Appellants,

v.

JOSEPH R. BIDEN, JR., et al.,

Defendants-Appellants/Cross-Appellees.

On Appeal from the United States District Court
for the Eastern District of Missouri

## RESPONSE IN OPPOSITION TO EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

MICHAEL S. RAAB
THOMAS PULHAM
SIMON C. BREWER
SARAH N. SMITH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7529*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue, NW*
  *Washington, DC 20530*
  *(202) 616-5367*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................. 1

STATEMENT ................................................................................................... 2

    A.    Background ...................................................................................2

    B.    The Final Rule .............................................................................4

    C.    Prior Proceedings ........................................................................6

    D.    *Alaska* Litigation ........................................................................9

ARGUMENT ................................................................................................... 9

I.    The Government Is Likely to Succeed on the Merits. ...........................10

    A.    Plaintiffs Lack Article III Standing. .............................................10

    B.    Plaintiffs' Claims Lack Merit. ......................................................15

        1.    The Education Act Clearly Authorizes the
            Challenged Provisions of the Final Rule. ...........................15

        2.    Plaintiffs Cannot Obtain Relief with Respect to
            Previously Adopted Rules. ...................................................19

II.    The Remaining Factors Favor the Department....................................22

    A.    Plaintiffs Have Not Established Irreparable Injury....................22

    B.    The Balance of the Equities Favors the Department. ................23

CONCLUSION.................................................................................................26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Alaska v. U.S. Dep't of Educ.*,
    2024 WL 3104578 (D. Kan. June 24, 2024) ..................................... 9

*Atlantic Mut. Ins. Co. v. Commissioner*,
    523 U.S. 382 (1998) ................................................................ 12

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023) ............................................... 10, 13, 17

*California v. Texas*,
    593 U.S. 659 (2021) ................................................................ 13

*Corner Post, Inc. v. Board of Governors of the Fed. Reserve Sys.*,
    144 S. Ct. 2440 (2024) .......................................................... 20

*Lewis v. Casey*,
    518 U.S. 343 (1996) ................................................................ 10

*Lewis v. GEICO*,
    98 F.4th 452 (3d Cir. 2024) .................................................. 11

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024) ..................................................... 15, 17

*Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms &*
    *Explosives*,
    78 F.4th 1011 (8th Cir. 2023) ............................................. 21

*Murthy v. Missouri*,
    144 S. Ct. 1972 (2024) ............................................. 10, 12, 13

*Nebraska v. Biden*,
    52 F.4th 1044 (8th Cir. 2022) ............................................... 9

*Ng v. Board of Regents of the Univ. of Minn.*,
    64 F.4th 992 (8th Cir. 2023) ............................................... 22

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................ 22

*Respect Me. PAC v. McKee,*
562 U.S. 996 (2010) ................................................................ 9

*Simon v. Eastern Ky. Welfare Rights Org.,*
426 U.S. 26 (1976) ................................................................ 12

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ........................................................ 10, 12

*Wendt v. 24 Hour Fitness USA, Inc.,*
821 F.3d 547 (5th Cir. 2016) ................................................ 11

*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ............................................................ 22, 25

**Statutes:**

Higher Education Act of 1965,
20 U.S.C. § 1078-3(b)(1)(D) ................................................ 12
20 U.S.C. § 1087e(d)(1)(D) ...................................... 3, 15, 17
20 U.S.C. § 1087e(d)(1)(E) .................................................... 5
20 U.S.C. § 1087e(e)(1) ........................................... 3, 16, 18
20 U.S.C. § 1087e(e)(2) .......................................................... 3
20 U.S.C. § 1087e(e)(4) ........................................... 3, 15, 16
20 U.S.C. § 1089(c)(1)-(2) ...................................................... 6
20 U.S.C. § 1221e-3 ............................................................ 18

Pub. L. No. 103-66, 107 Stat. 341 (1993)....................................2

**Regulation:**

34 C.F.R. § 685.220(f)(1)-(2) .............................................. 12

**Other Authorities:**

59 Fed. Reg. 61,664 (Dec. 1, 1994) ............................... 3, 4, 15

77 Fed. Reg. 66,088 (Nov. 1, 2012) ............................... 3, 4, 15

80 Fed. Reg. 67,204 (Oct. 30, 2015) ............................................................. 3, 4, 15

88 Fed. Reg. 43,820 (July 10, 2023) ........................................... 4, 5, 6, 16, 18, 19

89 Fed. Reg. 2489 (Jan. 16, 2024) ..................................................................... 6

Fed. Student Aid, *Consolidating Student Loans*,
    https://studentaid.gov/manage-loans/consolidation
    (last visited July 19, 2024) ............................................................................13

Order, *Alaska v. U.S. Dep't of Educ.*,
    No. 24-3089 (10th Cir. June 30, 2024) ...........................................................9

**INTRODUCTION**

In July 2023, after two years of negotiated and notice-and-comment rulemaking, the Department of Education (Department) adopted a rule that makes various improvements to statutorily required plans that allow millions of Americans to make student-loan payments based on their income. Nine months later, the plaintiff States filed suit challenging a few discrete features of the rule. The district court preliminarily enjoined one such feature, which provided for forgiveness of some smaller loans in as little as 10 years, as opposed to the 20- or 25-year timeline provided by previous regulations. That court declined to enjoin any other parts of the rule and subsequently denied plaintiffs' request to extend its injunction to pre-existing regulations that plaintiffs did not challenge.

Plaintiffs now seek an extraordinary injunction pending appeal that would drastically increase the monthly payments and balances for millions of borrowers and stop any forgiveness under income contingent repayment plans, even pursuant to regulations that plaintiffs did not challenge in the district court. Such relief would inflict serious and irreparable harm on the Department, its loan servicers, and millions of borrowers. Indeed, many of those harms have already begun as a result of the Court's administrative

stay order. The Department has begun to place all borrowers on the challenged payment plan in forbearance, which will cause widespread confusion and potential financial harm, including the delay of forgiveness under programs like Public Service Loan Forgiveness that are not even challenged here.

Worse yet, plaintiffs show no likelihood that they will succeed on the merits of the challenges pressed in their motion. Thus, even if the district court correctly enjoined the loan-forgiveness portion of the 2023 rule, plaintiffs are not entitled to the further relief they seek now.

To minimize the harms caused by the administrative stay, the Department respectfully requests that the Court rule as quickly as possible on the motion.

## STATEMENT

### A.    Background

1.      In 1993, Congress amended the Higher Education Act of 1965 (Education Act) to authorize the Secretary to lend money directly to student borrowers. Pub. L. No. 103-66, 107 Stat. 341 (1993). The Secretary must offer a choice of plans to repay those loans, including "an income contingent repayment plan, with varying annual repayment amounts based on the

income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D).

The amount that a borrower must repay under an income contingent repayment (ICR) plan depends on the borrower's income. *See* 20 U.S.C. § 1087e(e)(2). The statute expressly authorizes the Department to "determine[]" the "appropriate portion" of the borrower's income on which payments shall be based, 20 U.S.C. § 1087e(e)(4), and to "establish procedures for determining the borrower's repayment obligation," as well as "such other procedures as are necessary to implement effectively income contingent repayment," *id.* § 1087e(e)(1). The statute also authorizes the Department to "prescribe[]" the "period of time"—an "extended" period, "not to exceed 25 years"—during which the borrower must make payments. *Id.* § 1087e(d)(1)(D).

2. Before the rule at issue here, the Secretary had used this authority three times: (1) to create an income contingent repayment plan in 1994, *see* 59 Fed. Reg. 61,664 (Dec. 1, 1994); (2) to create the PAYE plan in 2012, *see* 77 Fed. Reg. 66,088 (Nov. 1, 2012); and (3) to create the REPAYE plan in 2015, *see* 80 Fed. Reg. 67,204 (Oct. 30, 2015). These three plans shared the same basic structure. First, each involved a determination about

the amount of a borrower's income that should be "protected from [loan] payments." 88 Fed. Reg. 43,820, 43,827 (July 10, 2023). Each plan calculated a borrower's discretionary income by subtracting that protected amount from the borrower's adjusted gross income. 80 Fed. Reg. at 67,239; 77 Fed. Reg. at 66,137; 59 Fed. Reg. at 61,698. Second, each plan involved a determination about the percentage of a borrower's discretionary income that should "go[] toward [monthly] loan payments." 88 Fed. Reg. at 43,827; *see* 80 Fed. Reg. at 67,239; 77 Fed. Reg. at 66,137; 59 Fed. Reg. at 61,698. Third, each plan involved a determination about the period "of time borrowers must pay before repayment ends." 88 Fed. Reg. at 43,827. Under each plan, the Department forgave any outstanding loan balance (principal plus interest) at the end of that period. *See* 80 Fed. Reg. at 67,209; 77 Fed. Reg. at 66,114; 59 Fed. Reg. at 61,666.

## B.   The Final Rule

After engaging in negotiated and notice-and-comment rulemaking, the Department published a final rule designed to improve income-driven repayment (IDR) plans—an umbrella term encompassing both ICR and income-based repayment, another plan option required by the Education

Act.  88 Fed. Reg. at 43,820-43,821 (Final Rule); *see* 20 U.S.C. § 1087e(d)(1)(E).

The Final Rule makes various changes to the REPAYE plan.  88 Fed. Reg. at 43,822.  It increases the amount of income protected from loan payments to 225% of the federal poverty line (*i.e.*, $32,805 for a borrower without dependents in 2023).  *Id.* at 43,881, 43,901.  It lowers monthly payments for undergraduate loans to 5% of a borrower's discretionary income.  *Id.* at 43,901.  It "provid[es] for a shorter repayment period and earlier forgiveness for borrowers with smaller original principal balances," starting at 10 years for those who borrowed $12,000 or less.  *Id.* at 43,880; *see id.* at 43,902-43,903.  And it decreases the amount of accrued interest charged to a borrower's loan balance after the monthly payment has been applied (from 50% to 0%).  *Id.* at 43,827, 43,832.  This amended version of REPAYE is also referred to as the Saving on a Valuable Education (SAVE) plan.  *Id.* at 43,822.

These changes are "distinct and significant improvements" that have been "determined independently," and are therefore "independent and severable" from each other and the rest of the Final Rule.  88 Fed. Reg. at 43,827-43,828.

Although the Final Rule was generally scheduled to take effect on July 1, 2024, the Department designated certain provisions for early implementation. *See* 20 U.S.C. § 1089(c)(1)-(2). Those provisions included the increase in protected income and the interest benefit, which took effect on July 30, 2023, as well as the shortened timelines to forgiveness for borrowers with smaller loans, which took effect on January 21, 2024. *See* 88 Fed. Reg. at 43,820-43,821; 89 Fed. Reg. 2489 (Jan. 16, 2024).

### C. Prior Proceedings

Plaintiffs brought this suit in April 2024, R. Doc. 1 (App.001), nine months after its publication in the Federal Register and eight months after early implementation began. They claim that the Final Rule exceeds the Department's statutory authority and violates the Administrative Procedure Act (APA).

On June 24, the district court granted in part and denied in part their motion for preliminary injunction. R. Doc. 35 (App.395). The court observed that most of plaintiffs' standing theories were "tenuous," but it accepted that a Missouri instrumentality known as MOHELA would lose loan servicing revenue under "the Final Rule's loan forgiveness provisions." *Id.* at 38-39 (App.432-33). The court held that "Plaintiffs' arguments regarding the

Secretary's authority to set payment schedules and interest accrual limitations are unlikely to succeed on the merits" because "the Secretary has significant discretion" to set the terms of an ICR plan, and the "discretionary changes to the ICR program here appear reasonably tailored to accomplish the Secretary's stated goal." *Id.* at 42-43 (App.436-37). The court reached the opposite conclusion as to the shortened timelines to loan forgiveness, however, and it preliminarily enjoined "any further loan forgiveness for borrowers under the Final Rule's SAVE plan." R. Doc. 35, at 61 (App.455).

The Department appealed and immediately complied with the district court's order. "Upon receipt of the preliminary injunction and in compliance with it, [the Department] immediately ceased processing any additional loan forgiveness for borrowers enrolled in SAVE on the shortened timelines provided for in the Final Rule." R. Doc. 44, at 1 (App.466). The Department informed the district court that it did not understand the injunction to apply to pre-existing regulations "that authorize loan forgiveness after 20 or 25 years of payment." *Id.*

Plaintiffs cross-appealed and sought an injunction pending appeal from the district court to prohibit "Defendants from implementing other provisions of the Final Rule—specifically, the two payment threshold

provisions and the interest accrual provision." R. Doc. 41, at 7 (App.462).

The district court denied the motion because plaintiffs "ha[d] not provided an

adequate basis" to enjoin "any additional provisions of the Final Rule."

R. Doc. 45, at 1 (App.468). The court further "found that Plaintiffs' delay in

bringing this case undermines their request for immediate relief." *Id.* at 2

(App.469).

Plaintiffs also filed a "motion for clarification" asking the district court

to declare that its injunction prohibits any use of "ICR authority to forgive

loans for any borrowers enrolled in the SAVE plan," including pursuant to

previously adopted regulations. R. Doc. 48, at 2-3 (App.471-72). The district

court also denied that motion, explaining that it would not "extend this

injunction beyond the scope of the Final Rule as Plaintiffs only sought

injunctive relief from implementation of the Final Rule." R. Doc. 54

(App.498).

Plaintiffs now seek an injunction pending appeal that goes even

further. Specifically, they seek (Mot. 28) to enjoin the Department from

"[s]etting or implementing ICR payments that are too low for a borrower to

fully repay within 25 years" and from "forgiving principal or interest" for any

borrower enrolled in the SAVE plan, whether pursuant to the Final Rule or pre-existing regulations.

### D. *Alaska* Litigation

Another group of States separately challenged the Final Rule. The district court there believed that the Education Act's "[p]lain [t]ext [a]uthorizes the SAVE [p]lan" but ultimately concluded that statutory context did not provide sufficiently clear authorization. *Alaska v. U.S. Dep't of Educ.*, 2024 WL 3104578, at *7-12. (D. Kan. June 24, 2024). That court enjoined the Department from implementing parts of the Final Rule set to become effective on July 1, 2024. *Id.* at *20-21. The Tenth Circuit stayed the district court's injunction pending appeal, Order, *Alaska v. U.S. Dep't of Educ.*, No. 24-3089 (10th Cir. June 30, 2024), and the plaintiffs have asked the Supreme Court to vacate that stay, *see Alaska v. Department of Educ.*, No. 24A11 (U.S. July 5, 2024).

## ARGUMENT

The motion for an injunction pending appeal should be denied. "[T]he court must engage in the same inquiry as when it reviews the grant or denial of a preliminary injunction." *Nebraska v. Biden*, 52 F.4th 1044, 1046 (8th Cir. 2022) (per curiam). Such a motion "'demands a significantly higher

justification' than a request for a stay." *Respect Me. PAC v. McKee*, 562 U.S. 996, 996 (2010).

## I. The Government Is Likely to Succeed on the Merits.

### A. Plaintiffs Lack Article III Standing.

Plaintiffs must "make a 'clear showing'" that they are "'likely' to establish" an injury in fact caused by the challenged conduct and redressable by a favorable ruling. *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024). They cannot.

Plaintiffs claim that Missouri's instrumentality, MOHELA, will lose revenue when loans it services are forgiven under the SAVE plan, arguing that such an injury was sufficient to establish standing in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023). Mot. 16. But the forgiveness provision of the Final Rule has already been enjoined, and plaintiffs have not alleged, much less clearly shown, that the provisions they challenge here—which govern the size of monthly payments and the charging of interest—will decrease their servicing revenue. "[S]tanding is not dispensed in gross," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), so the "right to complain of *one* … [alleged] deficiency" in the Final Rule does not "automatically confer[] the right to complain of *all* … [alleged] deficiencies," *Lewis v. Casey*, 518 U.S.

343, 358 n.6 (1996). As plaintiffs' "alleged harms are entirely focused on the Final Rule's early loan forgiveness provisions," R. Doc. 35, at 56 (App.450), they cannot obtain an injunction against its other provisions.

If anything, these provisions are likely to benefit MOHELA financially. As plaintiffs recognize, Mot. 25, the Final Rule's payment threshold provisions will result in more borrowers paying $0, so their accounts will cost almost nothing to service (while MOHELA still gets paid the same amount). R. Doc. 22-2, at 5-6 (App.299-300). These provisions and the interest benefit will also decrease the number of delinquencies (which are expensive to service) and defaults (which close accounts and reduce servicing income). *Id.* at 7-8 (App.301-02). Plaintiffs make no effort to show that any reduction in servicing revenue attributable to the provisions at issue here would offset these financial benefits. *Cf. Lewis v. GEICO*, 98 F.4th 452, 460 (3d Cir. 2024) (considering adjustments that "offset" the alleged harm); *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547, 550 n.10 (5th Cir. 2016) (considering "all of the costs and benefits aris[ing] from a single transaction").

While they do not invoke it to support their standing, plaintiffs later claim (Mot. 26-27) that "the interest accrual and payment-threshold changes also harm" them by inducing borrowers to consolidate Federal Family

Education Loans (FFELs) held by MOHELA into direct loans held by the Department. But when a borrower consolidates in this manner, MOHELA is paid the principal and any accrued interest in full. 20 U.S.C. § 1078-3(b)(1)(D); 34 C.F.R. § 685.220(f)(1)-(2). Full repayment "would ordinarily be cause for celebration, not a lawsuit." *TransUnion*, 594 U.S. at 437. Plaintiffs suggest (Mot. 26) that MOHELA would still be harmed because a borrower stops making interest payments. But the reason borrowers would not owe any future interest is because their FFELs are repaid in full. Such early repayment both eliminates the risk of default and lets MOHELA recoup the time value of money—the economic equivalent of the forgone interest payments. *See Atlantic Mut. Ins. Co. v. Commissioner*, 523 U.S. 382, 384 (1998) ("[A] dollar today is worth more than a dollar tomorrow.")

Further, even if consolidation did result in pocketbook injury, plaintiffs have not shown that such injury would be "fairly traceable" to the Final Rule. *Murthy*, 144 S. Ct. at 1986; *see also id.* at 1992 n.8. It is "purely speculative" whether borrowers' consolidation decisions are attributable to the SAVE plan or are instead "made by the [borrowers] without regard to" the SAVE plan. *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976). Consolidation entails various considerations that differ among borrowers.

*See* Fed. Student Aid, *Consolidating Student Loans*, [https://studentaid.gov/manage-loans/consolidation](https://studentaid.gov/manage-loans/consolidation) (last visited July 19, 2024) (listing possible benefits and disadvantages).  Plaintiffs' evidence fails to establish "who" is consolidating and, most critically, "*why*." *California v. Texas*, 593 U.S. 659, 677-78 (2021).  They claim (Mot. 27) to identify an increase in consolidations "right after Defendants announced in late January that they were forgiving loans," but such evidence proves nothing about the non-forgiveness provisions at issue here, which were published much earlier and implemented at different times.  Thus, plaintiffs have offered only "guesswork" insufficient to meet their burden.  *Murthy*, 144 S. Ct. at 1986.

Finally, to the extent that it would be appropriate now, for the first time, to consider plaintiffs' standing to challenge forgiveness under preexisting regulations that were not the subject of litigation in the district court, they have failed on that score as well.  The Supreme Court held in *Nebraska* that MOHELA suffered an injury in fact when it lost "fees that it otherwise would have earned" after the Secretary attempted to modify the terms of existing loans to eliminate student debt.  143 S. Ct. at 2364, 2366.  The district court in this case held that MOHELA suffered a similar injury when the Secretary implemented a provision of the Final Rule that

"accelerated loan forgiveness."  R. Doc. 35, at 36 (App.430).  But even assuming that holding was correct, plaintiffs do not challenge any such unexpected or "early loan forgiveness," *id.* at 37 (App.431), in this motion. Following the district court's injunction, the Department has ceased forgiving loans on the shortened timelines provided in the Final Rule and has reverted to prior regulatory provisions that authorize loan forgiveness after 20 or 25 years of payment.  Loan forgiveness (and the associated closing of accounts) on that timeframe has been a feature of ICR plans since they have existed.  Plaintiffs fail to show that continued application of rules that existed when MOHELA acquired the accounts would cause them any harm.[1]  Thus, they lack standing to challenge the Department's longstanding forgiveness practices.

---

[1] Plaintiffs' suggestion (Mot. 16) that they stand to lose $285 million in one year lacks foundation.  That figure assumes the immediate closure of every account that MOHELA services—including millions of accounts not enrolled in an ICR plan—regardless of how many years of payment remain.

**B.    Plaintiffs' Claims Lack Merit.**

    **1.    The Education Act Clearly Authorizes the Challenged Provisions of the Final Rule.**

Even assuming plaintiffs did have standing, their challenges to the Final Rule cannot succeed.  The Education Act grants the Secretary clear authority to set the terms and conditions of an ICR plan.

Since 1993, Congress has required the Department to offer "income contingent repayment" plans to borrowers of direct loans.  20 U.S.C. § 1087e(d)(1)(D).  Congress established the basic framework, defining ICR plans as having "varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years."  *Id.*  But Congress "empower[ed]" the Secretary "to prescribe rules to 'fill up the details.'"  *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024).  In particular, the Secretary must establish "[i]ncome contingent repayment schedules" and to "require payments that vary in relation to the *appropriate* portion of the annual income of the borrower … *as determined by the Secretary*."  20 U.S.C. § 1087e(e)(4) (emphases added).

That provision plainly authorizes the Secretary to "determine[]" the "appropriate portion of the [borrower's] annual income" for calculating

payments. 20 U.S.C. § 1087e(e)(4). In every ICR plan, the Secretary has exercised that authority by specifying the appropriate portion as a percentage of a borrower's discretionary income. *See* 80 Fed. Reg. at 67,239; 77 Fed. Reg. at 66,137; 59 Fed. Reg. at 61,698. In the original REPAYE plan, for example, the Secretary determined the appropriate portion to be "no more than 10 percent" of a borrower's discretionary income, defined as income above 150% of the federal poverty line. 80 Fed. Reg. at 67,239. In the Final Rule challenged here, the Secretary adjusted the threshold for discretionary income and reduced the portion of that income that would be appropriate to pay for undergraduate loans. 88 Fed. Reg. at 43,820, 43,901. Section 1087e(e)(4) clearly authorized that action. *See also* 20 U.S.C. § 1087e(e)(1) (directing the Secretary to "establish procedures for determining the borrower's repayment obligation").

Plaintiffs assert that "forgiveness actions" trigger the major-questions doctrine because they have "vast economic and political significance." Mot. 17. But the forgiveness provision of the Final Rule has already been enjoined, and plaintiffs do not argue that the provisions at issue in this motion have similar significance. Thus, even if the district court correctly applied the major-questions doctrine to the loan-forgiveness portion of the Final Rule, the

doctrine has no application here.  And regardless, the Department has clear

authority to implement the provisions at issue now, which simply adjust the

terms of a statutorily required repayment plan and do not forgive any debt.

*See Nebraska*, 143 S. Ct. at 2372 (recognizing the importance of "past practice

under" the relevant statutory authority).

To the extent that plaintiffs address the scope of the Secretary's

authority under the Education Act, they fare no better.  They argue (Mot. 18-

21) that the Act does not confer "authority to forgive principal and interest"

under an ICR plan.  But the district court already enjoined the Final Rule's

forgiveness provision, and there is no further relief this Court can offer as to

that provision now.  Regarding the Final Rule's amended income thresholds,

plaintiffs contend that the Secretary must require payments "large enough for

borrowers to actually repay within 25 years."  Mot. 24-25.  The text of

§ 1087e(e)(4) does not impose this full repayment requirement, but rather

expressly empowers the Secretary to "determine[]" the portion of a

borrower's income that is "appropriate"—a term that "leaves agencies with

flexibility," *Loper Bright*, 144 S. Ct. at 2264.  Moreover, payment schedules

dictated by the amount and term of the loan would no longer be "based on the

income of the borrower," 20 U.S.C. § 1087e(d)(1)(D), and would entirely defeat the purpose of ICR.

Finally, plaintiffs contend (Mot. 21) that the district court wrongly concluded "that Defendants—while forbidden from forgiving principal—could forgive monthly interest." In fact, the district court preliminarily enjoined "*any* further loan forgiveness for borrowers under the Final Rule's SAVE plan." R. Doc. 35, at 61 (App.455) (emphasis added). The district court did conclude, however, that plaintiffs were unlikely to succeed in their challenge to the Final Rule's interest benefit, which relates not to forgiveness but to how the balance on an existing loan is calculated. *See id.* at 42-43; 88 Fed. Reg. at 43,832-43,833 (explaining that borrowers would not be charged with any accrued interest not covered by their monthly payment). The Education Act "defines how to calculate the balance due on a loan repaid under an ICR plan" but "does not restrict the Secretary's discretion to define or limit the amounts used in calculating that balance." 88 Fed. Reg. at 43,832 ; *see also* 20 U.S.C. §§ 1087e(e)(1), 1221e-3. The Final Rule's interest benefit, which expanded a benefit provided under REPAYE, "reflect[s] the Secretary's judgment as to how that balance should be calculated." 88 Fed. Reg. at 43,832.

### 2. Plaintiffs Cannot Obtain Relief with Respect to Previously Adopted Rules.

**a.** In addition to an injunction concerning parts of the Final Rule, plaintiffs also ask this Court to enjoin the Department from forgiving loans pursuant to pre-existing regulations, not challenged in this lawsuit, that authorize forgiveness after 20 or 25 years of payment.

Plaintiffs' assertion (Mot. 22) that the Department is "evad[ing]" the preliminary injunction was properly rejected by the district court. The district court enjoined only the "implementation" of one provision of the Final Rule shortening the REPAYE plan's timelines to forgiveness for certain smaller loans. The injunction does not prohibit the Department from granting forgiveness pursuant to timelines that existed previously. Indeed, the district court expressly declared that its injunction does "not extend" "beyond the scope of the Final Rule" because plaintiffs "only sought injunctive relief from implementation of the Final Rule." R. Doc. 54 (App.498).

As a result, the status quo following the district court's injunction was that (1) the 1994 ICR and PAYE plans remained in effect, and (2) the REPAYE plan was partly amended and renamed, governed by the terms of the Final Rule *except* for the criteria regarding time to forgiveness, which

reverted to the terms of the original REPAYE plan. (This Court's administrative stay altered the second condition by preventing any implementation of the Final Rule, which necessitated that all SAVE borrowers be placed in forbearance.) That state of affairs did not reflect the adoption of some "new rule," Mot. 22, but rather the application of well-established severability principles. *See* R. Doc. 35, at 60 (App.454); 88 Fed Reg. at 43, 828.

Further, it is far too late for plaintiffs to introduce, for the first time on appeal, a claim against forgiveness rules that pre-dated the Final Rule. Nowhere in their complaint did plaintiffs challenge (or seek relief from) any of the pre-existing ICR plans. Nor did they do so in their request for preliminary relief. R. Doc. 7. Plaintiffs have at times suggested that some other loan-forgiveness plans are unlawful, *see, e.g.*, R. Doc. 1, at 10 (App.010). But such statements do not establish entitlement to extraordinary relief against agency actions not challenged in this lawsuit.[2]

---

[2] Plaintiffs assert that they "sought an injunction pending appeal" to stop the Department from applying pre-existing forgiveness rules. Mot. 15. Such relief is mentioned only in a single sentence at the end of a reply supporting a motion for clarification. R. Doc. 53, at 4 (App.493).

If plaintiffs had challenged any of those other plans, the Department would have compelling arguments in response, based on, for example, laches or the statute of limitations. *See, e.g., Corner Post, Inc. v. Board of Governors of the Fed. Reserve Sys.*, 144 S. Ct. 2440, 2447 (2024) (APA actions must be brought "'within six years after the right of action first accrues'"). After all, although plaintiffs waited nine months to challenge the SAVE Plan, they (hypothetically) would have waited nine *years* to challenge REPAYE, and even longer to challenge other plans.

**b.**  Similarly, plaintiffs cannot obtain an injunction preventing the Department from implementing *any* "ICR payment amounts that are too low for a borrower to fully repay within 25 years." Mot. 28.  If plaintiffs succeed in their challenge to the parts of the Final Rule amending REPAYE's payment schedules and interest benefit, then those provisions of the Final Rule will not go into effect.  Instead, the regulations adopted as part of the original REPAYE, PAYE, and 1994 ICR plans would remain in force. Plaintiffs never challenged any of those regulations in district court and cannot do so for the first time on appeal.

## II. The Remaining Factors Favor the Department.

### A. Plaintiffs Have Not Established Irreparable Injury.

The absence of irreparable injury is independently sufficient to deny an injunction pending appeal. "This is especially true when, as is the case here," this Court is "not the only court addressing" challenges to a policy. *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023).

As plaintiffs have not shown any Article III injury attributable to the administrative actions at issue in this motion, they necessarily have not shown irreparable harm. Even if they had, their "tenuous" standing theories, R. Doc. 35, at 39 (App.433), fall far short of the "clear showing," *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), necessary to obtain preliminary injunctive relief.

Plaintiffs' unexplained and unreasonable delay also negates their belated assertions of irreparable harm. *See Ng v. Board of Regents of the Univ. of Minn.*, 64 F.4th 992, 998 (8th Cir. 2023). The Department began implementing portions of the Final Rule—including the income-protection and interest-accrual provisions—in July 2023, nine months before plaintiffs brought this suit. As the district court stated in denying plaintiffs' motion for

an injunction pending appeal, that "delay in bringing this case undermines their request for immediate relief." R. Doc. 45, at 2 (App.469). This is especially true with respect to plaintiffs' challenge to forgiveness and payment provisions under repayment plans created 10-30 years ago.

## B. The Balance of the Equities Favors the Department.

In contrast, granting the requested injunction would cause irreparable harm to the government, its loan servicers, and borrowers. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (government and public interests "merge"). The Secretary signed the Final Rule 13 months ago. For over a year, the Department worked alongside its servicers to implement the provisions of the rule that were scheduled to take effect on July 1, 2024. Carter Decl. ¶ 5 (Add.2). That work was necessary because administering a repayment plan for millions of borrowers involves linking various "technically complex" database systems, which are used "to calculate payment amounts, send bills, and collect payments." *Id.* ¶ 12 (Add.4).

If the requested injunction were granted in full, the Department would have to devise an entirely new approach to ICR plans. At a minimum, the Department and its servicers would have to reprogram their systems, retrain their staff, and recalculate monthly payments. Carter Decl. ¶¶ 22-27 (Add.7-

8). That process would take at least several months, forcing the Department to place many borrowers into forbearance until servicers are able to bill them with the new amounts. *Id.* ¶¶ 28-33 (Add. 8-9).[3] And the Department would have to devote considerable time and resources to the reprogramming effort, which would detract from other critical priorities. *Id.* ¶ 35-37 (Add.10).

Borrowers would also stand to suffer significant and irreparable harm. Many have already received bills that reflect the decrease in monthly payments contemplated by the Final Rule. Carter Decl. ¶ 42 (Add.11). Many would experience intense confusion when they are told that their payments must be recalculated and that they must be placed in forbearance—which would delay any eventual loan forgiveness, including under programs not challenged here, like public interest service loan forgiveness. *Id.* ¶¶ 43-44 (Add.11-12). And many would suffer additional harm when they are sent vastly higher bills based on a brand-new requirement that loans on ICR

---

[3] Contrary to Plaintiffs' assertions (Mot. 27-28), the Department had not previously suspended payment obligations for all borrowers in the SAVE plan. Borrowers enrolled in SAVE received bills for July. A subset of borrowers was placed in a brief forbearance as part of the transition to lower payments, but the relief plaintiffs seek would require a new, widespread use of forbearance for a longer period of time and with more significant consequences for borrowers. Carter Decl. ¶ 49 (Add.13-14). Indeed, the Department has taken steps to place all SAVE borrowers into forbearance to comply with the Court's administrative stay order.

plans must be fully repaid within 25 years.  *Id.* ¶ 39 (Add.10-11).  Borrowers who chose such plans because they could not afford an extended payment plan without any forgiveness option "are likely to suffer financial hardship as a result and may fall into delinquency or default."  *Id.* ¶ 45 (Add.12).

Some of these harms are already taking place under the Court's administrative stay order.  The Department has been forced to move all 8 million borrowers on the SAVE plan into forbearance because it cannot implement the payment schedules adopted in the Final Rule.  Carter Decl. ¶ 48 (Add.13).  Time spent in this forbearance places borrowers in a worse position than they would otherwise be in and delays forgiveness (including under programs not challenged here, such as Public Service Loan Forgiveness).  *Id.* ¶ 44 (Add.12).  The Department cannot advise borrowers how long this forbearance will last or what their payment obligations will be when forbearance ends, which will lead to widespread confusion and risk of financial harm when forbearance finally ends.  *Id.* ¶ 48 (Add.13).

Against this backdrop, plaintiffs' speculative and minimal injuries come nowhere close to justifying the sweeping, burdensome injunction they seek. *See Winter*, 555 U.S. at 26 (even "serious" irreparable harms to the movant do not justify a preliminary injunction when outweighed by other equities).

Finally, the Court's recent administrative stay order prohibits the Department from implementing provisions of the Final Rule that are not part of the SAVE plan and have never been challenged in this litigation. Carter Decl. ¶ 47 (Add.12-13). At a minimum, such relief is overbroad. Any injunction pending appeal should be properly tailored to address the portions of the Final Rule that plaintiffs challenged and have standing to challenge.

## CONCLUSION

For the foregoing reasons, the Court should expedite its consideration of and deny the motion for an injunction pending appeal. If the Court does grant the motion, it should stay the injunction for at least ten days to permit the Solicitor General to seek relief from the Supreme Court, should she decide to do so.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

MICHAEL S. RAAB
THOMAS PULHAM
  *s/ Simon C. Brewer*
SIMON C. BREWER
SARAH N. SMITH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7529*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5367*
  *Simon.C.Brewer@usdoj.gov*

July 2024

**CERTIFICATE OF COMPLIANCE**

This response to a motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,197 words. It also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Expanded BT 14-point font, a proportionally spaced typeface.

Pursuant to Circuit Rule 28A(h)(2), I further certify that the brief has been scanned for viruses, and the brief is virus free.

*s/ Simon C. Brewer*
Simon C. Brewer

**CERTIFICATE OF SERVICE**

I hereby certify that on July 19, 2024, I electronically filed the

foregoing response to a motion with the Clerk of the Court for the United

States Court of Appeals for the Eighth Circuit by using the appellate

CM/ECF system. Service will be accomplished by the appellate CM/ECF

system.


 *s/ Simon C. Brewer*
Simon C. Brewer

# ADDENDUM

## TABLE OF CONTENTS

Declaration of Denise L. Carter ................................................................. Add.1

20 U.S.C. § 1087e (excerpts) .................................................................... Add.15

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

STATE OF MISSOURI, *et al.*,

                *Plaintiffs-Cross Appellants*,

         v.

JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,

                *Defendants-Appellants*.

Case Nos. 24-2332, 24-2351

## DECLARATION OF DENISE L. CARTER

I, Denise L. Carter, do declare under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and accurate:

1. I am the Principal Deputy Chief Operating Officer and Acting Chief Operating Officer at Federal Student Aid ("FSA") in the United States Department of Education. In this role, my responsibilities include the coordination of major policies, programs, and activities related to federal student aid. This includes, but is not limited to, overseeing the administration of the student loan programs, including the SAVE plan. As such, I am familiar with the systems and processes used to administer the SAVE plan and other loan repayment plans. I make this declaration based on my personal knowledge and based on information provided to me in my official capacity.

2. As described below, student loan repayment involves multiple complex systems that require many steps and significant time to create and change. Small changes affect many people and systems; large changes, even more so.

3. The injunction that plaintiffs request would affect every single one of the nearly 8 million borrowers on SAVE, and any determination that ICR plans do not lead to forgiveness would affect every borrower on every ICR plan. If the provisions related to the protected income threshold and the existing payment amounts are enjoined, then nearly everyone making more than the prior protected income threshold— updated almost a year ago—would pay more each month. If the interest benefit is also enjoined, then even the people below the prior protected income threshold, whose

payments would not change, would see changes to their balances as interest balloons over time. If the pre-SAVE forgiveness provisions are enjoined, it will cause significant confusion and administrative disruption for borrowers who have been working toward forgiveness on longer timelines since the ICR plan was created 30 years ago.

4. Complying with the injunction that the plaintiffs request will require the Department, its vendors, and the loan servicers to implement significant technical changes to their student loan database systems. These significant technical changes would be required to comply with the requested injunction's application to the SAVE plan's provisions related to the threshold of protected income, the interest benefit, and the provisions related to monthly payment amounts—all of which are already in effect.

5. For nearly a year, these systems have been operating with programming that reflects the protected-income threshold and interest benefit provisions that took effect July 30, 2023. The systems have also already been programmed to implement the SAVE provisions that took effect on July 1, 2024, which required over a year of preparation. Complying with the plaintiffs' requested injunction will entail reprogramming all the systems that process new enrollees in Income Driven Repayment ("IDR") plans. This process would take at least several months and would be costly. For example, the Department would have to halt electronic applications for IDR and for consolidation loans, during which time the Department would only be able to accept paper applications. The Department and its loan servicers would also have to reprogram their systems to recalculate SAVE borrowers' monthly payment amounts and to change the way the servicers' systems process payments. This would be a time-consuming, costly, and disruptive process, during which the Department would be required to put all impacted borrowers into forbearance. Overall, these compliance measures would create significant disruptions to loan servicing, require wasteful and costly stop-gap measures, and create widespread borrower confusion.

A.     **Loan Servicing & Repayment Plans**

6. Administering a borrower's loan on an IDR Plan such as SAVE begins with the borrower choosing a repayment plan and submitting information to FSA to determine eligibility and the terms of repayment. This is the process for new enrollees going forward. There is another process for transitioning the repayment plans of current SAVE enrollees described in paragraph 21 below. For new enrollees, applications are often submitted through StudentAid.gov and then processed through the Department's Digital and Customer Care ("DCC") platform. DCC is a system that is maintained by FSA through a vendor.

7. The next step is to determine the borrower's eligibility for her chosen repayment plan and the terms of repayment. This includes determining the amount of the borrower's income that is protected from payments and the borrower's monthly payment amount.

8. For Direct loan borrowers who consent to FSA obtaining their tax data from the Internal Revenue Service, this step takes place by processing the borrower's application information through database systems maintained by FSA. These are:

    a. The Common Origination and Disbursement ("COD") system, which is the Department's system that facilitates the disbursement of loans. COD is maintained by FSA through a vendor.

    b. The National Student Loan Database System ("NSLDS"), which is a database system that records and stores information about federal student loans and grants. NSLDS is maintained by FSA through a vendor.

    c. The Federal Tax Information Module ("FTIM"), which is a system that securely pulls information from the IRS and uses that information to make income- and repayment-related calculations. The FTI module is maintained by FSA through a vendor. The database system from which the FTI module pulls tax information is maintained by the IRS.

9. For borrowers who do not use the automated process, the borrower submits records with income-related information directly to the servicer, which processes these records to determine eligibility for her chosen repayment plan, the amount of the borrower's income that is protected from payments, and the borrower's monthly payment amount.

10. For Direct loan borrowers who apply through the automated process, once the eligibility and repayment determinations described in paragraphs 7-8 above are completed, the borrower's information is packaged and sent to the borrower's servicer in a data file. For borrowers who do not apply through the automated process, these determinations are made by the servicer. At this point, the tasks of servicing the loan then fall to the borrower's servicer, contracted by the Department to administer many aspects of the federal student loan programs.

    a. The servicer processes the repayment-plan details, confirms the borrower's eligibility for the plan, and communicates with the borrower to confirm the plan.

    b. Then the servicer begins managing the borrower's repayment. This includes:

        i. calculating monthly payment amounts;

> ii. sending borrowers bills, collecting payments, and applying payments to the borrower's account and loan balance;
>
> iii. interacting with borrowers to provide them information and support; and
>
> iv. maintaining borrower accounts, including information about the loan status and progress toward any eligible forgiveness program.

c. The servicer also regularly updates NSLDS throughout these processes.

11. The Department currently employs five student loan servicers that service student loan borrowers, including SAVE enrollees. One recently-added servicer services a total of about 41,000 borrowers, and each of the others services between 7 and 14 million borrowers.

12. To complete the tasks described in paragraphs 6-10, the Department and servicers rely on database systems. These systems are technically complex in their own right, as are the bridges linking them together (that is, between servicers' databases and the Department's). To implement a repayment plan, the Department and its servicers write a considerable volume of computer code that is specific to each repayment plan. That is, when a borrower who opts to use IRS data selects a particular plan on StudentAid.gov, the relevant information is recorded in DCC; then that information is processed through COD, NSLDS, and the FTIM, which includes FTIM pulling any relevant tax information from the IRS; the result of that processing is a determination that the borrower is eligible for the selected repayment plan under certain terms; that information is packaged in a data file and sent to the servicer; and the servicer uses that information to calculate payment amounts, send bills, and collect payments. Each system (and the interfaces between them) contains computer code for each available payment plan so that the borrower gets billed the right amounts and so, eventually, the loan is processed according to the right plan.

13. To make changes in those systems, the Department proceeds through a "change-request" (CR) process with specific parameters required by contract. The CR process is a multi-step process that involves FSA drafting requirements and an Independent Government Cost Estimate ("IGCE") and issuing a CR to the vendor; an iterative question-and-answer process to reach consensus with the vendor on the CR's requirements; an impact analysis and cost proposal from the vendor that estimates the time and cost needed to implement the CR; FSA securing funding; and FSA finalizing the CR. Once the CR is finalized, FSA gives the vendor the authority to proceed with implementing it. The Department must use this same process to instruct the servicers to change or add to the functions they perform.

**B.     Implementation of SAVE & the Final Rule**

14. The Department, its vendors, and the loan servicers have already undertaken a considerable amount of work to design, program, and test their systems to implement provisions of the Final Rule and the SAVE plan that would be affected by the injunction that plaintiffs request.  These provisions have already gone into effect and have been woven into the software for the systems described above.

15. The provisions related to the threshold of protected income were designated in the Final Rule for early implementation on July 30, 2023.  These provisions went into effect on that date and are not subject to the district court's preliminary injunction, but are currently administratively stayed under this Court's order.

    a.   This threshold is reflected in the IDR application process and has been woven into the programming of the systems that process intake, plan eligibility, plan details, and monthly payment amounts, which are described in paragraphs 6-9 above.

    b.   Since July 30, 2023, this is the protected-income threshold used to generate the monthly payments of all borrowers currently enrolled in SAVE.

16. The interest-benefit provisions were designated in the Final Rule for early implementation on July 30, 2023.  These provisions went into effect on that date and are not subject to the district court's preliminary injunction, but are currently administratively stayed under this Court's order.

    a.   For borrowers eligible for the interest benefit, it is applied by the borrower's servicer each time the borrower makes a payment as described in paragraph 10.b.ii above.

    b.   The servicers' systems have been programmed to apply the interest benefit to eligible borrowers' payments and have been doing so since July 30, 2023.

17. The Department, its vendors, and the loan servicers undertook a considerable amount of work to design, program, and test their systems to reimplement provisions of the Final Rule and the SAVE plan that went effect on July 1, 2024, and especially the 5% payment provision. The Department and its vendors have prepared the systems so that borrowers' repayment plans transition to the new SAVE provisions that took effect July 1.  The servicers programmed their systems to begin calculating new payment amounts for SAVE enrollees for the month of July, both existing and new SAVE enrollees.  The servicers have already been recalculating existing SAVE borrowers' payment amounts to reflect the 5% rate that SAVE provides instead of the previous rate.  For many borrowers, the servicers' systems have already recalculated and

implemented their new rate for July 2024 payments, and the servicers' systems are processing the remaining borrowers' rates regularly. Borrowers whose rates have been recalculated have already received bills for July or August that reflect the new payment amount.

18. The Department, its vendors, and the loan servicers also undertook a considerable amount of work to design, program, and test their systems to make the SAVE Plan available to borrowers who want to enroll in or switch to the plan. To do this, the Department, its system contractors, and its servicers utilized the CR process to create functionalities in all the above-referenced systems according to SAVE's particular terms. In all, the engineering and testing processes required to coordinate and operationalize the systems under SAVE's parameters took more than a year. More specifically, the development process required designing the platform and determining the necessary requirements for a vendor to build the platform; documenting these requirements in instructions to the vendor through a contractual change-request process; working with the vendor to develop the platform; overseeing the vendor's implementation of the platform; and testing all of the systems to ensure they operate and interact properly through an application programming interface (API).

19. FSA and its vendors have been working to build systems that accommodate the SAVE provisions that took effect July 1, 2024, since the draft plan was first announced in January 2023, and have been working to implement SAVE's specific repayment provisions since the rule was finalized in July 2023. That is, it has required more than a year of work on the relevant systems' functionalities so that when a borrower enrolls in SAVE, the repayment plan administered is consistent with current regulations. In tandem with these technical and engineering steps required to implement SAVE, the Department and its servicers have trained their staff and customer service representatives on the new regulations and new systems.

20. FSA had to undergo the same process with each servicer. FSA provided CRs to each of the servicers to implement these changes. The servicers provided time and cost estimates to FSA, which FSA approved or negotiated and then approved. The servicers then updated their systems and trained their staff and customer service representatives.

21. The Department, its vendors, and the loan servicers also undertook a considerable amount of work to design, program, and test their systems to transition existing SAVE borrowers to updated repayment terms. For these borrowers, the servicers programmed their systems to begin calculating new payment amounts for the month of July 2024 that also incorporate the 5% rate provided by the SAVE provisions that

went into effect on July 1, 2024. The programming to calculate these payment amounts also incorporates the increased income protection threshold already in effect for almost a year. Borrowers enrolled in SAVE have already received bills with a payment amount calculated using the existing protected-income threshold and the 5% rate and have begun making payments at their new rate.

## C.    Compliance with the Requested Injunction & Resulting Harms

22. To comply with the requested injunction, the Department, its vendors, and the loan servicers would have to undertake emergency changes that would be disruptive, costly, and time-consuming and that would pose numerous administrative impracticalities.

23. To change the existing protected-income threshold and revert to a previous threshold, the Department and its vendors would have to reprogram the electronic application for IDR and reprogram all of the systems that process intake, plan eligibility, plan details, and monthly payment amounts, which are described in paragraphs 6-9. The reprogrammed systems would also have to undergo considerable testing to ensure that borrowers' payment amounts are calculated accurately.

24. To change the interest-benefit that is applied to eligible borrowers' payments and revert to the previous approach, the servicers would have to reprogram their systems. This would require undergoing the CR process in which the Department issues each servicer a CR, responds to their questions, approves cost estimates, and allocates funding. It would also require detailed testing to ensure borrowers' payments are processed accurately and interest benefit amounts and balances are correct.

25. To change the system for new enrollees, FSA would first need to reprogram its own computer systems, such as NSLDS, FTIM, DCC and COD, to establish each borrower's repayment plan eligibility and payment amount according to the parameters for prior payment plans and that were not built into the functionalities that have been created to implement the FUTURE Act, a law that permits the Department to obtain federal tax information more directly. This would require submitting CRs to vendors, responding to their questions, approving their cost estimates, and providing them authority to proceed. The vendors would then need to craft their own system requirements, program the systems for the new payment plan criteria, and do the required testing. Once FSA's internal systems were reprogrammed, FSA would need to communicate its determination concerning borrower eligibility and repayment amount to servicers.

26. FSA would also need to communicate the new system requirements to servicers, who would need to update their computer systems by going through the full new cycle of

development.  This would include CRs cost estimates, providing them with Authority to Proceed (ATPs), crafting new system requirements, programming, and testing. The servicers would also need to write new manuals and train their staff.

27. After the servicers had reprogrammed their systems, servicers would need to test them against FSA systems.  Servicers would also need to notify the borrowers of their new repayment terms.

28. Reprogramming the relevant systems and calculating the new rates would take at least several months. This is so because all of FSA's and servicers' systems had to be programmed to match the new SAVE requirements and would need to be reprogrammed to revert back to the pre-SAVE rates.  If plaintiffs' request to require all ICR payments at an amount that would repay loans in full within 25 years, this would involve significantly more changes to all ICR plans.

29. In order to bring the process for new enrollees into compliance with the injunction that plaintiffs request, the Department would have to halt the electronic submissions of IDR applications and the electronic applications for consolidation loans, because these processes and the systems that facilitate them are all programmed to account for the existing protected-income threshold and repayment rates.  During that time the Department would only be able to accept paper applications for IDR and consolidations.

30. The Department would also be forced to make significant changes for borrowers who are already enrolled in SAVE.

   a.  Because payment amounts of all borrowers currently enrolled in SAVE reflect the already-implemented income threshold, the Department would have to recalculate payment amounts for all of these borrowers.

   b.  Recalculating these borrowers' payment amounts in order to collect accurate payments, including changes to both the income threshold and for some borrowers, the percentage of discretionary income due, would require a change carried out through the CR process and cannot be done on a short timeframe.

   c.  The Department cannot simply change a borrower's payment and collect a new payment immediately and without notice.  In addition to the time needed for these new payment amounts to be recalculated, to demand the new payment amount, these borrowers must be given notice weeks in advance so that they know the accurate amount to pay.

31. As a result of these administrative impracticalities during the time it would take the Department and its servicers to recalculate monthly payments and bill borrowers with the correct amounts, the Department would be required to keep all borrowers on SAVE in forbearance. *See* paragraphs 32-33, 38, below. Rapid changes to systems can lead to erroneous billing, and without such a forbearance, the Department would be unable to bill these borrowers at the appropriate amount and would be unable to avoid even greater borrower confusion.

32. During this period of forbearance, although interest will not accrue, these borrowers would not be required to make payments and would not have this forbearance time counted toward IDR forgiveness or Public Service Loan Forgiveness.

33. The process of conforming the Department's and servicers' database systems to the modified repayment rules applicable under the requested injunction, alongside the forbearance necessary while that process is ongoing, would cause significant and irreparable harm to the Department, its servicers, and borrowers.

34. Finally, in order to comply with the requested injunction's prohibition on forgiving principal for enrollees in the SAVE plan even on the pre-existing timeline for forgiveness, the Department would have to undertake measures that would cause significant confusion for borrowers and introduce considerable administrative uncertainty into these borrowers' repayment status.

   a. There are many borrowers currently enrolled in SAVE who were previously enrolled in the REPAYE payment plan.

   b. Most of these borrowers enrolled in this plan before the SAVE plan was conceived of or announced. Under the terms of the prior repayment plan that these borrowers enrolled in, borrowers with only undergraduate loans who make payments for 20 years are to have the remainder of their balances forgiven after that 20-year milestone and borrowers with any graduate loans who make payments for 25 years are to have the remainder of their balances forgiven after their 25-year milestone.

   c. There are many borrowers who are approaching their forgiveness milestones under the terms of pre-existing regulations before the amendments published by the Department in July 2023.

   d. If the plaintiffs' requested injunction is entered, the Department would be prohibited from carrying out the forgiveness terms of the repayment plans under the pre-existing regulations.

e.  It is not possible to place these borrowers into a standard repayment plan after they have already been in REPAYE for 10 years or more. *See* 20 U.S.C. § 1087e(d)(1)(A) (incorporating 20 U.S.C. § 1078(b)(9)(A)(i) ("a standard repayment plan, with a fixed annual repayment amount paid over a fixed period of time, not to exceed 10 years"); 34 C.F.R. § 685.210(b)(2)(i) (providing that a borrower may not change to a repayment plan with a repayment period less than the number of years the borrower has been in repayment)).

**D.  Costs to the Department and Servicers**

35. Complying with the requested injunction would cause the Department to incur significant additional costs—some of the same types of costs it has already incurred in implementing the SAVE plan.

36. Rebuilding the framework to comply with the plaintiffs' requested injunction would consume considerable staff time, interfering with other critical Department priorities including: the launch of the 2025-26 FAFSA Form; implementing the IDR payment count adjustment; managing the transition to the USDS servicing platform, which is the first such transition in years; and implementation of the Gainful Employment and Financial Value Transparency rules.

37. Reprogramming the Department's systems would also affect millions of other student loan borrowers not on SAVE because of interdependencies across systems. For example, the system that counts time toward SAVE forgiveness also affects the forgiveness count for other IDR plans.

**E.  Costs to Borrowers**

38. The steps required to comply with the requested injunction would cause intense confusion and hardship among borrowers, stemming from several sources.

39. A significant cohort of borrowers who would be harmed are borrowers who enrolled in REPAYE before SAVE and who are approaching their milestones for forgiveness as described in paragraphs 34 above.

a.  These borrowers have relied on having the remaining balance of their loans forgiven after having made the requisite number of payments to reach their applicable milestone.

b.  To comply with the requested injunction, the Department would be prohibited from delivering the forgiveness that these borrowers were promised and have relied on since enrolling in their repayment plan or SAVE.

c.  In addition, the Department would also be prohibited by law from placing borrowers who have been in repayment for more than ten years back into a standard repayment plan. *See* 20 U.S.C. § 1087e(d)(1)(A) (incorporating 20 U.S.C. § 1078(b)(9)(A)(i) ("a standard repayment plan, with a fixed annual repayment amount paid over a fixed period of time, not to exceed 10 years"); 34 C.F.R. § 685.210(b)(2)(i) (providing that a borrower may not change to a repayment plan with a repayment period less than the number of years the borrower has been in repayment)). Borrowers with less than ten years in repayment who reenter standard repayment may face extraordinary monthly payment amounts.

d.  As a result of the injunction, the status of these borrowers' loans would be in considerable doubt.

e.  In order to address this confusing status, the Department would be forced to take last-minute, stop-gap measures for these borrowers that would be administratively disruptive to the Department and cause significant confusion and harm to affected borrowers.

40. In addition to the harm to these borrowers, complying with the plaintiffs' requested injunction would cause additional confusion and harm.

41. The Final Rule, and the details in it about the SAVE plan, was published in July 2023, creating expectations among borrowers that its provisions—including lower payments—will go into effect.  These expectations would not be met if borrowers are placed into forbearance and eventually (after forbearance is completed) charged many times what they expected to pay monthly in some cases based on the requested injunction's terms that would require full repayment within 25 years.  These payment amounts would be catastrophic for borrowers, likely leading many to default. The removal of the interest benefit by the requested injunction would also add significantly to the amount to be repaid for many borrowers.

42. It would be an especially confusing situation for borrowers who have already received billing notices for July and August 2024.  There will also be confusion for those who have already had the benefit of the increased income protection threshold and interest benefit for almost a year.

43. The confusion experienced by borrowers would cause significant difficulties for servicers (already burdened by the technical adaptations required to update their database systems) as they are overwhelmed with email and phone inquiries from borrowers seeking information about the modified terms of SAVE under the

requested injunction. This difficulty would, in turn, make it harder for borrowers to get accurate and timely information from servicers.

44. This injunction-related forbearance would harm borrowers because months spent in forbearance would not count toward forgiveness under IDR plans or Public Service Loan Forgiveness, thus delaying any eventual loan forgiveness.

45. Once these borrowers exit forbearance, many would suffer financial hardship. Borrowers enrolled in SAVE have relied on the increased income protection in the SAVE Final Rule since July 30, 2023. As explained in the next paragraph, it is not clear how such unprecedented changes would affect a specific borrower's payment, but between stripping out the added payment protections of SAVE and the uncertain effects of completely reinterpreting the meaning and structure of IDR plans, I would anticipate that many borrowers would see their payments rise quite substantially, perhaps even astronomically. These borrowers are likely to suffer financial hardship as a result and may fall into delinquency or default.

46. Because the Department has always interpreted ICR plans to provide forgiveness at the end of the term of repayment, it is unclear how the proposed injunction requiring full repayment within 25 years would affect these borrowers' remaining payments. And, certainly, there is no code available at this time to implement such an unprecedented rule. Many of these borrowers would see their monthly payments rise, possibly quite substantially. For example, a borrower in repayment for 23 years could, under plaintiffs' theory, be placed on a repayment plan that requires them to repay their entire balance in 2 years. That would easily turn into payments that are thousands of dollars a month and bears little if any relationship to the borrower's income.

## F.     Compliance with the July 18, 2024 Order

47. Compliance with the stay and with the requested injunction will also frustrate several additional features of the rule for borrowers in all ICR plans.

   a. This Court's administrative stay "prohibit[s] the appellees from implementing or acting pursuant to the Final Rule until this Court rules on the appellants' motion for an injunction pending appeal." But if this Court were to convert its administrative stay into an injunction pending appeal, complying with that injunction would also significantly impact many borrowers who are not enrolled in SAVE, because many elements of the Final Rule apply to other or multiple IDR plans. There are many provisions of the rule that are not part of the SAVE plan itself and have significant effects on the non-SAVE IDR plans, and those would also be affected.

b. For instance, non-SAVE-specific aspects of the Final Rule include credit toward forgiveness in all IDR plans for borrowers who are in deferment on their loans while receiving treatment for cancer or serving in the military.

c. Another non-SAVE-specific change is a statutorily-mandated provision to allow automatic recertification of borrower income on all IDR plans. *See* 20 U.S.C. 1087e(e)(8) (added by Pub. L. 116-91 (Dec. 19, 2019)).

d. Other non-SAVE-specific provisions in the Final Rule include but are not limited to:

    i. Providing borrowers who are diligently making payments on their confirmed bankruptcy plans credit toward loan forgiveness.

    ii. Changing how payments prior to a loan consolidation are counted so that borrowers do not lose all credit toward IDR forgiveness if they consolidate.

48. Already, to comply with the Order issued by the Court on July 18, 2024, which prohibits the Department from "implementing or acting pursuant to the Final Rule," the Department must take multiple administrative steps that are complex, costly, and disruptive to both the Department and to student loan borrowers.

a. Because payment amounts of all borrowers currently enrolled in SAVE reflect the already-implemented income threshold, the Department has taken steps to place all 8 million SAVE borrowers in forbearance. This forbearance time will not count toward IDR forgiveness or Public Service Loan Forgiveness. This will cause substantial confusion and concern, and will extend borrowers' time in repayment.

b. The Department has removed the online application for IDR and consolidation loans from its website, because, until it can be reprogrammed, that application would provide borrowers incorrect information about what monthly payments they would have on various plans.

c. The Department is instructing servicers to continue their current practice, adopted in compliance with the district court's preliminary injunction, of not processing any loan forgiveness on the shortened timelines provided for in the Final Rule.

49. Separately, a subset of SAVE borrowers were placed in a brief forbearance for a different reason. Beginning in late May 2024, FSA and servicers were not able to

finish setting up and testing the coding and processing the information needed to provide borrowers their new payment amounts in time to get correct bills to every borrower by their July 2024 bill send date. Borrowers who could therefore not get a correct bill in time for their July bill send date (commonly 22 to 28 days before their payment due date) were placed in a brief forbearance—typically for one to two months—until they could be correctly billed at the new amount. That was an administrative forbearance to transition them to their new payment amount; no interest was due, and the month was counted toward PSLF and IDR forgiveness. Some borrowers' billing statements were not delayed at all. Other borrowers who were in this recalculation forbearance have since been or would otherwise soon be billed at the correct amount.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of July 2024.

_Denise L Carter_
Denise L. Carter

**20 U.S.C. § 1087e (excerpts)**

**§ 1087e. Terms and conditions of loans**

. . .

**(d) Repayment plans**

  **(1) Design and selection**

    Consistent with criteria established by the Secretary, the Secretary shall offer a borrower of a loan made under this part a variety of plans for repayment of such loan, including principal and interest on the loan. The borrower shall be entitled to accelerate, without penalty, repayment on the borrower's loans under this part. The borrower may choose—

    **(A)** a standard repayment plan, consistent with subsection (a)(1) of this section and with section 1078(b)(9)(A)(i) of this title;

    **(B)** a graduated repayment plan, consistent with section 1078(b)(9)(A)(ii) of this title;

    **(C)** an extended repayment plan, consistent with section 1078(b)(9)(A)(iv) of this title, except that the borrower shall annually repay a minimum amount determined by the Secretary in accordance with section 1078(b)(1)(L) of this title;

    **(D)** an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years, except that the plan described in this subparagraph shall not be available to the borrower of a Federal Direct PLUS loan made on behalf of a dependent student; and

    **(E)** beginning on July 1, 2009, an income-based repayment plan that enables borrowers who have a partial financial hardship to make a lower monthly payment in accordance with section 1098e of this title, except that the plan described in this subparagraph shall not be available to the borrower of a Federal Direct PLUS Loan made on behalf of a dependent student or a Federal Direct Consolidation Loan, if the proceeds of such loan were used to discharge the liability on such Federal Direct PLUS Loan or a loan under section 1078–2 of this title made on behalf of a dependent student.

. . .

**(e) Income contingent repayment**

**(1) Information and procedures**

The Secretary may obtain such information as is reasonably necessary regarding the income of a borrower (and the borrower's spouse, if applicable) of a loan made under this part that is, or may be, repaid pursuant to income contingent repayment, for the purpose of determining the annual repayment obligation of the borrower. Returns and return information (as defined in section 6103 of title 26) may be obtained under the preceding sentence only to the extent authorized by section 6103(l)(13) of title 26. The Secretary shall establish procedures for determining the borrower's repayment obligation on that loan for such year, and such other procedures as are necessary to implement effectively income contingent repayment.

**(2) Repayment based on adjusted gross income**

A repayment schedule for a loan made under this part and repaid pursuant to income contingent repayment shall be based on the adjusted gross income (as defined in section 62 of title 26) of the borrower or, if the borrower is married and files a Federal income tax return jointly with the borrower's spouse, on the adjusted gross income of the borrower and the borrower's spouse.

**(3) Additional documents**

A borrower who chooses, or is required, to repay a loan made under this part pursuant to income contingent repayment, and for whom adjusted gross income is unavailable or does not reasonably reflect the borrower's current income, shall provide to the Secretary other documentation of income satisfactory to the Secretary, which documentation the Secretary may use to determine an appropriate repayment schedule.

**(4) Repayment schedules**

Income contingent repayment schedules shall be established by regulations promulgated by the Secretary and shall require payments that vary in relation to the appropriate portion of the annual income of

the borrower (and the borrower's spouse, if applicable) as determined by the Secretary.

**(5) Calculation of balance due**

The balance due on a loan made under this part that is repaid pursuant to income contingent repayment shall equal the unpaid principal amount of the loan, any accrued interest, and any fees, such as late charges, assessed on such loan. The Secretary may promulgate regulations limiting the amount of interest that may be capitalized on such loan, and the timing of any such capitalization.

. . .

. . . .