# IN THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

———————————————

STATE OF MISSOURI, ET AL.,
*Plaintiffs-Appellees/Cross-Appellants*

v.

JOSEPH R. BIDEN, JR., ET AL.,
*Defendants-Appellants/Cross-Appellees*

———————————————

On Appeal from the United States District Court
for the Eastern District of Missouri
No. 4:24-cv-00520-JAR

———————————————

**BRIEF OF AMICUS CURIAE
STUDENT BORROWER PROTECTION CENTER\*
IN SUPPORT OF APPELLANTS**

———————————————

Persis S. Yu
R. T. Winston Berkman-Breen
David S. Nahmias
STUDENT BORROWER PROTECTION CENTER\*
1025 Connecticut Ave NW, #717
Washington, DC 20036
(202) 670-3871
persis@protectborrowers.org
winston@protectborrowers.org
david.nahmias@protectborrowers.org
*Counsel for Amici Curiae*

*\* A fiscally sponsored project of the
Shared Ascent Fund*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Civil Procedure 26.1(a), the undersigned counsel states that amicus curiae Student Borrower Protection Center is a fiscally sponsored project of the Shared Ascent Fund, which is a nonprofit organization. The Shared Ascent Fund has no parent corporations, and no publicly held corporation owns 10% or more of its stock.

*/s/ David S. Nahmias*
David S. Nahmias

*Counsel for Amici Curiae*

i

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS .......................................................................... ii

TABLE OF AUTHORITIES ..................................................................... iv

INTERESTS OF AMICUS CURIAE .............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1

ARGUMENT ...................................................................................6

I.    THE SAVE PLAN BENEFITS MILLIONS OF BORROWERS
BY INCREASING AFFORDABILITY AND SIMPLIFYING
THE COMPLICATED FEDERAL STUDENT LOAN
PROGRAM. ..............................................................................6

    A.    The Federal Student Loan Program, Including Income-
Driven Repayment Plans, Is Intended To Expand Access
To Affordable Higher Education. ....................................7

    B.    The Final Rule Serves Critical Salutary Ends To Help
Ease Rising Unaffordability And Simplify The Income-
Driven Repayment Plan System. ..................................11

II.    THE INJUNCTIONS IN THIS CASE CREATE
CONSIDERABLE UNCERTAINTY AND HARM TO
BORROWERS AND THE STUDENT LOAN SYSTEM. ...................14

    A.    Because Of The Injunctions, Borrowers Cannot Make
Fundamental Decisions About Their Loan Repayment At
A Time When Millions Must Do Exactly That. ...........................15

    B.    The Injunctions Pose Particular Harms To Borrowers
Facing Delinquency And Default. ..................................17

    C.    The Injunctions Create A Great Administrative Burden
For Student Loan Servicers, Jeopardizing The Stability
Of The Student Loan System Itself. ..............................20

Appellate Case: 24-2351    Page: 3    Date Filed: 08/26/2024 Entry ID: 5428260

III. THE EQUITIES FAVOR KEEPING INCOME-DRIVEN REPAYMENT PLANS, INCLUDING THE SAVE PLAN, INTACT..................................................................................24

CONCLUSION ..................................................................................29

CERTIFICATE OF COMPLIANCE ....................................................30

CERTIFICATE OF SERVICE.............................................................31

Appellate Case: 24-2351    Page: 4    Date Filed: 08/26/2024 Entry ID: 5428260

# TABLE OF AUTHORITIES

## CASES

*Ariz. Christian Sch. Tuition Org. v. Winn*,
  563 U.S. 125 (2011)................................................................28

*ASARCO Inc. v. Kadish*,
  490 U.S. 605 (1989)................................................................27

*Bernhardt v. Los Angeles Cty.*,
  339 F.3d 920 (9th Cir. 2003)....................................................25

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023)..............................................................6

*Borough of Duryea, Pa. v. Guarnieri*,
  564 U.S. 379 (2011)................................................................26

*Brannan v. United Student Aid Funds, Inc.*,
  94 F.3d 1260, 1264 (9th Cir. 1996)...........................................26

*Cliff v. Payco Gen. Am. Credits, Inc.*,
  363 F.3d 1113 (11th Cir. 2004)..................................................7

*Dakotans for Health v. Noem*,
  52 F.4th 381 (8th Cir. 2022)......................................................2

*Dep't of Agric. Rural Hous. Rural Dev. Serv. v. Kirtz*,
  601 U.S. 42 (2024)...............................................................8, 11

*Educ. Assistance Corp. v. Cavazos*,
  902 F.2d 617 (8th Cir. 1990).....................................................26

*Labickas v. Ark. State Univ.*,
  78 F.3d 333 (8th Cir. 1996)........................................................8

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997)..................................................................6

iv

*Missouri v. Biden*,
    2024 WL 3104514 (E.D Mo. June 24, 2024)..........................................25, 27

*Missouri v. Biden*,
    2024 WL 3738157 (8th Cir. Aug. 9, 2024)...................................................2

*Morehouse Enters., LLC v. ATF*,
    78 F.4th 1011 (8th Cir. 2023)..........................................................2, 24

*R.I. Higher Educ. Assistance Auth. v. Dep't of Educ.*,
    929 F.2d 844 (1st Cir. 1991) ............................................................7

*TD Bank N.A. v. Hill*,
    928 F.3d 259 (3d Cir. 2019)............................................................25

*United States v. Oakland Cannabis Buyers' Co-op.*,
    532 U.S. 483 (2001)....................................................................27

*Walker v. Lockhart*,
    678 F.2d 68 (8th Cir. 1982).........................................................2, 6

*Winter v. NRDC*,
    555 U.S. 7 (2008) ....................................................................5, 24

## STATUTES

20 U.S.C. § 1070(a).......................................................................7
        § 1087a(a)(1) ....................................................................7
        § 1087e(d)(1) ....................................................................9
        § 1087e(d)(1)(d) .................................................................7
        § 1087f(b)(4) ...................................................................21
        § 1221-1(2) ......................................................................7

Pub. L. 89-329, 79 Stat. 1232 (1965) ......................................................7

## REGULATIONS

12 C.F.R. pt. 1090 ......................................................................23

Appellate Case: 24-2351    Page: 6    Date Filed: 08/26/2024 Entry ID: 5428260

20 U.S.C. § 1087f ...................................................................................23

34 C.F.R. § 685.209(a) .......................................................................9, 10
     § 685.209(b) .........................................................................10
     § 685.209(c)(4)(iv) ..........................................................12, 17
     § 685.209(c)(5)(iv) ..........................................................12, 17

Improving Income Driven Repayment for the William D. Ford
     Federal Direct Loan Program and the Federal Family
     Education Loan (FFEL) Program,
     88 Fed. Reg. 43,820 (July 10, 2023) .................................... passim

## RULES

Fed. R. App. P. 29(a) ...............................................................................1

## OTHER AUTHORITIES

@Nelnet, X (Dec. 19, 2023, 1:43 P.M.) ...................................................18

11A Wright & Miller, *Federal Practice & Procedure* § 2948.4
     (3d ed. 2025) ........................................................................27

Am. Fed'n of Teachers & SBPC, *The MOHELA Papers* (Feb. 2024) ....................21

*Calculate Your Federal Student Loan Repayment Options with Loan
     Simulator*, FSA ................................................................10

CFPB, *Student Loan Servicing: Analysis of public input and
     recommendations for reform* (Sept. 2015) ....................................21

Commc'ns Workers of Am. & SBPC, *Customer Disservice: Examining
     Maximus, the federal contractor that just became the largest
     student loan company in the world* (March 2022) .........................21

Appellate Case: 24-2351   Page: 7   Date Filed: 08/26/2024 Entry ID: 5428260

Comment ED-2023-OPE-0004-5558, *Improving Income-Driven Repayment for the William D. Ford Federal Direct Loan Program*, ED-2023-OPE-0004-0001 (Jan. 30, 2023) ...................................13

Comment ED-2023-OPE-0004-6446, *Improving Income-Driven Repayment for the William D. Ford Federal Direct Loan Program*, ED-2023-OPE-0004-0001 (Jan. 31, 2023) ...................................13

Council of Economic Advisors, White House, *The Economics of Administration Action on Student Debt* (Apr. 8, 2024) ................................11

*Department of Education Updates on Saving on a Valuable Education (SAVE Plan)*, Dep't of Educ. ......................................................23

*Federal Student Aid Portfolio Summary (2024 Q2)*, FSA ........................................3

*Federal Student Loan Portfolio by Borrower Location (2024 Q2)*, FSA ..........................................................................8

*Federal Student Loan Portfolio, Portfolio by Delinquency Status (DL, ED-Held FFEL, ED-Owned)*, FSA ..........................................17

*Federally Managed Portfolio by Repayment Plan (2024 Q2)*, FSA ..............3, 8, 16

FSA, *Federal Student Aid Posts New Quarterly Reports to FSA Data Center (GENERAL 23-119)* (Dec. 20, 2023) ..............................19

*Get Out of Default With Fresh Start*, FSA ................................................19

*Get to Know MOHELA*, Mo. Higher Education Loan Auth....................................21

*Income-Driven Portfolio by Borrower Age (2024 Q2)*, FSA ...................................8

Letter from Gov't Accountability Office to Sen. Bill Cassidy & Rep. Virginia Foxx, *Federal Student Loans: Preliminary Observations on Borrower Repayment Practices after the Payment Pause* 5 (July 29, 2024) ..........................................3, 4, 19

*Master Promissory Note (MPN)*, FSA ......................................................8

Appellate Case: 24-2351    Page: 8    Date Filed: 08/26/2024 Entry ID: 5428260

*Navient agrees to $1.85 billion in student loan settlement; $53 million returning to Missouri borrowers*, KY3 (Jan. 13, 2022)............21

Phillip Oliff, *At What Costs? The Impact of Student Loan Default on Borrowers*, Pew Charitable Trusts (Feb. 16, 2023) ......................11

*Portfolio by Loan Status (2024 Q2)*, FSA ...............................................20

Press Release, *CFPB Report Identifies Challenges Faced by Borrowers in Resumption of Student Loan Payments*, CFPB (Jan. 5, 2024) .................22

Press Release, *CFPB Sanctions Edfinancial for Lying about Student Loan Cancellation*, CFPB (Mar. 30, 2022)....................................21

*Repaying Loans 101*, FSA ...............................................................9

*Restarting Student Loan Payments*, FSA ...............................................18

*SAVE Plan Court Actions: Impact on Borrowers*, FSA .........................18

*Student Loan Delinquency and Default*, FSA ........................................11

*The Saving on a Valuable Education (SAVE) Plan Offers Lower Monthly Loan Payments*, FSA .......................................................18

U.S. Dep't of Educ., *2021 Negotiated Rulemaking: Affordability and Student Loans Committee* (Oct. 4, 2021) ..............................22

U.S. Dep't of Educ., *How the New SAVE Plan Will Transform Loan Repayment and Protect Borrowers* (June 30, 2023)...........................12

U.S. Gen. Services Admin., *Legacy Loan Servicing Contract - MOHELA*, ED-FSA-11-D-0012 (Sept. 27, 2011) ........................................20

U.S. Gen. Services Admin., *United Servicing and Data Solution (USDS) Awards Notice - Central Research Inc.*, Notice ID USDS_Awards_91003123D0002 (Apr. 24, 2023) ........................................5

*Welcome*, Nelnet, Inc.................................................................21

Appellate Case: 24-2351     Page: 9     Date Filed: 08/26/2024 Entry ID: 5428260

*William D. Ford Federal Direct Loan Program Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement*, FSA .....................................................................9

Appellate Case: 24-2351    Page: 10    Date Filed: 08/26/2024 Entry ID: 5428260

## INTERESTS OF AMICUS CURIAE[1]

The Student Borrower Protection Center (a fiscally sponsored project of the Shared Ascent Fund) (SBPC) is a nonprofit organization focused on eliminating the burden of student debt for millions of Americans. It engages in advocacy, policymaking, and litigation strategy to rein in industry abuses, protect borrowers' rights, and advance racial and economic justice. SBPC attorneys and advocates regularly participate in negotiated rulemakings convened by the federal Department of Education (Department). In particular, counsel for amicus was a negotiator in the sessions that preceded the Department's promulgation of the Saving on a Valuable Education Plan (SAVE) plan. SBPC also submitted public comment in support of the SAVE plan during the rulemaking process. SBPC thus has a particular interest in the continued viability of the final Rule effectuating the SAVE plan.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Two coalitions of eighteen states have managed to successfully obtain a trio of orders enjoining core components of the federal student loan system nationwide. Their actions rendered chaos in a trillion-dollar regime and triggered significant

---

[1] No counsel for any party authored this brief in whole or in part, and no person other than amici curiae, their members, and their counsel made a monetary contribution to the preparation or submission of this brief. Fed. R. App. P. 29(a). All parties consented to the filing of this brief.

Appellate Case: 24-2351    Page: 11    Date Filed: 08/26/2024 Entry ID: 5428260

harm to millions of student loan borrowers—including millions in their own states. The effects of the first two, issued nearly simultaneously on June 24, by the Eastern District of Missouri and the District of Kansas are compounded by the much broader injunction issued by this Court on August 9. Although the Plaintiff States filed this action to challenge only one of the several income-driven repayment (IDR) plans, the SAVE plan, *see* Compl. ¶ 7, *Missouri v. Biden*, No. 24-cv-00520-JAR (Apr. 9, 2024), the injunction in place extends beyond that plan and impairs the rights of borrowers not enrolled in SAVE, *Missouri v. Biden*, 2024 WL 3738157, at *4 (8th Cir. Aug. 9, 2024).

The impact of enjoining the final Rule far exceeds the scope of the lawsuit and causes further unwarranted harm to borrowers who are already beleaguered by the tremendous upheavals in the system over the past several years. *See Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022) (requiring preliminary injunctions be "narrowly tailored to remedy only the specific harms shown by the plaintiffs"); *Walker v. Lockhart*, 678 F.2d 68, 70 (8th Cir. 1982) (observing that a preliminary injunction and an injunction pending appeal involve "the same inquiry").

Moreover, the injunctions in this case have thoroughly disrupted, rather than preserved, the status quo in the sprawling federal student loan system. *See Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1016 (8th Cir. 2023) (explaining

2

that courts must evaluate "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined"). The federal government currently holds $1.62 trillion in federal student loan debt for nearly 43 million borrowers.[2] As of January 2024, nearly a quarter of those borrowers—accounting for $397 billion in student loan balances—were enrolled in the SAVE plan.[3] The number is likely even higher today as more borrowers have become aware of the plan and its important benefits.[4] Upon graduation and entering repayment, student borrowers elect from a number of statutory and regulatory repayment plans, including four IDR plans that predicate monthly payment amounts on borrowers' income. Borrowers can choose among the different plans that work best for them and their families. The SAVE plan is one such IDR plan, crafted with the needs of borrowers in mind as student loan payments have grown increasingly unaffordable.

---

[2] *Federal Student Aid Portfolio Summary (2024 Q2)*, Fed. Student Aid, U.S. Dep't of Educ. ("FSA"), https://studentaid.gov/sites/default/files/fsawg/datacenter/library/PortfolioSummary.xls.

[3] Letter from Gov't Accountability Office to Sen. Bill Cassidy & Rep. Virginia Foxx, *Federal Student Loans: Preliminary Observations on Borrower Repayment Practices after the Payment Pause* 5 (July 29, 2024) (GAO Report), https://www.gao.gov/assets/880/870313.pdf.

[4] *See Federally Managed Portfolio by Repayment Plan (2024 Q2)*, FSA, https://studentaid.gov/sites/default/files/fsawg/datacenter/library/DLPortfoliobyRepaymentPlan.xls (demonstrating an increase in SAVE enrollment by March 31, 2024).

3

By blocking the final Rule, which both created the SAVE plan and included a "restructuring" of the entire IDR system,[5] the injunctions prompted widespread unpredictability and uncertainty in the system and are causing student loan borrowers significant financial and personal distress. In recognition of this chaos, the Department has suspended monthly payments for borrowers who are enrolled in SAVE—*i.e.*, it imposed an administrative forbearance. Yet temporary relief from payments only prolongs the problem for borrowers. Also, borrowers cannot make informed choices among the plethora of repayment options available as long as different administrative aspects of IDR plans are blocked. For the nearly ten million borrowers who are already facing financial hardship and are past-due on their payments as is,[6] the injunctions compound their problems because—unless the final Rule is reinstated—they will suddenly have to contend with likely higher monthly payments than they anticipated, and they may not have an affordable option available. Finally, the injunctions have disrupted the already precarious operations of the Department's student loan servicers, which possess billions of dollars' worth of contracts to administer the massive federal student loan industry

---

[5] Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43,820, 43820 (July 10, 2023) (final Rule).

[6] *See* GAO Report, *supra* note 3, at 18 (finding that 29 percent of all student loan borrowers were at least a day late on their loans).

4

and interface with borrowers daily.[7] These interruptions threaten the ongoing stability of the program.

The severe economic consequences for borrowers, as well as the widespread disruption to a multi-trillion-dollar public lending regime, point to the considerable public interests favoring the continued implementation of the SAVE plan and final Rule. *See Winter v. NRDC*, 555 U.S. 7, 24 (2008) (admonishing that "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction"). In contrast to the tremendous and well-documented harm to borrowers posed by halting the final Rule, the States have offered little but speculation and supposition about the plan's impact to the public fisc. *See* Mot. for Stay/TRO at 46-49, *Missouri*, No. 24-cv-00520-JAR (E.D. Mo. Apr. 6, 2024) (ECF No. 10) ("Stay/TRO Mot.");[8] Emergency Mot. for Inj. Pending Appeal at 25-27, *Missouri*, No. 24-2332 (8th Cir. Aug. 12, 2024) ("Emerg. Mot."). Nor can they demonstrate that stopping the final Rule is congruent with Congress's expressed goals to make higher education more accessible. They have therefore

---

[7] *See* U.S. Gen. Services Admin., *United Servicing and Data Solution (USDS) Awards Notice - Central Research Inc.*, Notice ID USDS_Awards_91003123D0002 (Apr. 24, 2023), https://sam.gov/opp/0264de6ac3354dd6814455e535e783e9/view (awarding one of five contracts for $16 billion dollars to service federal student loans).

[8] The States' additional speculative harms raised in the court below rely on theories of injury that that court did not address and lacked any evidentiary support. *See* Stay/TRO Mot. at 46-48.

failed to demonstrate that the equities clearly weigh in their favor to warrant the injunctions, including the injunction issued by the motions panel, in this case. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (requiring "a clear showing" in order to grant a preliminary injunction); *Walker*, 678 F.2d at 70.

Borrowers have relied for decades on the stability and security of IDR plans like SAVE to help pay back their loans at affordable and predictable rates. That was the status quo before the States filed this action. The injunctions in this matter have unnecessarily sown chaos in the system, threatening the financial well-being of millions of borrowers. Accordingly, the injunctions should be vacated, and the judgment of the district court reversed.

## ARGUMENT

## I. THE SAVE PLAN BENEFITS MILLIONS OF BORROWERS BY INCREASING AFFORDABILITY AND SIMPLIFYING THE COMPLICATED FEDERAL STUDENT LOAN PROGRAM.

The final Rule faithfully implements Congress's intent to "increase educational opportunities" and help students access the "benefits of postsecondary education." *Biden v. Nebraska*, 143 S. Ct. 2355, 2362 (2023). The injunctions widely displace the status quo providing stability and consistency to millions of student loan borrowers.

6

**A. The Federal Student Loan Program, Including Income-Driven Repayment Plans, Is Intended To Expand Access To Affordable Higher Education.**

Congress created—and has repeatedly reinforced—the federal student loan program as part of its expansive regime enacted through the federal Higher Education Act of 1965 (HEA) and its amendments to "make higher education more widely accessible to the populace," *R.I. Higher Educ. Assistance Auth. v. Dep't of Educ.*, 929 F.2d 844, 847 (1st Cir. 1991), and "provide financial assistance to students in higher education." *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1122-23 (11th Cir. 2004); *see* Pub. L. 89-329, 79 Stat. 1232 (1965), *codified at* 20 U.S.C. § 1070(a) *et seq.* Congress has affirmed a national policy "that every citizen is entitled to an education to meet his or her full potential *without financial barriers*." 20 U.S.C. § 1221-1(2) (emphasis added).

The William D. Ford Federal Direct Loan Program, created in 1994, furthers those ambitious ends by enabling students, through a wide-ranging portfolio of loans, to borrow money to cover the increasingly higher costs of tuition, room and board, and other expenses. *See id.* § 1087a(a)(1). Congress also conferred wide-ranging authority to the Department to flesh out the ambitious program through interpretive regulations. *Id.* § 1087e(d)(1)(d) (instructing the Department to craft "criteria" and a variety of repayment plans with "varying annual repayment amounts" in order to administer the student loan program); *see Labickas v. Ark.*

7

*State Univ.*, 78 F.3d 333, 334 (8th Cir. 1996) (noting that "[t]he HEA specifies that the Secretary of Education has the power to carry out the Act's purposes"). Today, nearly forty-three million borrowers have $1.62 trillion in federal student loans that may be eligible for IDR plans like the SAVE plan.[9] Those borrowers hail from every state in the nation and every age group, ranging from younger than twenty-four to older than sixty-two years of age.[10]

The direct student loan program is a wide-ranging web of financial transactions with the nation's most significant creditor. *See Dep't of Agric. Rural Hous. Rural Dev. Serv. v. Kirtz*, 601 U.S. 42, 45 (2024) (observing that the federal government is "one of the Nation's largest lenders"). While its operations are firmly set out by law, in many ways it functions like any conventional private lending program. When borrowers take out their loans for the first time, they sign legally enforceable promissory notes with the Department;[11] they agree to have their information furnished to the national credit bureaus and to a number of

---

[9] *Federal Student Aid Portfolio Summary (2024 Q2)*, *supra* note 2.

[10] *Income-Driven Portfolio by Borrower Age (2024 Q2)*, FSA, https://studentaid.gov/sites/default/files/fsawg/datacenter/library/IDRPortfolio-by-Age.xls; *Federal Student Loan Portfolio by Borrower Location (2024 Q2)*, FSA, https://studentaid.gov/sites/default/files/fsawg/datacenter/library/Portfolio-by-Location.xls.

[11] *See Master Promissory Note (MPN)*, FSA, https://studentaid.gov/mpn/.

Appellate Case: 24-2351     Page: 18     Date Filed: 08/26/2024 Entry ID: 5428260

repayment obligations set forth by the Department.[12] In exchange, the Department offers seven statutorily created or authorized repayment options, including four IDR plans.[13] *See* 20 U.S.C. § 1087e(d)(1) (setting forth five statutory repayment plans and authorizing the Department to issue additional ones); 34 C.F.R. § 685.209(a) (setting forth the terms of the four IDR plans). In other words, borrowers, and, often their parents, are informed from the outset of their variety of lending rights and obligations, and that their pursuit of higher education comes with important financial strings attached.

The seven different repayment plans operate in tandem, and they are intended for borrowers to comparison shop and choose the plan that best fits their financial situation.[14] Each plan offers different monthly payments and loan repayment periods (generally ten, twenty, and twenty-five years), yielding different total costs to borrowers over the lifetime of their loans. Borrowers can even assess and compare their repayment options using free online calculators like Federal

---

[12] *See*, *e.g.*, *William D. Ford Federal Direct Loan Program Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement*, FSA, https://studentaid.gov/app/viewCounselingHtml. action?version=10&type=subunsub.

[13] *Id.*

[14] *Repaying Loans 101*, FSA, https://studentaid.gov/manage-loans/repayment/repaying-101 ("You have options for how to repay.")

9

Student Aid's Loan Simulator, which use borrowers' actual loan data to estimate their payment obligations on each available plan.[15]

The IDR plans are one subset of these repayment options and play a crucial role in effectuating the congressional purpose underlying the HEA to make higher education more attainable and affordable. These plans determine borrowers' monthly payments as a function of their discretionary income, *i.e.*, income above a percentage of the federal poverty guidelines and set by regulation. *See* 34 C.F.R. § 685.209(b). Although the four IDR plans share core characteristics, these characteristics vary meaningfully with respect to the calculation of monthly payments, the length of the repayment term, and the amount of discretionary income that factors into the equation. Today, the four plans that are in effect are: the Income-Based Repayment (IBR) plan, the Income-Contingent Repayment (ICR) plan, the Pay As You Earn (PAYE) plan, and the Revised Pay As You Earn (REPAYE) plan—the latter renamed the SAVE plan. 34 C.F.R. § 685.209(a); *see* App. Br. at 4-9 (describing the legislative and regulatory history of these plans); 88 Fed. Reg. at 43,822 (discussing determination to change the name of the REPAYE plan). Although certain aspects of each plan are presently enjoined, all four plans

---

[15] *See, e.g.*, *Calculate Your Federal Student Loan Repayment Options with Loan Simulator*, FSA, https://studentaid.gov/loan-simulator/.

Appellate Case: 24-2351     Page: 20     Date Filed: 08/26/2024 Entry ID: 5428260

are currently available to borrowers, although each has unique eligibility requirements.

**B.    The Final Rule Serves Critical Salutary Ends To Help Ease Rising Unaffordability And Simplify The Income-Driven Repayment Plan System.**

As the costs of higher education have skyrocketed and the student loan program has ballooned, borrowers have increasingly become ensnared in a crisis of unaffordability.[16] The consequences of default can be catastrophic, including: a collapsed credit score—which impacts their ability to further engage in the lending market, find a job or secure housing, or start a business, *see Kirtz*, 601 U.S. at 45 (noting the importance of a credit score)—the risk of going into debt collection and having judgments issued against the borrower, having wages garnished and bank accounts levied, and more.[17]

---

[16]    Council of Economic Advisors, White House, *The Economics of Administration Action on Student Debt* (Apr. 8, 2024), https://www.whitehouse.gov/cea/written-materials/2024/04/08/the-economics-of-administration-action-on-student-debt/ (attributing student debt crisis, in part, to "rapid and unforeseeable rises in prices and declines in college wage premia," causing "decades of 'unlucky' college-entry cohorts affected by a form of recessionary scarring").

[17] *See Student Loan Delinquency and Default*, FSA, https://studentaid.gov/manage-loans/default; Phillip Oliff, *At What Costs? The Impact of Student Loan Default on Borrowers*, Pew Charitable Trusts (Feb. 16, 2023), https://www.pewtrusts.org/en/research-and-analysis/issue-briefs/2023/02/at-what-cost-the-impact-of-student-loan-default-on-borrowers.

The Department issued the SAVE plan and the final Rule in part to address the unaffordability crisis, as well as to streamline the complicated IDR program. By issuing the SAVE plan, the Department sought to offer a plan that meets borrowers' affordability needs, *see* 88 Fed. Reg. at 43,822 ("the Department took the proper steps to develop these rules to help make the repayment plans more affordable"), and to funnel nearly all borrowers into this more-affordable plan by sunsetting eligibility for the PAYE and ICR plans, *see* 34 C.F.R. § 685.209(c)(4)(iv) (limiting new enrollment to PAYE after July 1, 2024); *id*. § 685.209(c)(5)(iv) (limiting new enrollment to ICR after July 1, 2024); 88 Fed. Reg. at 43,847 (discussing why "[s]tudent borrowers will not be eligible to access PAYE or ICR after July 1, 2024"). The final Rule therefore created a new, simpler status quo for borrowers, which began in July 2023, when the Rule's first provisions took effect.[18]

The SAVE plan—and IDR plans in general—thus serve a critical goal by helping make it possible for borrowers to better make repayment, attain financial stability, and "avoid delinquency and default." *See* 88 Fed. Reg. at 43,820 (explaining that the Rule is intended to "mak[e] it easier for individuals to

---

[18] U.S. Dep't of Educ., *How the New SAVE Plan Will Transform Loan Repayment and Protect Borrowers* (June 30, 2023), https://www2.ed.gov/policy/highered/ reg/hearulemaking/2021/idrfactsheetfinal.pdf (discussing early implementation of certain SAVE provisions).

12

successfully manage their debt"). The Department found that the Rule will assist borrowers who are "trapped under exorbitant monthly payments and that it will help many borrowers avoid delinquency, default, and their associated consequences." *Id.* at 43,822. The administrative record from the final Rule's rulemaking is replete with examples from student borrowers who desperately needed more affordable options to repay their burdensome student loans. For example, one borrower wrote:

> The changes to the idr plan will allow me to be able to afford basic needs such as food and utilities. Without this new plan I will not be able to afford my basic needs and my entire household will suffer. This is a crucial change that will benefit many families allowing them to keep a house and food over the heads of children. I have paid on my loans for years but the balance just keeps growing.[19]

Another borrower commented:

> The IDR payment plan is important to me and my family. Without this plan I would not be able to afford my house payments, keep my lights on and keep my children fed. Even though I'm making a decent income with inflation we are barely scraping by even with student loan payments on hold.[20]

---

[19] Comment ED-2023-OPE-0004-6446, *Improving Income-Driven Repayment for the William D. Ford Federal Direct Loan Program*, ED-2023-OPE-0004-0001 (Jan. 31, 2023), https://www.regulations.gov/comment/ED-2023-OPE-0004-6446 (sic).

[20] Comment ED-2023-OPE-0004-5558, *Improving Income-Driven Repayment for the William D. Ford Federal Direct Loan Program*, ED-2023-OPE-0004-0001 (Jan. 30, 2023), https://www.regulations.gov/comment/ED-2023-OPE-0004-5558.

The final Rule therefore reflects both Congress's intent for the HEA to give access to education without financial barriers and the statute's mandate to offer a repayment plan that is affordable by pegging payments to borrowers' income. This has been the status quo since the Rule took effect in July 2023, and it was the status quo that the injunctions upset in 2024.

## II. THE INJUNCTIONS IN THIS CASE CREATE CONSIDERABLE UNCERTAINTY AND HARM TO BORROWERS AND THE STUDENT LOAN SYSTEM.

The injunctions against the continued implementation of the final Rule cause current, specific, and compounding harms to borrowers. Millions of borrowers across the country today cannot make decisions about their monthly payments. Alternatively, they have had their loans placed in administrative forbearance, which suspends their obligation to make their monthly payments, meaning that in the long run, borrowers will end up in debt for longer than they would absent the forbearance. Rather than preserve the status quo as they must, *see Morehouse*, 78 F.4th at 1016, the injunctions have worsened circumstances for borrowers and exacerbated the programs of the massive student loan system. This is especially true given that the present injunction prohibits debt cancellation even for borrowers who are enrolled in plans other than SAVE but are still subject to the final Rule. These negative effects far outweigh the States' speculative harm from allowing borrowers to access the SAVE plan.

14

**A.** **Because Of The Injunctions, Borrowers Cannot Make Fundamental Decisions About Their Loan Repayment At A Time When Millions Must Do Exactly That.**

By blocking certain key components of the final Rule—forgiveness of principal or interest for any loan governed in whole or in part by the final Rule (effectively all loans), waiver of accrued interest, and SAVE's payment calculations—the injunctions create considerable uncertainty and distress for all federal student loan borrowers. They also have the practical effect of preventing borrowers from making informed decisions about what is often their household's largest financial obligation. The injunctions have upended the status quo and therefore thrown the already-fragile student loan landscape into chaos.

Moreover, limiting access to SAVE harms every federal student loan borrower to some degree. The nearly eight million borrowers already enrolled in the plan cannot determine whether they should switch to another plan if they cannot know with certainty what each plan offers, including the potential for eventual debt cancellation. The same is true for borrowers not yet enrolled in SAVE but who could otherwise consider the plan, or who are enrolled in another IDR plan and now are uncertain about the ultimate length of their repayment term.

Before the injunctions, borrowers could weigh the differences between plans and make informed decisions about which plan, including SAVE, best suits their

needs. As of March 2024, 7.83 million borrowers were enrolled in SAVE.[21] Now that the Department can no longer charge borrowers enrolled in SAVE pursuant to that plan's payment calculation, those borrowers cannot make progress on paying down their debt. However, since debt cancellation through several of the other IDR plans is no longer available to borrowers due to the injunctions, a borrower cannot know what their repayment obligations under one of those plans will be if they were to switch. A borrower might choose to switch to a different non-income-driven plan and make higher monthly payments for the certainty that their repayment term will end after ten years, rather than paying lower amounts in perpetuity—or, as the States have suggested, rather than facing a balloon payment or default at the end of twenty or twenty-five years. *See* Emerg. Mot. at 25.

Because of the injunction, borrowers can no longer meaningfully assess in an apples-to-apples fashion the bundle of features of each plan discussed above to determine which is the most appropriate for their individual circumstances. For example, although a borrower knows that her 10-year standard plan payment will only be paid for ten years until the balance is paid off, she cannot meaningfully compare that plan to an IDR plan with a lower monthly payment if she does not know for how long she will have to make that lower payment. This financial conundrum is not hypothetical. Many borrowers have contacted the Student

---

[21] *See Federally Managed Portfolio by Repayment Plan*, *supra* note 4.

Borrower Protection Center expressing their distress at being unable to make decisions. One borrower from North Carolina, for example, explained that, due to the injunctions, she cannot continue on SAVE and gain credit toward Public Service Loan Forgiveness; however, she also cannot enroll in other IDR plans (PAYE or ICR) because the parts of the final Rule still in effect prevent new enrollment in those plans. *See* 34 C.F.R. § 685.209(c)(4)(iv) (limiting new enrollment to PAYE after July 1, 2024); *id*. § 685.209(c)(5)(iv) (limiting new enrollment to ICR after July 1, 2024).[22]

## B. The Injunctions Pose Particular Harms To Borrowers Facing Delinquency And Default.

Also, for some specific and readily identifiable groups of borrowers, this inability to meaningfully select a repayment plan is particularly acute. In the first quarter of this year, the first time that delinquencies were reported since the start of the pandemic in 2020, 7.12 million borrowers were between thirty-one and ninety days delinquent on their student loans.[23] During the second quarter, that number rose to 7.17 million borrowers, owing a total of $206.8 billion dollars. These

---

[22] Although the Court's injunction prevents certain aspects of the final Rule from taking effect, the Rule's provisions that prevent new enrollment in PAYE and ICR were not enjoined, and so as of July 1, 2024, new enrollment in these plans is no longer permitted.

[23] *Federal Student Loan Portfolio, Portfolio by Delinquency Status (DL, ED-Held FFEL, ED-Owned)*, FSA, https://studentaid.gov/sites/ default/files/fsawg/datacenter/library/DLPortfoliobyDelinquencyStatus.xls.

borrowers currently benefit from the Department's "Onramp to Repayment," a one-year period designed to help borrowers transition from the COVID-19 pandemic payment pause by protecting borrowers who are unable to pay their monthly payments from having their delinquencies reported to the credit borrowers and their accounts eventually directed to collections.[24]

However, the onramp period is set to end on September 31, 2024. Throughout the onramp period, the Department and its contracted loan servicers widely encouraged enrollment in SAVE to borrowers so that they could reduce their monthly payments.[25] Because SAVE has been enjoined, with the onramp likely to end next month, borrowers are facing a bait-and-switch: after having been advised that SAVE would be the most affordable option for them, now they must prepare to cover higher monthly payments—or, in the worst case scenario, they may not be able to afford them.[26] Given that already nearly 30 percent of

---

[24] *Restarting Student Loan Payments*, FSA, https://studentaid.gov/manage-loans/repayment/prepare-payments-restart.

[25] *See, e.g.*, *The Saving on a Valuable Education (SAVE) Plan Offers Lower Monthly Loan Payments*, FSA, https://studentaid.gov/announcements-events/save-plan; @Nelnet, X (Dec. 19, 2023, 1:43 P.M.), https://x.com/Nelnet/status/1737181779386134576 ("Have questions about the new SAVE Plan? We created a short video that summarizes the plan, details, the benefits, and walks you through the application process.").

[26] While the Department placed all borrowers enrolled in SAVE on a forbearance after this Court issued its injunction, *SAVE Plan Court Actions: Impact on Borrowers*, FSA, https://studentaid.gov/announcements-events/save-court-actions, that forbearance is only temporary and may only prolong the inevitable result for

18

borrowers are in "past due" status,[27] once the onramp concludes, delinquencies will likely soar. Blocking the SAVE plan and its affordable repayment options only increases the likelihood of delinquencies and, ultimately, defaults.

The same is true for the over six million borrowers currently in default on their student loans.[28] These borrowers can return their loans to good standing through the Fresh Start program, a one-time opportunity that expires next month.[29] When defaulted borrowers enroll in Fresh Start, however, the Department recommends borrowers enroll in an IDR plan, too, to help make their new payments affordable.[30] These borrowers, who by definition have experienced financial distress, cannot confidently select a plan without knowing all of its terms and without knowing how that plan compares to other available repayment plans.

---

borrowers if the Plan is permanently enjoined: having to enroll in a different, less affordable repayment plan.

[27] *See* GAO Report, *supra* note 3, at 4. This number may be under representative because, pursuant to the onramp, the Department has been actively moving borrowers who miss payments from a delinquent status back into a current status.

[28] FSA, *Federal Student Aid Posts New Quarterly Reports to FSA Data Center (GENERAL 23-119)* (Dec. 20, 2023), https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2023-12-20/federal-student-aid-posts-new-quarterly-reports-fsa-data-center.

[29] *See Get Out of Default With Fresh Start*, FSA, https://studentaid.gov/announcements-events/default-fresh-start ("Fresh Start ends Sept. 30, 2024).

[30] *Id.* (advising borrowers "Enroll in an Affordable Repayment Plan").

Appellate Case: 24-2351     Page: 29     Date Filed: 08/26/2024 Entry ID: 5428260

Finally, more than one million borrowers exit the post-school grace period on their loans every six months,[31] at which point they must select a repayment plan. These borrowers are generally recent graduates from their college, university, or graduate program. They are new to repayment and to the workforce, and so they have a dire need to select a repayment plan that sets them on a path for financial stability. Today, these borrowers are unable to make a fully informed decision about which plan is most appropriate for their circumstances—affecting their finances for years to come.

### C. The Injunctions Create A Great Administrative Burden For Student Loan Servicers, Jeopardizing The Stability Of The Student Loan System Itself.

An additional foreseeable factor that flows from the harm to borrowers of enjoining SAVE is the added stress to federal student loan servicers. The Department does not administer federal student loans directly; rather, it contracts with private companies to manage the day-to-day operations of processing payments, assisting borrowers, and maintaining account records.[32] *See* 20 U.S.C. §

---

[31] *See Portfolio by Loan Status (2024 Q2)*, FSA, https://studentaid.gov/sites/default/files/fsawg/datacenter/library/PortfoliobyLoanStatus.xls.

[32] *See*, *e.g.*, U.S. Gen. Services Admin., *Legacy Loan Servicing Contract - MOHELA*, ED-FSA-11-D-0012 (Sept. 27, 2011), https://sam.gov/opp/d9e44d6034ed4edbb0880b0bceb3bd42/view.

Appellate Case: 24-2351   Page: 30   Date Filed: 08/26/2024 Entry ID: 5428260

1087f(b)(4). These companies are often borrowers' primary points of contact for

managing their loans.

Understandably, borrowers turn to their assigned student loan servicer for

assistance with their accounts, in part because servicers encourage borrowers to

contact them for help.[33] Student loan servicers, however, have historically failed to

meet borrowers' needs and to adapt quickly to program and policy changes.[34] Most

recently, when federal student loan payments resumed in October 2023, for

instance, borrowers seeking assistance from their servicers encountered long call

---

[33] *See*, *e.g.*, *Get to Know MOHELA*, Mo. Higher Education Loan Auth., https://mohela.studentaid.gov/DL/common/about.aspx ("We promise to listen, offer customized solutions to meet your specific needs, and provide superior guidance as your resource expert."); *Welcome*, Nelnet, Inc., https://nelnet.studentaid.gov/welcome ("We're here to help you find repayment options and to process your loan payments. We're committed to providing excellent service and helping you have a successful student loan experience.")

[34] *See*, *e.g.*, CFPB, *Student Loan Servicing: Analysis of public input and recommendations for reform* (Sept. 2015), https://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf; Press Release, *CFPB Sanctions Edfinancial for Lying about Student Loan Cancellation*, CFPB (Mar. 30, 2022), https://www.consumerfinance.gov/about-us/newsroom/cfpb-sanctions-edfinancial-for-lying-about-student-loan-cancellation/; *Navient agrees to $1.85 billion in student loan settlement; $53 million returning to Missouri borrowers*, KY3 (Jan. 13, 2022), https://www.ky3.com/2022/01/13/navient-agrees-185-billion-student-loan-settlement-53-million-returning-missouri-borrowers/; Commc'ns Workers of Am. & SBPC, *Customer Disservice: Examining Maximus, the federal contractor that just became the largest student loan company in the world* (March 2022), https://protectborrowers.org/wp-content/uploads/2022/03/CWA_SBPC_MAXIMUS.pdf; Am. Fed'n of Teachers & SBPC, *The MOHELA Papers* (Feb. 2024), https://www.mohelapapers.org/.

Appellate Case: 24-2351    Page: 31    Date Filed: 08/26/2024 Entry ID: 5428260

wait times, struggled to use inoperable web portals and other self-help options, and received inaccurate information from customer service representatives.[35]

Removing a key tenet of the current student loan landscape by enjoining SAVE and other aspects of the IDR plans pours fuel on an already-raging fire. The confusion that it causes borrowers foreseeably results in an increased need for assistance, which falls predominantly on servicers to provide. This increase in demand occurs at the same time that the servicers themselves are working to understand and implement the changes. This is true for any change to the system but is particularly acute with respect to the present injunctions—which, unlike regular agency rulemaking and program changes, were not subject to an open process, such as the final Rule's statutorily mandated negotiated rulemaking at which servicers had a seat at the table,[36] and which did not include a delayed effective date to allow for measured implementation. *Contra* 88 Fed. Reg. at 43,820 (final Rule published July 10, 2023 with rolling effective dates).

---

[35] *See* Press Release, *CFPB Report Identifies Challenges Faced by Borrowers in Resumption of Student Loan Payments*, CFPB (Jan. 5, 2024), https://www.consumerfinance.gov/about-us/newsroom/cfpb-report-identifies-challenges-faced-by-borrowers-in-resumption-of-student-loan-payments/.

[36] U.S. Dep't of Educ., *2021 Negotiated Rulemaking: Affordability and Student Loans Committee* (Oct. 4, 2021), https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/2021negotrulemakingcomlist.pdf (listing MOHELA as negotiator).

The Consumer Financial Protection Bureau, the federal agency tasked with protecting student loan borrowers,[37] has also raised serious concerns about the harm to borrowers from strains on student loan servicers. The Bureau's head of supervision recently warned:

> Because the injunction entered by the United States District Court for the Eastern District of Missouri concerns the availability of loan discharge under the SAVE plan, and the availability and timeline of discharge is a highly material element of income-driven repayment plans, borrowers are likely to seek clarification about the impact of the Missouri injunction in addition to the impact of the injunction entered by this Court. This additional complexity would further increase demand for servicer contact and exacerbate the risk of servicing breakdowns that adversely affect borrowers.

Decl. of Lorelei Salas, *Alaska v. Dep't of Educ.*, No. 24-cv-01057 (D. Kan. June 27, 2024) (ECF No. 81-2).

The uncertainty that enjoining student loan repayment plans causes is reflected in the Department's decision to place all SAVE-enrolled borrowers into administrative forbearances until the present litigation is resolved.[38] Maintaining the student loan system without the complete and intact suite of repayment plans is nonetheless unworkable. The Department's action does not completely blunt the

---

[37] Although the Department oversees student loan servicers, *see generally* 20 U.S.C. § 1087f, the CFPB has defined student loan servicing as a larger market participant subject to its authority. *See* 12 C.F.R. pt. 1090.

[38] *See Department of Education Updates on Saving on a Valuable Education (SAVE Plan)*, Dep't of Educ., https://www.ed.gov/Save.

Appellate Case: 24-2351     Page: 33     Date Filed: 08/26/2024 Entry ID: 5428260

injunctions' impact on borrowers, who are now stuck in limbo. For example, a teacher in Nevada recently contacted the SBPC to share that he was one month away from having his debts cancelled through Public Service Loan Forgiveness. Due to the injunctions, however, he cannot accrue his final qualifying payment, and he is stuck with his loans instead of being debt free. As a result, he is contemplating moving out of state to live with his parents to save money.

## III.   THE EQUITIES FAVOR KEEPING INCOME-DRIVEN REPAYMENT PLANS, INCLUDING THE SAVE PLAN, INTACT.

The financial and social maelstrom that has befallen millions of borrowers makes plain the overwhelming harm to the public caused by the multiple overlapping—and in some cases conflicting—injunctions to the final Rule. As described above, the consequences to borrowers far outweigh the speculative and tenuous harms to the States, which are indirect by means of an unsubstantiated financial harm to MOHELA. *See Winter*, 555 U.S. at 24. The equities and public interest expressed in needs of the millions of borrowers who were promised stability and affordability, as well as those of the student loan system itself, counsel in favor of keeping the final Rule in place. *See Morehouse*, 78 F.4th at 1018 (noting the equities and the public interests "merge" in an action like this one).

The Court must take the true cost to borrowers into its consideration of effect of any injunction of the final Rule. Borrowers have a compelling interest in

24

ensuring that they can pay back their loans and avoid default, which must be appropriately weighed. *See TD Bank N.A. v. Hill*, 928 F.3d 259, 284 (3d Cir. 2019) (declaring that "[t]o determine where the public interest lies, a court should weigh the advantages and disadvantages to the public"); *Bernhardt v. Los Angeles Cty.*, 339 F.3d 920, 931 (9th Cir. 2003) (noting, in case involving injunction against government entity, that "[t]he public interest inquiry primarily addresses impact on non-parties rather than parties"). By interfering with borrowers' ability to continue to repay their loans, the injunctions disrupt millions of pre-existing contractual relationships between borrowers and their lender, the Department of Education. Although the district court weighed several of the negative effects from enjoining SAVE raised by the Department and acknowledged that borrowers already enrolled in SAVE "have an interest in ensuring consistency in loan repayment programs," *see Missouri v. Biden*, 2024 WL 3104514, at *28-29 (E.D Mo. June 24, 2024), it failed to consider an even more fundamental fact: borrowers cannot determine which repayment plan to select while the terms of any one plan are uncertain. Nor did the court factor in the timing of enjoining aspects of federal student loan repayments, as millions of borrowers must select affordable plans in the coming weeks or risk delinquency and default. *See supra* Sections II.A-B.

Likewise, the federal government has a compelling interest in preserving the stability, efficiency, and regularity of the federal loan repayment system. *See*

*Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1264 (9th Cir. 1996)

(noting, "in accordance with the congressional intent embodied in the HEA, the

public interest in having a stable student loan program"). By halting the final Rule

months after it was finalized and adopted and millions of borrowers had enrolled in

SAVE, causing the Department to place these borrowers into an administrative

forbearance, the injunctions jeopardize the certainty and predictability that is

crucial to the effective operations of the federal government. *See Borough of

Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 386 (2011) (stating that "[t]he government

has a substantial interest in ensuring that all of its operations are efficient and

effective"). It also hamstrings the Department's flexibility to create income-driven

repayment plans that best suit the needs of borrowers today. *See Educ. Assistance

Corp. v. Cavazos*, 902 F.2d 617, 629 (8th Cir. 1990) (observing that "the [HEA]

needs to be responsive to 'ever-changing' conditions"). Unlike the States' alleged

harms, the sweeping instability that has resulted from the injunctions in recent

weeks demonstrates the concrete and acute harms to the government's ability to

maintain the student loan system. If it was not clear to the district court that the

government's interest outweighed those of the States, it should be clear now.

Even more concerningly, the States' claims that the debt cancellation

inherent to the long-standing IDR repayment plans exceeds the Secretary's

statutory authority, Emerg. Mot. at 18-21, is unfounded and, if adopted, would

26

undermine the Department's position as the lender-of-first-resort for postsecondary education and throw the entire federal loan system into chaos. To the contrary, the States' position contravenes Congress's intent, as expressed in the Higher Education Act, to expand opportunities for Americans to seek—and be able to afford—higher education. *See United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) ("[A] court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation"); 11A Wright & Miller, *Federal Practice & Procedure* § 2948.4 (3d ed. 2025) ("The public interest also may be declared in the form of a statute"). Because the injunctions ignore the statutory dictates of the Higher Education Act, they run counter to—rather than advance— the public interest.

The public interest of maintaining a stable student loan system and the very real and tangible consequences for borrowers thus strongly militates in favor of the Department's position and against the injunctions. By contrast, public interest concern about a generalized harm to taxpayers is wholly conjectural and insufficient. *See Missouri*, 2024 WL 3104514, at *28-29. Concerns about the impact to taxpayers of government programs are better resolved by the legislative branch, not the courts. *Cf. ASARCO Inc. v. Kadish*, 490 U.S. 605, 613 (1989) (stating, with regards to the unavailability of taxpayer standing in federal court, that "a taxpayer's interest in the moneys of the Treasury is shared with millions of

27

others, is comparatively minute and indeterminable; and the effect upon future taxation, of any payments out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for judicial intervention" (cleaned up)). Also, just as "it would be 'pure speculation' to conclude that an injunction against a government expenditure or tax benefit 'would result in any actual tax relief' for a taxpayer-plaintiff," *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 136 (2011) (quoting *ASARCO*, 490 U.S. at 614), it is equally speculative to conclude that an injunction against a rule implementing a loan repayment program would cause tax relief for non-plaintiffs. That is especially true in light of the benefits to the public fisc of making repayment affordable, not extending repayment timelines, and not making loan recoupment so burdensome that borrowers fall behind on their payments.

Over the past several years, millions of borrowers have been whipsawed by economic instability, rising unaffordability, and repeated complexities and shifts in the student loan market. The SAVE plan provided important clarity and financial and programmatic benefits to borrowers—until the start of this litigation and the resulting injunction by the court below and this Court. We urge this Court to recognize the enormous and negative impact that these injunctions have had on borrowers, and to vacate all injunctions.

28

## **CONCLUSION**

For the foregoing reasons, the decision of the district court should be reversed and the preliminary injunction vacated. The injunction pending appeal entered by this Court should also be vacated.

Dated: August 25, 2024

Respectively submitted,

s/ Persis S. Yu
Persis S. Yu
R. T. Winston Berkman-Breen
David S. Nahmias
STUDENT BORROWER PROTECTION CENTER*
* *A fiscally sponsored project of the Shared Ascent Fund*

1025 Connecticut Ave NW, #717
Washington, DC 20036
(202) 670-3871
persis@protectborrowers.org
winston@protectborrowers.org
david.nahmias@protectborrowers.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,464 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word. The text is in 14-point Times New Roman type.

Pursuant to Eighth Circuit Rule 28A(h)(2), I further certify that the brief has been scanned for viruses, and the brief is virus free.

*/s/ David S. Nahmias*
David S. Nahmias

*Counsel for Amici Curiae*

Appellate Case: 24-2351     Page: 40     Date Filed: 08/26/2024 Entry ID: 5428260

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ David S. Nahmias*
David S. Nahmias

*Counsel for Amici Curiae*

Appellate Case: 24-2351    Page: 41    Date Filed: 08/26/2024 Entry ID: 5428260