## UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

State of Missouri, *et al.*,
*Plaintiffs-Appellees, Cross-Appellants*,

v.

Joseph R. Biden, Jr., in his official capacity as the President of the United States of America, *et al.*,
*Defendants-Appellants, Cross-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Missouri
The Honorable District Court Judge John A. Ross
Case No. 4:24-cv-520-JAR

# PRINCIPAL AND RESPONSE BRIEF OF MISSOURI AND ALL OTHER PLAINTIFFS-APPELLEES

Andrew Bailey
  *Attorney General of Missouri*
Joshua M. Divine
  *Solicitor General*
Reed C. Dempsey
  *Deputy Solicitor General*
Samuel Freedlund
  *Deputy Solicitor General*
Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
(573) 751-1800
josh.divine@ago.mo.gov

## STATEMENT ABOUT THE CASE AND ORAL ARGUMENT

Interpreting the Secretary of Education's authority, the Supreme Court held just last year that "Congress opted to make debt forgiveness available only in a few particular exigent circumstances." *Biden v. Nebraska*, 143 S. Ct. 2355, 2369 (2023). The Supreme Court thus struck down Defendants' first attempt to mass cancel student loans. Defendants responded minutes later by announcing a second attempt at mass cancellation. And despite the Supreme Court's admonition that the Secretary's forgiveness authority extends only to a "few particular exigent circumstances," the assertion of authority in this newest attempt is even broader: authority to cancel every penny of every federal student loan.

Every court to rule on the issue—including a motions panel of this Court—has held that the Final Rule is unlawful. In August, Defendants asked the Supreme Court to vacate this Court's injunction pending appeal. Without any dissents, the Supreme Court rejected that request. Defendants press the same arguments here. They fail for the same reasons. Fifteen minutes of oral argument is plenty sufficient.

# TABLE OF CONTENTS

STATEMENT ABOUT THE CASE AND ORAL ARGUMENT ......... i

TABLE OF AUTHORITIES .................................................... iv

JURISDICTIONAL STATEMENT ...................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........ 1

INTRODUCTION .............................................................. 2

STATEMENT OF THE CASE .............................................. 5

  I.  The Higher Education Act and Previous Rulemakings. ........ 5

  II.  The Department Initially Rejects Mass Forgiveness. ............ 9

  III.  The First and Second Mass Cancellation Attempts. ............ 10

  IV.  The States Challenge the Final Rule in Its Entirety. .......... 15

  V.  The District Court Enjoins Forgiveness Provisions, and This Court Blocks the Attempt to Evade That Injunction. ................................................. 16

  VI.  Defendants Surreptitiously Attempt Mass Cancellation a Third Time. ................................................... 20

SUMMARY OF THE ARGUMENT .................................... 25

STANDARD OF REVIEW ................................................ 28

ARGUMENT .................................................................. 29

  I.  Several of the Administrative Panel's Conclusions Are Law of the Case. .................................................. 29

  II.  The States Easily Have Standing. ......................... 31

   A.  The States have standing under the exact theory the Supreme Court accepted last year. ........................ 31

B.    Plaintiffs have standing because the Final Rule deprives MOHELA of a stream of future interest revenue. ........................................................ 42

C.    The Final Rule harms North Dakota. ......................... 43

D.    The States have standing for additional reasons. ........ 45

III.    The States Are Likely to Succeed on the Merits. ................. 46

A.    The Final Rule violates the major questions doctrine. ....................................................................... 46

B.    The Final Rule is in excess of statutory authority. ...... 52

a.    The Final Rule violates the plain text. ............... 52

b.    Defendants' nontextual arguments fail. ............. 60

C.    The revised payment amounts and other provisions that increase eligibility for forgiveness are unlawful. .............................................................. 62

D.    The Final Rule is arbitrary and capricious because it deliberately underestimates the cost by $300 billion. ......................................................................... 64

IV.    Plaintiffs Face Irreparable Harm, and the Equities Strongly Favor the States. ................................................... 69

V.    The Scope of Relief This Court Has Twice Ordered Is Appropriate Here Too. ......................................................... 76

**CONCLUSION** ........................................................................... 80

**CERTIFICATE OF COMPLIANCE** ..................................... 83

**CERTIFICATE OF SERVICE** ............................................... 84

# TABLE OF AUTHORITIES

**Cases**                                                      Page(s)

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
  594 U.S. 758 (2021) .................................... 1, 4, 43, 46–49, 52

*Alaska v. U.S. Dep't of Educ.*,
  2024 WL 3104578 (D. Kan  June 24, 2024) ........................ 50

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
  576 U.S. 787 (2015) ................................................. 58

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023)
  ....................................... i, 1, 4, 10, 15, 32, 35, 37, 39, 42, 45, 46, 49–52

*Bittner v. United States*,
  598 U.S. 85 (2023) ................................................. 57

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*,
  17 F.4th 604 (5th Cir. 2021) ..................................... 47

*Career Colleges & Sch. of Texas v. U.S. Dep't of Edu.*,
  98 F.4th 220 (5th Cir. 2024) ................................. 60, 79

*Cigna Corp. v. Bricker*,
  103 F.4th 1336 (8th Cir. 2024) ................................... 28

*Citizens for Responsibility & Ethics in Wash. v. Trump*,
  953 F.3d 178 (2d Cir. 2019) ..................................... 80

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ............................................. 79

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve System*,
  144 S. Ct. 2440 (2024) ........................................... 39

*Data Mktg. Partnership, LP v. U.S. Dept. of Labor*,
  45 F.4th 846 (5th Cir. 2022) ..................................... 64

*DHS v. Regents of the Univ. of Cal.*,
591 U.S 1 (2020) ................................................................ 79

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ...................................................... 65, 66

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ........................................................ 40

*Food & Drug Admin. v. All. for Hippocratic*,
*Med.*, 602 U.S. 367 (2024) ........................................... 42, 43

*Gill v. Whitford*,
585 U.S. 48 (2018) .......................................................... 76

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
559 U.S. 280 (2010) ........................................................ 40

*Hawaii v. Trump*,
859 F.3d 741 (9th Cir. 2017) ........................................... 80

*In re Goodvin*,
No. 19-10623, 2020 WL 6821867 (Bankr. D. Kan. Sept. 1, 2020) ...... 53

*In re Rodriquez*,
258 F.3d 757 (8th Cir. 2001) ........................................... 30

*Judulang v. Holder*,
565 U.S. 42 (2011) .......................................................... 64

*Labrador v. Poe*,
144 S. Ct. 921 (2024) ..................................................... 78

*Louisiana Energy & Power Auth. v. FERC*,
141 F.3d 364 (D.C. Cir. 1998) ...................................... 45, 46

*Louisiana ex rel. La. Dep't of Wildlife & Fisheries v.*
*National Oceanic & Atmospheric Admin*,
70 F.4th 872 (5th Cir. 2023) ........................................... 35

*Maxfield v. Cintas Corp., No. 2*,
487 F.3d 1132 (8th Cir. 2007) ......................................... 31

*McCuen v. Am. Cas. Co. of Reading, Pennsylvania,*
   946 F.2d 1401 (8th Cir. 1991) ............................................................29

*Michigan v. EPA,*
   576 U.S. 743 (2015) ...................................................................66, 67

*Mingo Logan Coal Co. v. Env't Prot. Agency,*
   829 F.3d 710 (D.C. Cir. 2016) ..........................................................66

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.,*
   463 U.S. 29 (1983) ..........................................................................64

*N.Y. Progress & Prot. PAC v. Walsh,*
   733 F.3d 483 (2d Cir. 2013) ..............................................................71

*Nebraska v. Biden,*
   52 F.4th 1044 (8th Cir. 2022) ....................................................29, 69

*New York State Telecommunications Ass'n, Inc. v. James,*
   101 F.4th 135 (2nd Cir. 2024)..........................................................19

*Ng v. Bd. of Regents of Univ. of Minnesota,*
   64 F.4th 992 (8th Cir. 2023) ............................................................74

*Nordgren v. Hennepin Cnty.,*
   96 F.4th 1072 (8th Cir. 2024) ..........................................................30

*Nyffeler Constr., Inc. v. Sec'y of Labor,*
   760 F.3d 837 (8th Cir. 2014)............................................................30

*Ohio v. EPA,*
   144 S. Ct. 2040 (2024).................................................................1, 67

*Pinder v. WellPath, LLC,*
   No. 22-3050, 2024 WL 3734159 (8th Cir. Aug. 9, 2024) ....................30

*Ross v. Bank of Am., N.A. (USA),*
   524 F.3d 217 (2d Cir. 2008) ............................................................34

*Sprint Commun. Co., L.P. v. APCC Services, Inc.,*
   554 U.S. 269 (2008)........................................................................32

*Taggart v. Lorenzen,*
    587 U.S. 554 (2019) .................................................................. 56

*Texas Children's Hosp. v. Burwell,*
    76 F. Supp. 3d 224 (D.D.C. 2014) ...................................... 75

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) ................................................ 34

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ............................................... 34

*Thompson v. United States,*
    872 F.3d 560 (8th Cir. 2017) ................................... 29, 30, 31

*Tumey v. Mycroft AI, Inc.,*
    27 F.4th 657 (8th Cir. 2022) ................................................ 28

*U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at
Lakeridge, LLC,*
    583 U.S. 387 (2018) .............................................................. 33

*United States v. United Foods, Inc.,*
    533 U.S. 405 (2001) .............................................................. 40

*Van Buren v. United States,*
    593 U.S. 374 (2021) .............................................................. 59

*Wendt v. 24 Hour Fitness USA, Inc.,*
    821 F.3d 547 (5th Cir. 2016) ............................................... 35

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ....................................................... 47, 52

**Statutes**

5 U.S.C. § 801(a)(3) ........................................................... 22, 68, 72

5 U.S.C. §§ 705, 706 ................................................................ 78, 79

20 U.S.C. § 1078(b)(9)(A) .............................................................. 3

20 U.S.C. § 1087e ................................1, 3, 4, 6, 44, 52–56, 60, 62, 63, 66

20 U.S.C. § 1087ee................................................................ 49, 56

28 U.S.C. § 1292(a)(1)................................................................ 1

N.D.C.C. § 6-09-01 .................................................................. 43

N.D.C.C. § 15-62.1-01 .............................................................. 44

## Regulations

31 C.F.R. § 901.1 .................................................................... 4

34 C.F.R. § 685.209 ................................................................ 12

## Other Authorities

13A Federal Practice & Procedure § 3531.4 (3d ed.) .............................34

Bank of North Dakota, *DEAL Student Loan*
(last visited Sept. 18, 2024) ...................................................44

*Biden's New Income-Driven Repayment ("SAVE") Plan: Budgetary Cost
Estimate Update*, Penn Wharton (July 17, 2023) ...........................15

*Fact Sheet: How the New SAVE Plan Will Transform Loan Repayment
and Protect Borrowers* (June 30, 2023) ...................................14

*FACT SHEET: President Biden Cancels Student Debt for More Than
150,000 Student Loan Borrowers Ahead of Schedule,* The White
House (Feb. 21, 2024) ...................................................13, 63

Lauren Camera, *Pelosi: Biden Lacks Authority to Cancel Student Debt,*
U.S. News & World Report (July 28, 2021).................................58

*Remarks by President Biden on the Saving on a Valuable Education
Plan* (Feb. 21, 2024) ...................................................11

Roll Call on S.J.Res. 43 (Nov. 15, 2023)...................................69

Roll Call on H.J.Res. 88 (Dec. 7, 2023) ...................................69

Rubinstein Memorandum (2021) ........................................... 9, 48

*SAVE Plan Announcement*, Federal Student Aid
  (last visited August 14, 2024) ............................................. 18

*Secretary Cardona Statement on Supreme Court Ruling on Biden
  Administration's One Time Student Debt Relief Plan*, Department
  of Education (June 30, 2023) ............................................. 10

*Statement from President Joe Biden on Supreme Court Decision on
  Student Loan Debt Relief*, The White House (June 30, 2023) ........... 11

*State of the Union Address* (Jan. 27, 2010) ............................... 8

## JURISDICTIONAL STATEMENT

Plaintiff States invoked the district court's jurisdiction under 5 U.S.C. §§ 701–706 and 28 U.S.C. §§ 1331, 1361, 2201. App.17; R.Doc.1, at 8. On June 24, 2024, the district court issued an order partly granting and partly denying Plaintiff States Motion for Preliminary Injunction, App.326; R.Doc.35; App.387; R.Doc.36. Plaintiff States timely appealed on June 28, 2024. App.399; R.Doc.42. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Whether the district court erred by failing to preliminarily enjoin the entirety of the Final Rule.

- *Biden v. Nebraska*, 143 S. Ct. 2355 (2023)

- *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758 (2021)

- *Ohio v. EPA*, 144 S. Ct. 2040 (2024)

- 20 U.S.C. § 1087e

# INTRODUCTION

Minutes after the Supreme Court struck down the Federal Government's first attempt to mass cancel $430 billion in student loan debt, the Federal Government announced its Plan B. This newest plan carries an even *higher* price tag: $475 billion. Worse, it asserts a statutory interpretation that would give the Secretary of Education unrestricted power to cancel every penny of every federal student loan.

Every court to issue an opinion evaluating this plan has concluded it is unlawful. Here, the district court correctly concluded: (1) the Plaintiff States easily have standing; (2) the Secretary has no authority to forgive loans under Defendants' stated statutory provision; and (3) both the plain text of the HEA and the major questions doctrine compel this merits conclusion. Yet the district court entered only a partial injunction, *declining* to stop Defendants from using this statute to forgive loans and *permitting* Defendants to set monthly "payment" amounts to $0. To prevent hundreds of millions in losses, the States were forced to seek an injunction pending appeal, which this Court granted.

This panel should confirm what the motions panel already held. Defendants plainly lack authority to forgive under the statute they cite—

as every court to hear this question has held.  And if Defendants cannot forgive loans at all, then the eligibility criteria for forgiveness necessarily falls as well.

The Higher Education Act creates a number of "repayment plans" and dictates that their length is "not to exceed" a certain number of years. *E.g.*, 20 U.S.C. § 1078(b)(9)(A).  The relevant type of plan here is the Income-Contingent Repayment or ICR plan.  Nearly all borrowers are eligible (or readily can become eligible) to enroll in ICR.  That plan permits varying payment amounts based on income and is "not to exceed 25 years" in length.  § 1087e(d)(1)(D).  So instead of paying fixed monthly amounts over 10 years on a "standard repayment plan," ICR borrowers pay amounts that can vary each year, and ICR borrowers can take up to 25 years to pay back their loans.

Defendants used this authority for something much more ambitious—and illegal.  From this banal text about length, the Secretary asserts authority to forgive every penny of every loan.  The Secretary slashed payment amounts—down to $0 for most borrowers—and directed that balances be forgiven after as few as ten years.  Indeed, under the

Final Rule, nearly everybody receives forgiveness—including borrowers in the 98th income percentile.

That assertion of authority is "staggering by any measure" and triggers the major questions doctrine, as two district courts and this Court's motion panel concluded. *Biden v. Nebraska*, 143 S. Ct. at 2373. The Government thus must identify "exceedingly clear language" authorizing the Final Rule. *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021). It cannot. Instead, it relies on inference and implication.

The plain text is also against Defendants. Far from authorizing forgiveness, the ICR section expressly requires repayment. It mandates "repayment," including "principal and interest" and says the "balance due" from ICR borrowers "*shall equal* the unpaid principal amount of the loan, any accrued interest, and any fees." § 1087e(d)(1)(D), (e)(5) (emphasis added). This is consistent with the general requirement of the Government to "aggressively collect all debts" absent an express exception. 31 C.F.R. § 901.1. And it is the only way to make sense of the rest of the Act, which repeatedly and expressly authorizes forgiveness in *other* programs—just with eligibility criteria narrower than Defendants

like. Defendants' assertion that they can forgive every penny of every student loan makes a mockery of those reticulated forgiveness programs. As the district court correctly concluded, "Congress has made it clear under what circumstances loan forgiveness is permitted, and the ICR plan is not one of those circumstances." App.369, R.Doc.35 at 44.

With no authority to forgive, other aspects of the Final Rule must also fall. All aspects of the Final Rule rest on the mistaken presumption that the Secretary can use ICR authority to forgive loans. Because he cannot, Defendants must set payment amounts high enough for borrowers to actually repay.

## STATEMENT OF THE CASE

## I.    The Higher Education Act and Previous Rulemakings.

For years the Federal Government did not issue student loans directly. Under the Higher Education Act, private organizations issued loans and the Government financially guaranteed them. Later amendments to the Act enabled the Government to issue loans directly and to create "repayment plans" for borrowers. §§ 1087a, *et seq*. These include a "standard repayment plan" (10 years, fixed payment amount); a "graduated repayment plan" (10 years, gradually increasing amounts);

and an "extended repayment plan" (25 years, fixed or graduated). § 1087e(d)(1)(A)–(C).

Most relevant here is a fourth plan, the "income contingent repayment plan" or "ICR," which Congress authorized in 1993 and which allows payments to vary based on a borrower's annual income. It is the basis for the Final Rule. 88 Fed. Reg. 43,826–27. And nearly all borrowers are eligible (or readily can become eligible) to enroll in ICR. ICR allows for "varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." § 1087e(d)(1)(D).

No ICR text expressly authorizes forgiveness of student loans. Indeed, like the provisions governing the standard, graduated, and extended plans, the ICR provision requires "repayment of such loan, including principal and interest." § 1087e(d)(1). It further requires that the "balance due" from each borrower "shall equal the unpaid principal amount of the loan, any accrued interest, and any fees." § 1087e(e)(5).

Between 1993 and 2023, two Secretaries of Education (out of nine) promulgated three ICR plans. And despite the ICR statute not expressly authorizing forgiveness, each Secretary chose to permit a small amount

of forgiveness. These plans are called "ICR" (1994), "PAYE" (2012), and "REPAYE" (2015).

The first plan (ICR) was promulgated in 1994. It stated that borrowers could have remaining balances forgiven after 25 years. But forgiveness eligibility was strictly limited. Borrowers had to pay 20% of their income above the federal poverty line. *See* 59 Fed. Reg. 66,132, -135. Last year, the poverty line for a family of four was $30,000. The median household income was about $75,000. So under that plan, the median borrower would pay $9,000 every year for up to 25 years ($225,000 total). Because of these strict eligibility requirements, there was "low participation" and few people qualified for forgiveness. 77 Fed. Reg. 66,116.

In 2007, Congress amended the HEA to create a new type of plan where payments depend on annual income: the "income-*based* repayment program" or IBR. IBR is unlike ICR in two relevant respects. First, IBR expressly authorizes forgiveness—to "cancel any outstanding balance" after 25 years. § 1098e(a)(3), (b)(7). Second, unlike ICR (which is open enrollment), IBR enshrines into statute income eligibility requirements. Individuals can participate if their annual payments would otherwise

exceed 15% of income above 150% of the poverty line (rather than the 20% above 100% of the poverty line in the ICR regulation). § 1098e(a)(3)(B), (b)(1). In 2010, the President urged Congress in his State of the Union to broaden eligibility for IBR. *State of the Union Address* at 5 (Jan. 27, 2010).[1] Congress accepted that invitation, broadening the eligibility amount to 10% (from 15%) and accelerating forgiveness to 20 years (from 25). § 1098e(e).

The Secretary then promulgated two new ICR plans (PAYE and REPAYE) in 2012 and 2015. These plans incrementally established eligibility/payment amounts generally in line with the statutory thresholds of the IBR program, and also adopted a 20-year forgiveness provision (for undergraduate borrowers) that matched the statutory IBR program. 77 Fed. Reg. 66,088; 80 Fed. Reg. 67,204.

The three ICR plans went unchallenged despite permitting some forgiveness. As the administrative panel noted in granting an injunction pending appeal, "these plans were relatively uncontroversial as they were limited in scope and less generous than income-based repayment

---

[1]https://www.govinfo.gov/content/pkg/DCPD-201000055/pdf/DCPD-201000055. pdf

('IBR') plans, which Congress had specifically established to enable more-favorable repayment terms and ultimately loan forgiveness." Inj. Op. 3; *see also* 77 Fed. Reg. 66,116 (stating that later ICR plans simply altered ICR "consistent with the statutory changes to IBR"). Under these plans, comparatively few people ever became eligible for forgiveness: just 3% as much as the amount anticipated by the 2023 rule challenged here. Inj. Op. 7.

## II.   The Department Initially Rejects Mass Forgiveness.

In 2021, the Department considered its authority to forgive loans. It conducted a full survey to determine whether it had "statutory authority to cancel, compromise, discharge, or forgive, on a blanket or mass basis," student loans or "materially modify the repayment amounts or terms thereof." Rubinstein Memorandum (2021).[2] The Department determined that it lacked authority: "it is impossible to escape the conclusion that Congress funds student loans with the expectation that such loans will be repaid in full with interest, except in identified circumstances." *Id.* at 6. The Department's conclusion aligned with the

---

[2] https://static.politico.com/d6/ce/3edf6a3946afa98eb13c210afd7d/ogcm emohealoans. pdf

Supreme Court's decision, two years later, that "Congress opted to make debt forgiveness available only in a few particular exigent circumstances." *Biden v. Nebraska*, 143 S. Ct. at 2369.

## III. The First and Second Mass Cancellation Attempts.

Despite the Department's conclusion in 2021, Defendants in 2022 tried to mass cancel up to $20,000 in debt for nearly all student loan borrowers, with a total price tag around $430 billion. The Supreme Court agreed with this Court that this was unlawful. *Biden v. Nebraska*, 143 S. Ct. at 2375.

Minutes later, the Secretary criticized the ruling sharply, calling it an "outrage," and announced he was "today" responding by "finaliz[ing]" a new regulation to again try to mass cancel loans. *Secretary Cardona Statement on Supreme Court Ruling on Biden Administration's One Time Student Debt Relief Plan*, Department of Education (June 30, 2023).[3] Defendant Biden declared he would "stop at nothing" to mass cancel loans. *Statement from President Joe Biden on Supreme Court Decision*

---

[3] https://www.ed.gov/news/press-releases/secretary-cardona-statement-supreme-court-ruling-biden-administrations-one-time-student-debt-relief-plan

*on Student Loan Debt Relief*, The White House (June 30, 2023).[4]  And he later boasted that "the Supreme Court blocked it.  They blocked it.  But that didn't stop me."  *Remarks by President Biden on the Saving on a Valuable Education Plan* (Feb. 21, 2024).[5]

The new rule, challenged here, amends and supersedes all three ICR plans.  The biggest changes are to REPAYE, which Defendants say was "fully replace[d]" by the new SAVE Plan.  App.412, R.Doc.52 at 2.  But the Final Rule changes all three ICR plans.  While those plans previously existed through separate regulations, this new rule is an "umbrella" regulation that "combin[es]" previous plans and makes changes to each.  88 Fed. Reg. 43,820.  As Defendants stated in their August 12 Emergency Motion for Clarification before this Court, the Final Rule "governs all ICR" plans.  CA8.App entry ID: 5423611 at 4.[6]

---

[4] https://www.whitehouse.gov/briefing-room/statements-releases/2023/ 06/30/statement-from-president-joe-biden-on-supreme-court-decision- on-student-loan-debt-relief/

[5] https://www.whitehouse.gov/briefing-room/speeches-remarks/2024/ 02/21/remarks-by-president-biden-on-the-saving-on-a-valuable-educ ation-plan-culver-city-ca

[6] All page citations to the parties' briefs refer to the page number listed in the docket stamp.

In their opening brief, Defendants discuss just one forgiveness provision. But the Final Rule includes three—25-year forgiveness, 20-year forgiveness, and 10-to-19-year forgiveness:

(1) 25-year forgiveness for borrowers "repaying at least one loan received for graduate or professional study" or "repaying under the [original 1994] ICR plan";

(2) 20-year forgiveness for borrowers "repaying only loans received for undergraduate study"; and

(3) 10-year to 19-year forgiveness for borrowers "repaying only loans received for undergraduate study" who had original principal balances of between $12,000 and $22,000.

88 Fed. Reg. 43,902–03 (amending 34 C.F.R. § 685.209); *see also* 88 Fed. Reg. 43,856 (noting that 20-year and 25-year forgiveness are provisions under SAVE).

The Final Rule also includes several other challenged provisions governing forgiveness eligibility. Most obvious are the new payment provisions. The old provisions were high enough that the typical borrower fully repaid each loan. For example, the 1994 ICR plan let individuals exempt only 100% of the poverty line and required payment of 20% of income above that line. *See* 59 Fed. Reg. 66,132, –135. The Final Rule, in contrast, lets borrowers exempt more than twice as much income—225% of the family-adjusted poverty line—and requires paying

just 5% of income above that line. Thus, while a borrower in a family of four with a median household income on the 1994 ICR plan would pay back $9,000 per year for up to 25 years, a borrower on the new plan under the Final Rule would repay almost nothing: just over $30 a month.

In fact, under the Final Rule almost nobody would repay their loans. The income eligibility is so lenient that *millions* of borrowers enrolled in the plan—a clear majority—"pay" $0. *FACT SHEET: President Biden Cancels Student Debt for More Than 150,000 Student Loan Borrowers Ahead of Schedule,* The White House (Feb. 21, 2024).[7] For those who pay anything at all, the "average" undergraduate borrower pays back only 61 cents per dollar borrowed. 88 Fed. Reg. 43,823, –80. Including graduate borrowers, that number ticks up only to 71 cents. *Id.* Even borrowers with incomes higher than 98 percent of Americans receive some forgiveness. *Id.* at 43,831. Even the most generous previous ICR plan (REPAYE), did not do that. Under that plan, the typical borrower repaid more than what he or she borrowed. *Id.* at 43,880.

---

[7] https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/21/fact-sheet-president-biden-cancels-student-debt-for-more-than-150000-student-loan-borrowers-ahead-of-schedule/

Other parts of the Final Rule also increase forgiveness. For example, the Final Rule changes the "family size" calculation for all three ICR plans. This change means certain borrowers "will no longer be required to include their spouse's income in their payment calculation." Department of Education, *Fact Sheet: How the New SAVE Plan Will Transform Loan Repayment and Protect Borrowers* at 1 (June 30, 2023).[8] Because of this change, those borrowers are able to shelter more income and thus pay less under all three ICR plans, leading to greater forgiveness. Similarly, Defendants note that the Final Rule "credits certain periods of deferment" toward forgiveness that were not previously credited. This includes deferment for periods of bankruptcy and unemployment. 88 Fed. Reg. 43,853, –903. By crediting those periods toward the forgiveness timeline, the Final Rule enables borrowers under all ICR plans to obtain forgiveness years faster than they could before.

The estimated cost of just the "SAVE" plan part of the Final Rule is nearly $500 billion. (The SAVE Plan replaces the REPAYE plan, but the Final Rule includes changes to all three ICR plans, plus some other

---

[8] https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/idrfactsheetfinal.pdf

changes.)  Defendants have not disputed that the Final Rule's published estimate of $156 billion is wrong.  88 Fed. Reg. 43,820.  That estimate wrongly assumed Defendants would prevail in *Biden v. Nebraska* and that loan balances would be $430 billion lower.  *Id*. at 43,875.  The Secretary chose not to update the estimate before finalizing the rule, but Penn Wharton estimates the cost of just the SAVE plan to be $475 billion. *Biden's New Income-Driven Repayment ("SAVE") Plan: Budgetary Cost Estimate Update*, Penn Wharton (July 17, 2023).[9]  The Supreme Court credited Penn Wharton's estimate in *Biden v. Nebraska*, 143 S. Ct. at 2373.

## IV.   The States Challenge the Final Rule in Its Entirety.

Although Defendants' brief at times contends that Plaintiff States challenged only one forgiveness provision in the Final Rule, they elsewhere admit (*e.g.*, at 23–24) the States in fact challenged the entirety of the Rule.

The States have consistently challenged *all* provisions that increase ICR forgiveness, not just the 10-to-19-year provision.  Although parts of

---

[9] https://budgetmodel.wharton.upenn.edu/issues/2023/7/17/biden-income -driven-repayment-budget-update

the complaint target that provision, others expressly challenge the "Final Rule" in its entirety. App.52–54, R.Doc.1 at 43–45. And in opposing the motion to dismiss, the States noted they "challenge Defendants' decision to unlawfully subsidize interest and challenge the ability of Defendants to use ICR authority to engage in *any* forgiveness." Supp.App.134;[10] R.Doc.26, at 61 (emphasis in original) (internal citation omitted).[11] The States thus challenge all ICR forgiveness provisions, plus others (such as the payment provisions) that increase ICR forgiveness.

## V. The District Court Enjoins Forgiveness Provisions, and This Court Blocks the Attempt to Evade That Injunction.

District courts in both the District of Kansas and the Eastern District of Missouri issued injunctions with respect to the Final Rule on the same day. *E.g.*, *Kansas v. Biden*, 6:24-cv-01057 (D. Kan. 2024), Supp.App.140; R.Doc.76.[12] The district court's core conclusion in the Missouri case held: "Congress has made it clear under what

---

[10] Plaintiffs do not understand Rule 30(a)(2) or Local Rule 28A(j) to require that all cited district court documents be filed in an appendix, but submit this Supplemental Appendix at the direction of the Clerk's Office.

[11] https://storage.courtlistener.com/recap/gov.uscourts.moed.211135/gov.uscourts.moed.211135.26.0.pdf

[12] https://storage.courtlistener.com/recap/gov.uscourts.ksd.151881/gov.uscourts.ksd.151881.76.0_2.pdf

circumstances loan forgiveness is permitted, and the ICR plan is not one of those circumstances." App.369, R.Doc.35 at 44. The court entered an injunction restricting Defendants from using that authority to forgive loans.

Defendants say (at 41) the district court enjoined only *one* provision related to forgiveness: the 10-to-19-year provision. Not so. The district court's order plainly says otherwise: "Defendants are preliminarily enjoined from *any further loan forgiveness* for borrowers under the Final Rule's SAVE plan."[13] App.387, R.Doc.36 (emphasis added). The SAVE plan includes *three* forgiveness provisions, not one. 88 Fed. Reg. 43,902–03. While Defendants contend that only one of these is new, they cannot dispute that all three are part of the SAVE Plan and that the plain text

---

[13] The district court may have conflated the SAVE plan with the Final Rule in its entirety. The district court's opinion goes even further than just the SAVE Plan mentioned in the one-page preliminary injunction, stating that it is "necessary to enjoin Defendants from *any* further implementation of the Final Rule's loan forgiveness *provisions*." App.328, R.Doc.35 at 3 (emphasis added). The Final Rule's forgiveness provisions pertain not only to the SAVE plan, but also to the ICR and PAYE plans. For present purposes, the States adopt the narrowest view of the district court's injunction. Even then, Defendants violated the injunction.

of the order enjoins *all* "forgiveness for borrowers under the Final Rule's SAVE plan." App.387, R.Doc.36.

Defendants nonetheless continued forgiving loans anyway, which this Court said "rendered the injunction a nullity." Inj. Op. 4. As the administrative panel put it, "[d]espite the district court's injunction, the Government continue[d] to forgive loans for borrowers enrolled in SAVE." *Id.* "It d[id] so through a new so-called 'hybrid rule'"—Defendants' term—that "combine[d] the parts of SAVE that the district court did not enjoin, such as the payment-threshold provisions and nonaccrual of interest, with the forgiveness-of-principal provisions in REPAYE." *Id.*

When Defendants announced they were continuing to forgive loans, the States immediately perceived several problems. First, Defendants contended they were forgiving loans under REPAYE, but REPAYE no longer existed. Defendants have repeatedly declared, "The SAVE Plan replaced the Revised Pay As You Earn (REPAYE) Plan." *SAVE Plan Announcement*, Federal Student Aid (last visited August 14, 2024).[14] Defendants thus had to concede to the district court that REPAYE was "fully replace[d]" by the SAVE plan. App.412, R.Doc.52 at 2.

---

[14] https://studentaid.gov/announcements-events/save-plan

Second, Defendants could not rely on the REPAYE forgiveness provisions because those became part of SAVE, and the district court expressly enjoined *all* forgiveness provisions in the SAVE plan. *Cf.*, *New York State Telecommunications Ass'n, Inc. v. James*, 101 F.4th 135, 156 (2nd Cir. 2024) (government cannot "pick and choose powers from both regulatory regimes simultaneously") (emphasis omitted). Unlike the States, Defendants never moved to clarify the injunction.

Third, Defendants did not go through notice and comment. As Defendants admitted to the district court, what Defendants called the "hybrid" plan involved a combination of benefits no borrower had ever received before. Defendants acknowledged that "[i]t is true" that "they are trying to forgive loans between 20 and 25 years for borrowers who were never in any previous ICR program." App.422, R.Doc.52 at 12. Defendants created this new set of benefits without notice or comment.

The States thus sought emergency relief in this Court. "In light of the Government's post-injunction actions, [this Court] administratively stayed implementation of the hybrid rule on July 18 until the parties could fully brief the emergency motion for an injunction pending appeal." Inj. Op. 5. Three weeks later, the administrative panel issued a 10-page

opinion granting an injunction pending appeal, concluding that this second "attempt to engage in mass student-loan cancellation" is "even larger in scope" than the first and "the text of the HEA makes a showing [by the Government] of even mere plausibility difficult." *Id.* at 5, 6, 8.[15]

On August 13, 2024, Defendants filed an application in the Supreme Court, requesting vacatur of this Court's injunction, and raising the same arguments they now raise before this Court. On August 28, 2024, following full briefing, the Supreme Court rejected Defendants' application without any dissent.

## VI. Defendants Surreptitiously Attempt Mass Cancellation a Third Time.

Immediately after the States brought this lawsuit, Defendants launched a third—more audacious—attempt to mass cancel loans. No doubt displeased that their first two attempts were blocked, Defendants took to cloak and dagger in an attempt to forgive hundreds of billions faster than anyone could sue—in brazen violation of mandatory waiting

---

[15] Defendants moved to clarify that the injunction did not (1) extend to forgiveness *other* than ICR nor (2) extend to the ICR and PAYE plans. The States opposed, noting that the States did not challenge forgiveness other than ICR (so clarification was unnecessary) and that the Final Rule alters the other ICR plans in ways that harm the States. The administrative panel rejected Defendants' motion.

periods set by Congress. Missouri and several other States discovered this plan at the end of August and obtained an injunction.

Defendants proposed their Third Mass Cancellation Rule in late April. This new rule rests on the weakest statutory authority yet. Indeed, in 2021 the President, Speaker of the House, and the Department itself disclaimed the authority that Defendants now assert. *Missouri v. Dep't of Educ.*, No. 2:24-cv-00103 (S.D. Ga.), Supp.App.211; R.Doc.5 at 8. Recognizing their plans could not withstand scrutiny, Defendants concocted a scheme to evade judicial review.

After the NPRM was published, Defendants informed the public they would publish a final rule in October. *E.g.*, Office of Information and Regulatory Affairs, RIN: 1840-AD93.[16] At the same time, behind closed doors, they told loan servicing organizations they were in fact going to cancel loans a month *earlier*, in September. *Dep't of Educ.*, Supp.App.199; R.Doc.1-12 at 2 ("In September of 2024, the Biden-Harris Administration *will* launch the Federal Student Loan Debt Initiative."

---

[16] This spring, Defendants stated on the website of the Office of Information and Regulatory Affairs their intent to publish in October. https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202404&RIN=1840-AD93.

(emphasis added)). Worse yet, Defendants began issuing mandates to loan servicers, instructing them on how to cancel loans, even before the comment period for the NPRM had closed.

Then in June, Defendants quietly altered the contracts of every federal loan servicing organization, compelling them to comply with demands to forgive loans. Defendants further instructed loan servicers to be ready to "immediately" forgive loans in early September, stating there would be a forgiveness "surge" on September 9. *Id.*; Supp.App.268; R.Doc.45 at 3; Supp.App.185–86; R.Doc.1-4 at 3–4; Supp.App.202; R.Doc.1-12 at 6.

All this occurred outside the public eye. Defendants never notified the public that they had already finalized their decision to cancel hundreds of billions of dollars in loans under a third mass cancellation rule, that they had altered the contracts of loan servicers to compel forgiveness, and that they were planning to forgive loans without first giving Congress the 60 days of notice required by the Congressional Review Act (CRA), 5 U.S.C. § 801(a)(3). Defendants even pre-drafted emails that they would require loan servicers to send out, letting

borrowers know to credit "[t]he Biden-Harris Administration" for their new windfall. *Dep't of Educ.*, Supp.App.193–95; R.Doc.1-10 at 1–3.

Fortunately, Missouri (through compulsory process) obtained documents in the last week of August revealing this surreptitious plan. Even though Defendants were telling the public they would not publish until October, and even though federal law prohibits the Department's rule from going into effect for at least 60 days, these documents proved that Defendants planned to publish their new rule on or just before the September 9 forgiveness "surge" date and immediately begin cancelling loans. *Id.*; Supp.App.266; R.Doc.45.

Missouri and six other States sued and quickly obtained injunctive relief. After expedited briefing, Defendants conceded at oral argument (held on September 18) that they quietly altered the contracts of loan servicers in June, that loan servicers were contractually obligated to effectuate forgiveness once the rule was published, and that they planned to violate the 60-day notice requirement under the Congressional Review

Act.[17]  Even more egregious, Defendants admitted that forgiveness was scheduled to begin no later than 72 hours after the rule was published.

At the end of the hearing, the district court granted Missouri's request for extended injunctive relief.  Although the third mass cancellation attempt rests on a different provision of the HEA and a different rulemaking, it provides important context to Defendants' pattern and practice of repeatedly trying to mass cancel hundreds of billions of dollars in student loans despite lacking authority.

---

[17] The States will provide a supplemental filing with the Court with a transcript of that proceeding as soon as that transcript becomes available.

## SUMMARY OF THE ARGUMENT

**I**. Many of the administrative panel's conclusions are law of the case and thus need not be revisited. But in any event, the States brief all issues and should prevail.

**II**. The States easily have standing. As both the district court and this Court's earlier panel concluded, the States proved the same theory of standing that prevailed in the Supreme Court last year. Against this, Defendants try to assert that the Final Rule somehow *benefits* MOHELA. The district court made a contrary fact finding, and Defendants do not contend that it is clearly erroneous. Courts also do not consider "offsetting benefits" in standing analysis, and in any event, MOHELA stands to lose up to $285 million each year, far more than the paltry "benefits" Defendants purport to identify. The States also have standing for other reasons, such as because the Rule deprives MOHELA of future interest revenue and harms the competitive interests of the Bank of North Dakota.

**III**. The Rule easily flouts the major questions doctrine, as every court to consider the issue has concluded. The Rule covers the same topic and is bigger than the first mass cancellation attempt. Defendants thus

must identify exceedingly clear language authorizing their actions. They cannot; they rely instead on inference and implication.

The Rule similarly exceeds statutory authority. The relevant statute not only does not authorize forgiveness; it expressly requires repayment. And in stark contrast to the ICR provision, many other sections in the Higher Education Act expressly permit forgiveness. Defendants' assertion that the Secretary has authority to cancel every penny of every loan would render those programs—carefully negotiated by Congress—completely superfluous.

Without the ability to forgive, everything else must fall. The Final Rule includes a number of provisions—such as the payment provisions—that dictate eligibility for forgiveness. Those provisions make no sense absent the ability to forgive.

The Final Rule is also arbitrary and capricious because it deliberately underestimates the cost of the Rule by more than $300 billion. Defendants rested their $156 billion cost estimate on the assumption that they would win *Biden v. Nebraska*—even though they had *already* lost that case before the Secretary finalized or published the

Rule. The APA requires "that agency action be reasonable and reasonably explained." The cost estimate is the antithesis of that.

**IV**. As this Court already concluded, the States face irreparable harm, and the balance of equities favor the States. That is especially true given Defendants' extraordinarily inequitable conduct, such as their repeated violations of the Congressional Review Act and their violation of the plain text of the district court's injunction.

**V**. As this Court has twice concluded, the scope of the injunction must be broad—against the entire Rule—for the States' injuries to be rectified. Defendants have twice pressed their scope-of-injunction argument to the Supreme Court and have twice lost.

## STANDARD OF REVIEW

When reviewing the grant or denial of a preliminary injunction, the Court must "apply clear error to fact findings, *de novo* review to legal conclusions, and abuse of discretion to the ultimate decision to grant the injunction." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (citation omitted). "[T]his Court will not disturb the issuance of a preliminary injunction so long as the decision 'remains within the range of choices available to the district court, accounts for all relevant factors, does not rely on any irrelevant factors, and does not constitute a clear error or judgment.'" *Id.* (citation omitted).

"[A] district court may grant a preliminary injunction when a movant shows '[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024) (citation omitted). "While no single factor is determinative, the probability of success factor is the most significant." *Id.* (citation and quotations omitted). "In circumstances where the movant has raised a substantial question and the equities are otherwise strongly in his favor,

the showing of success on the merits can be less." *Nebraska v. Biden*, 52

F.4th 1044, 1046 (8th Cir. 2022) (internal quotation marks omitted).

## ARGUMENT

The district court correctly concluded that Defendants lack

authority under the ICR provision to forgive loans. But the district court

failed to enjoin Defendants from evading that injunction, and the district

court failed to enjoin other parts of the Final Rule that necessarily

increase forgiveness. This Court temporarily fixed those errors by

granting an injunction pending appeal. This Court should confirm this

Court's earlier injunction.

## I. Several of the Administrative Panel's Conclusions Are Law of the Case.

Many of the administrative panel's determinations are law of the

case. This Court regularly applies law-of-the-case doctrine to decisions

by administrative panels. *E.g.*, *Thompson v. United States*, 872 F.3d 560,

564–65 (8th Cir. 2017) ("[A]n administrative panel's denial of a motion to

dismiss for lack of jurisdiction typically is the law of the case, ordinarily

to be adhered to in the absence of clear error or manifest injustice.");

*McCuen v. Am. Cas. Co. of Reading, Pennsylvania*, 946 F.2d 1401, 1403

(8th Cir. 1991) (law of the case where brief was "based essentially on the

same arguments" as before and there was "nothing clearly wrong or manifestly unjust about the previous order, entered by a motions panel"); *Pinder v. WellPath, LLC*, No. 22-3050, 2024 WL 3734159, at *8 (8th Cir. Aug. 9, 2024) (Kelly, J., concurring) (prior administrative panel decision before current panel is binding).

"For the law of the case doctrine to have any application, however, the prior administrative panel must have actually decided the specific jurisdictional issue." *Thompson*, 872 F.3d at 565 (quoting *Nyffeler Constr., Inc. v. Sec'y of Labor*, 760 F.3d 837, 841–42 (8th Cir. 2014)). That is because administrative panels sometimes issue tentative conclusions "on a scanty record." *In re Rodriquez*, 258 F.3d 757, 759 (8th Cir. 2001). The test is whether the administrative panel issued its decision with "sufficient directness and clarity" to show that the panel "actually decided the specific" issue. *Nyffeler*, 760 F.3d at 842; *Nordgren v. Hennepin Cnty.*, 96 F.4th 1072, 1077 (8th Cir. 2024) (reconsidering an administrative panel's decision because its "summary nature … lacked sufficient directness or clarity").

Here, the administrative panel's published opinion "actually decided" several issues with "sufficient directness and clarity"—and did

so with the benefit of briefing and several weeks of time. For example, the administrative panel decided that "at least one of the States, Missouri, has standing to sue"; that the States met the preliminary injunction standard because they "demonstrated at least a 'fair chance' that they will ultimately prevail" on the issues presented in that application; that the major-questions doctrine applies because the Final Rule includes a "vast assertion of newfound power"; and that Missouri has demonstrated irreparable harm. Inj. Op. 6–8.

These decisions are thus binding unless "substantially different evidence is subsequently introduced or the decision is clearly erroneous and works manifest injustice.'" *Maxfield v. Cintas Corp., No. 2*, 487 F.3d 1132, 1135 (8th Cir. 2007) (citation omitted). Defendants have not met these requirements. For example, as in *Thompson*, the record remains unchanged. The only thing that has happened since mid-August is the Supreme Court also rejected Defendants' arguments.

## II. The States Easily Have Standing.

### A. The States have standing under the exact theory the Supreme Court accepted last year.

As both the district court and this Court's earlier panel easily concluded, the States proved the same theory of standing that prevailed

in the Supreme Court last year. Specifically, the Supreme Court ruled that because "MOHELA is a 'public instrumentality' of the State," any "harm to MOHELA is also a harm to Missouri." *Biden v. Nebraska*, 143 S. Ct. at 2366 (quoting Mo. Rev. Stat. § 173.360). And because "MOHELA receives an administrative fee for each of the five million federal accounts it services," any decrease in balances decreases MOHELA's number of accounts, decreasing its administrative fees and conferring standing. *Id.* Just weeks ago, the district court in the Southern District of Georgia likewise concluded that Missouri has standing to challenge the third mass cancellation rule under this same theory. TRO order, *Missouri v. Dep't of Educ.*, No. 2:24-cv-103 (S.D. Ga., Sept. 5, 2024), Supp.App.262; R.Doc.17 at 3.

Since last year, MOHELA's number of accounts has grown to more than 8 million, the substantial majority of which (if not all) would be eligible for at least some forgiveness under the Final Rule or Defendants' new "hybrid" plan. *See, e.g.*, App.231, 236; R.Doc.22-2 ¶¶3, 32. For purposes of Article III, a single dollar of injury suffices. *E.g.*, *Sprint Commun. Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269, 289 (2008) ("a dollar or two"). At the base contract rate of $35.64 per account per year

(the rate when the suit was filed), MOHELA stands to lose not just a few dollars, but up to $285 million *each year* from cancellation.

Struggling against this reality, Defendants offer several arguments against standing. Each fails

**1.** Consider first Defendants' speculation (at 35) that "there is reason to believe that MOHELA would benefit financially from the Rule's implementation." Defendants ignore that the district court made an express fact finding rejecting that argument: "other purported benefits of the Final Rule to MOHELA do not offset the alleged and actual harms experienced by MOHELA." App.363, R.Doc.35 at 38. These "factual findings are reviewable only for clear error," and Defendants assert none. *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 394 (2018). Defendants cannot defeat the States' prima facie case of standing through pure speculation.

Defendants' contention is especially erroneous because courts universally reject any analysis of "offsetting benefits" for purposes of standing. The settled rule is that, as a matter of standing, "no attempt is made to ask whether the injury is outweighed by benefits." Wright & Miller, 13A Federal Practice & Procedure § 3531.4 (3d ed.). "In resolving

standing, courts do not engage in such an 'accounting exercise.'" *Texas v. United States*, 50 F.4th 498, 518 (5th Cir. 2022) (citing sources). Offsetting benefits may be "sufficient to defeat a claim for damages," but it "does not negate standing." *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008)

Defendants cite a Fifth Circuit case announcing that offsetting benefits may be considered when they "are of the same type and arise from the same transaction as the costs." *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015)). That would occur if the Final Rule agreed to compensate MOHELA for all its losses. But that of course is not what is going on here. Defendants' reliance on *Texas* is misplaced because that case expressly undercuts their position here. There, the Federal Government argued that the costs to Texas by the DAPA immigration program would "be offset by other benefits to the state"—immigrants registering their vehicles and buying insurance, thus "reducing the expenses associated with uninsured motorists." *Id.* at 155. The court disagreed, holding these purported benefits were too attenuated to be part of the "same transaction" as what imposed the costs. *Id.* at 156. In short, an offsetting benefits inquiry requires "a much tighter nexus" than

indirect economic effects.  Defendants offer no more than conjecture and speculation with little (if any) nexus to the losses MOHELA will suffer.[18] Defendants do not rely on a single case where a court found benefits offset the harms and undermined Article III standing.

As if more needed to be said, Defendants also cannot hope to win on the math.  Defendants speculate that the plan might reduce delinquency rates, thus increasing the amount of time accounts exist.  But the same arguments were applicable during the first mass cancellation attempt, yet the U.S. Solicitor General wisely "concede[d]" that MOHELA was harmed by the rule.  *Biden v. Nebraska*, 143 S. Ct. at 2366.  Now that they lost their argument that Missouri cannot sue on behalf of MOHELA, Defendants reverse course.  But they tellingly are unwilling to put up actual numbers behind their speculation.  That is because delinquency rates are near 0% right now and have historically hovered only around 10%.  Even if the Rule eliminated delinquencies, that would be a drop in

---

[18] Defendants' references to *Louisiana ex rel. La. Dep't of Wildlife & Fisheries v. National Oceanic & Atmospheric Admin*, 70 F.4th 872 (5th Cir. 2023), and *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547 (5th Cir. 2016) are equally confounding.  In each case, plaintiffs failed to submit evidence of *any harm whatsoever. Louisiana*, 70 F.4th at 877 ("no evidence of how the Final Rule will burden the LDWF"); *Wendt*, 821 F.3d at 550 ("alleged violations of the Act did not harm Plaintiffs in any way").

the bucket compared to the 98% of accounts that would be eligible for forgiveness under this rule.

Defendants are thus left with paltry figures compared to MOHELA's losses. Defendants cite (at 35–36) only $1.6 million in transition fees given to MOHELA (which do not even cover increased administrative costs), and they speculate that if MOHELA has fewer accounts it can "avoid error-related penalties." But Defendants are able to identify just *one* "penalty," which was $7.2 million and has not even been finalized as of the filing of this suit. Against this, MOHELA stands to lose up to $285 million *each year* from cancellation (the base contract rate of $35.64 per account per year when the suit was filed multiplied by the 8 million accounts). Even if only 3% of MOHELA's accounts were cancelled, that would still exceed every "offsetting benefit" Defendants identify. The U.S. Solicitor General was right the first time: MOHELA is obviously harmed by rules that decrease balances.

**2.** Even stranger is Defendants' assertion that MOHELA lacks standing because it previously asked Defendants to transfer up to 1.5 million accounts to other servicers. This argument is highly misleading and easily fails.

First, few of those accounts were even affected by the forgiveness provisions of the Final Rule. The vast majority of these accounts were Public Service Loan Forgiveness (PSLF) accounts, meaning they were eligible for forgiveness after 10 years under a separate, unchallenged program, not under the Final Rule. App.241; R.Doc.22-3 at 1. The Final Rule seeks to cancel different accounts.

Second, those accounts were already contractually scheduled to be transferred in June 2024; MOHELA simply asked for them to be transferred two months early for efficiency reasons. *Id.* In July 2022, MOHELA became the sole servicer of PSLF accounts. But under a new contract, "four other loan servicers" became servicers of PSLF accounts. *Id.* at 3. For that reason, MOHELA PSLF accounts already were "slated to be transferred to a different servicing platform." *Id.* at 2. MOHELA simply asked to transfer them early to save the expense and time of transitioning them to MOHELA's new operating system before transferring them to other loan servicers. *Id.* at 2–3 ("more work and time is required to transfer accounts off of the legacy platform and then onto MOHELA's new platform than to simply transfer the loan directly to another [loan] servicer"). Notably, Defendants "agree[d] that

movement of accounts" in this way "will improve customer service," so the Secretary agreed to accept the transfer. App.246; R.Doc.22-4 at 2 ("we are supporting the request").

Third, MOHELA's request to transfer accounts two months early in no way justifies Defendants cancelling millions of different accounts. Those transfers were completed before the end of June. If the Final Rule is permitted to go into effect, Defendants will prematurely cancel millions of MOHELA accounts in perpetuity, cancelling accounts every single month. Defendants' argument is a lot like saying that a car dealership that offers to donate one cruiser to the police department cannot complain if the police department forcibly takes 10.

Finally, in a highly misleading passage, Defendants assert that the 1.5 million accounts was 20 times the 81,000 accounts Defendants identified for cancellation in May. But those accounts were just the ones that had already been cancelled or were already "being processed" for forgiveness. App.236; R.Doc.22-2 at 8. Each month under the Final Rule, tens of thousands of additional accounts will be "processed" for cancellation. As of May, more than 2.24 million MOHELA account holders had enrolled in SAVE, with many millions more eligible to enroll.

App.231; R.Doc.22-2 ¶3. Defendants' attempt to represent the 81,000 accounts as the sum total accounts to be affected—rather than the total cancelled or "being processed" for cancellation by May 2024—is highly misleading.

**3.** As they unsuccessfully did at the Supreme Court, Defendants again assert (at 40) that MOHELA is not harmed by "forgiveness on preexisting timelines"—*i.e.*, forgiveness at 20 or 25 years. Nonsense. Any forgiveness deprives MOHELA of servicing fees. *Biden v. Nebraska*, 143 S. Ct. at 2366. Perhaps Defendants mean to say the statute of limitations has run. That is not an argument about standing, Defendants fail to develop it, and it is wrong. MOHELA is a directly regulated party and "suffers an injury from final agency action" every time the Secretary cancels a MOHELA-held account, regardless of when the regulation purporting to authorize cancellation was promulgated. *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve System*, 144 S. Ct. 2440, 2450 (2024).

In any event, the so-called "preexisting" forgiveness provisions operate not in isolation, but in combination with eligibility provisions. They must be assessed together, for as the Supreme Court has "stressed" for decades, the "the entire regulatory program must be considered in

resolving the case." *United States v. United Foods, Inc.*, 533 U.S. 405, 412 (2001). "Courts have a 'duty to construe statutes, not isolated provisions.'" *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010); *accord FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("a reviewing court should not confine itself to examining a particular statutory provision in isolation").

The Final Rule is brimming with new eligibility provisions that increase the amount of borrowers who receive forgiveness beyond what occurred under the ICR plans before they were amended by the Final Rule. Three examples suffice.

First are the payment provisions. These hike the income-exemption amount (to 225% of the federal poverty line) and slash the payment amount (down to 5% above that line), dramatically increasing eligibility for forgiveness by "3,000 percent." Inj. Op 7. Defendants cannot dispute that the payment provisions—operating together with forgiveness provisions—enable millions more borrowers to obtain forgiveness. That harms MOHELA, which services millions of those accounts.

Likewise, the "family size" provision harms MOHELA. That provision increases forgiveness eligibility by excluding certain income from consideration that used to be included. Again, Defendants cannot dispute that the provision leads to more forgiveness under all ICR plans than could occur without it.

Similarly, the provision crediting deferment for bankruptcy and unemployment harms MOHELA. It makes some borrowers newly eligible for forgiveness and makes other borrowers eligible for forgiveness sooner than they otherwise would be. Either event deprives MOHELA of servicing fees it otherwise would receive.

In short, the three previous ICR plans always harmed MOHELA (and thus Missouri) because they unlawfully cancelled loans. But because their strict eligibility requirements meant they had "low participation," 77 Fed. Reg. 66,116, the harm was small, and nobody sued. In contrast, the changes made by the Final Rule to all three plans hiked the harm by "an order of magnitude broader than anything that has come before." Inj. Op 3. Forgiveness provisions must be assessed together with eligibility provisions. This Court should reject Defendants insistence otherwise.

## B. Plaintiffs have standing because the Final Rule deprives MOHELA of a stream of future interest revenue.

Even in isolation, many of these provisions independently harm the States. All these provisions harm MOHELA by depriving it of a stream of interest revenue. Recall that until 2010, student loans were often issued and held by organizations other than the Federal Government. MOHELA owns nearly "$1 billion" in those loans, *Biden v. Nebraska*, 143 S. Ct. at 2365, and receives a large stream of interest revenue: $51 million last year, App.204, R.Doc.1-7, at 14. The Final Rule's provisions cause borrowers to refinance their legacy loans into direct loans so they can take advantage of the Final Rule's $0 payments. When borrowers refinance those loans, MOHELA loses that stream of revenue.

The States have easily "show[n] that the third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (quotation marks and citations omitted). It does not take a Ph.D. to understand why borrowers would prefer $0 "payments" under the Final Rule to actual repayment under their current loans.

Indeed, the States presented unrebutted evidence that right after Defendants announced in late January that they were forgiving loans before July, refinancing of MOHELA loans more than *tripled* in February compared to December. App.312–22, R.Doc.26-1 at 19–20. The last time MOHELA saw a similar increase was 2022 when Defendants announced their first mass cancellation. *Id.* The idea that not a single borrower will refinance because of the Final Rule "strains credulity." *Alabama Ass'n of Realtors*, 594 U.S. at 760. Indeed, Defendants expressly encourage borrowers to refinance specifically to take advantage of the Final Rule. App.39, R.Doc.1 ¶123 (citing sources).

## C. The Final Rule harms North Dakota.

Plaintiffs also have standing through the Bank of North Dakota. The State of North Dakota "maintain[s] a system of banking owned, controlled, and operated by it, under the name of the Bank of North Dakota." N.D.C.C. § 6-09-01. The bank funds and administers a state-sponsored student loan program and a student loan consolidation program. *See* N.D. Cent. Code ch. 15-62.1. The student loan offerings include the "Dakota Education Alternative Loan" or "DEAL" program for borrowers attending institutions of higher education in North Dakota.

*See* Bank of North Dakota, *DEAL Student Loan* (last visited Sept. 18, 2024).[19]  Interest earned by the Bank from student loans is used to implement, maintain, and administer state programs.  *See* N.D. Cent. Code §§ 15-62.1-01; 15-62.1-05.

The Final Rule harms the financial interests of this state-owned bank by undermining its ability to compete in the business of providing and consolidating student loans.  For example, the interest rate on federal student loans is set by a formula enshrined in statute.  20 U.S.C. § 1087e(b).  The Bank enables borrowers who have taken out federal student loans to refinance their loans as State-financed student loans when the Bank is able to offer rates lower than what the Federal Government is able to authorize.  About 16,000 borrowers have refinanced their federal student loans into North Dakota-financed student loans because the Bank has been able to provide better terms.  App.230; R.Doc.26-2 ¶8.  But under the Final Rule, student loan recipients that received or consolidated their student loans through the Bank of North Dakota will not be eligible to have their loans absolved or

---

[19]      https://bnd.nd.gov/education-funding/apply-for-student-loan/deal-student-loan/

their interest waived.  Consequently, despite the Bank's ability to offer more competitive rates and the convenience of the Bank working directly with in-state post-secondary institutions, under the Final Rule "borrowers will be strongly disincentivized to take or consolidate their loans with the Bank of North Dakota," *id.* ¶9, if loans issued by the Federal Government will no longer require repayment.  This will cost the Bank $19 million over the next 15 years.  *Id.* ¶10.

The Bank thus experiences Article III injury when the Federal Government begins engaging in loan forgiveness programs that are contrary to law.  And because the Bank is the State of North Dakota engaged in business, harms to the bank are direct harms to the State itself.  *Biden v. Nebraska*, 143 S. Ct. at 2366; *see also Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) (a party "suffer[s] constitutional injury in fact when agencies lift regulatory restrictions on their competitors").

### D. The States have standing for additional reasons.

The States presented several additional theories of standing to the district court.  Supp.App.097–105; R.Doc.26, at 24–32.  Though the district court, in dicta, "note[d]" those theories as "tenuous," it further

explained that it "need not address" any theories beyond MOHELA's clear and obvious standing to sue. *Id.* Defendants make no attempt to rebut those theories.

## III.   The States Are Likely to Succeed on the Merits.

There is a reason the Final Rule is Defendants' *backup* plan for mass loan forgiveness: Defendants' statutory arguments are even weaker than in *Biden v. Nebraska*. The Final Rule easily flunks the major questions doctrine, and even "ordinary tools of statutory interpretation" decisively prove that the ICR statute does not authority forgiveness *Biden v. Nebraska*, 143 S. Ct. at 2375. The payment provisions are likewise unlawful, and the whole rule is arbitrary and capricious for including a deliberately false cost estimate.

### A. The Final Rule violates the major questions doctrine.

As the district court and administrative panel readily concluded, the Secretary's assertion of unfettered authority to cancel every penny of every loan—and his attempt to cancel nearly $500 billion here—is obviously of "vast economic and political significance" and so triggers the major questions doctrine. *E.g.*, *Alabama Ass'n of Realtors*, 594 U.S. at 764. It covers the same political topic as in *Biden v. Nebraska* and carries

an even larger price tag. The district court correctly concluded that "there is no real dispute" the doctrine applies. App.371, R.Doc.35 at 46.

**1.** The problem for Defendants is that, having triggered the major questions doctrine, they are unable to satisfy its burden of identifying "exceedingly clear language," *Alabama Ass'n of Realtors*, 594 U.S. at 764, justifying the full "breadth of the authority that the agency has asserted," *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (cleaned up); *see also BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604, 617 (5th Cir. 2021) ("assertion of virtually unlimited power" raised separation-of-powers concerns over agency mandate). To date, Defendants have never disputed that the ICR provisions (unlike others in the Act) lack express forgiveness authority.

They have thus been forced to rely on implication and inference. Here, Defendants claim (at 55) the authority to forgive can be implied because (1) "Congress expressly granted the Secretary discretion to set ICR payments based on the borrower's income," and (2) Congress "capped the length of a borrowers obligation." Indeed, Defendants admit theirs is

not the only "natural interpretation." *Id.*[20] The very existence of dueling plausible interpretations is fatal to their claim. Indeed, it is doubtful an agency can ever satisfy the doctrine where, as here, the agency took the opposite position just three years ago. *See* Rubinstein Memorandum, *supra*. Under the major questions doctrine, authority must be clear and unequivocal, not subject to any other interpretation. *Alabama Ass'n of Realtors*, 594 U.S. at 764. The Secretary's assertion that he has authority to forgive every penny of every student loan is thus an open-and-shut violation of the major questions doctrine.

Moreover, in a tell-tale sign that that they lack "exceedingly clear language" authorizing the Rule, Defendants turn (at 43 n.5) to legislative history. Not only does reliance on legislative history undermine any notion of "exceedingly clear" statutory language, but the cited source *undercuts* their position; it establishes that the Department explicitly "suggested" that express forgiveness authority be included, only for

---

[20] Defendants asserted below that their interpretation was "(at least) equally consistent" with Plaintiff States' interpretation. Supp.App.050; R.Doc.22 at 50. That admission dooms their case under the major questions doctrine and conflicts with their assertion now (at 55) that "[n]either alternative [interpretation] identified by the district court provides a plausible alternative to forgiveness."

Congress not to include that language even though it had previously done so in other provisions in the Higher Education Act. *E.g.*, 20 U.S.C. § 1087ee.

**2.** Unable to identify unequivocal textual authority, Defendants press the uphill argument that the major questions doctrine does not even apply. Every court has rejected that—the district courts in Missouri and Kansas, and the administrative panel of this Court. Their argument fails for two fundamental reasons.

First, their argument (at 53–54) that triggering the doctrine requires more than a showing of "vast economic and political significance" misreads Supreme Court precedent, which requires only those two factors. *E.g.*, *Alabama Ass'n of Realtors*, 594 U.S. at 763 ("We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance."); *Biden v. Nebraska*, 143 S. Ct. at 2374 (similar).

Second, even accepting Defendants' invitation to look at the "history" and "breadth" of regulation, Defendants' actions easily violate the doctrine. As the administrative panel readily concluded, the Final Rule is a "vast assertion of newfound power," which authorizes

Defendants to "forgive hundreds of millions of dollars' worth of student loans, 3,000 percent more than have ever been forgive under any previous ICR program." Inj. Op. 7. In sum, because the Final Rule "expands agency authority to such an extent that it alters it," *id.* (quoting *Alaska v. U.S. Dep't of Educ.*, 2024 WL 3104578, at *11 (D. Kan June 24, 2024)), the doctrine applies.

Against the conclusion of this Court's administrative panel, Defendants downplay (at 52–53) their claimed authority as "not new" and "merely incremental, not transformative." To the contrary, "the Secretary's plan has modified the cited provisions only in the same sense that the French Revolution modified the status of the French nobility—it has abolished them and supplanted them with a new regime entirely." *Biden v. Nebraska*, 143 S. Ct. at 2369 (internal quotation marks omitted). Specifically, while ICR program previously had "low participation" and few people qualified for forgiveness, 77 Fed. Reg. 66,116, the Final Rule creates a universal plan for any and all borrowers that would provide forgiveness for participants up until the 98th income percentile. In effect, it turns a loan repayment program (where the average undergraduate borrower paid back their principals plus interest) into a grant program

(where the average undergraduate borrower pays only 61% of their principal before the remainder is forgiven).

**3.** Finally, Defendants for the first time dispute that the Final Rule is of "vast economic significance." They assert (at 53) that just $4 billion of the cost pertains to the 10-to-19-year forgiveness provision. They did not make this argument to the district court, so it is waived. *E.g.* App.371, R.Doc.35 at 46 (district court concluding "there is no real dispute" that the major questions doctrine applies). In any event, it is wrong for two reasons.

First, the amount is a vast underestimation. Defendants' loss in *Biden v. Nebraska* increased the cost of this rule by more than $300 billion—and much (if not most) of that increase applies to the 10-to-19-year provision. That is because this provision applies to undergraduate borrowers whose original principal balances are less than $22,000. The first mass cancellation rule would have wiped out between $10,000 and $20,000 in debt from nearly all borrowers and thus would have disproportionately wiped out accounts from individuals now eligible for the 10-to-19-year forgiveness. The true cost is not $4 billion, but likely 20 or 30 times that amount.

Second, the major questions doctrine is based on the full "breadth of the authority that the agency has asserted." *West Virginia*, 597 U.S. at 721 (cleaned up). The Supreme Court did not permit the Federal Government to continue imposing its eviction moratorium in a few States on the ground that it cost less than imposing it nationwide. *Alabama Assn. of Realtors*, 594 U.S. at 764. No, the Federal Government asserted authority to impose a nationwide moratorium, so the Court assessed the cost of that. Here, Defendants assert authority to cancel every penny of every loan. That is the baseline this Court must assess.

## B. The Final Rule is in excess of statutory authority.

What the major questions doctrine reveals, the plain text reinforces. "Congress opted to make debt forgiveness available only in a few particular exigent circumstances." *Biden v. Nebraska*, 143 S. Ct. at 2369. As both the administrative panel and the district court concluded, "the ICR plan is not one of those." Inj. Op. 7 (quoting the district court).

### a. The Final Rule violates the plain text.

The text enables the Secretary to promulgate "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D).

Nothing here provides authority—express or implied—for loan forgiveness. It simply states that the Secretary can vary payment amounts based on income (unlike the fixed amounts in other plans) and can let borrowers stretch repayment up to 25 years instead of 10. For at least three reasons, the plain text undermines the Final Rule.

**1.** Far from authorizing forgiveness, the text expressly requires "repayment." The statute describes ICR plans as "plans for *repayment* of such loan, *including principal and interest*," and goes on to say the "balance due" from each borrower on an "income contingent repayment" plan "*shall* equal the unpaid principal amount of the loan, any accrued interest, and any fees." § 1087e(d)(1)(D), (e)(5) (emphasis added). That matches the ordinary meaning of "repayment." *See Repayment*, Black's Law Dictionary (12th ed. 2024) ("An amount of money paid regularly until a debt has been satisfied"); *Repay*, Black's Law Dictionary (6th ed. 1990) ( "[t]o pay back"); *In re Goodvin*, No. 19-10623, 2020 WL 6821867, at *8 (Bankr. D. Kan. Sept. 1, 2020) ("In the loan or finance context, repayment means paying the amount borrowed and the interest."). Moreover, the "Calculation of Balance Due" provision, 20 U.S.C. § 1087e(e)(5), was included in the same bill Congress used to enact ICR.

It defies logic to suggest that Congress specifically included a provision defining "balance due" to include principal and interest if the Secretary could in fact set balances based solely on income, without any consideration of debt levels.

Defendants insist (at 46, 50) that the States are trying to insert "full" before "repayment," but as stated above, the ordinary meaning of "repayment" is satisfying the entire debt. It is Defendants who try to insert the adjective "partial" before "repayment," which clashes with text commanding "repayment of such loan, including principal and interest." § 1087e(d)(1).

Similarly, Defendants selectively omit statutory text when they suggests that ICR refers to "*income contingent* repayment." The text actually refers to an "income contingent repayment plan." 20 U.S.C. 1087e(d)(1)(D). In this case, "repayment" is an adjective modifying the noun "plan," not a noun in its own right. Defendants cannot alter grammar to fit their preferred interpretation.

**2.** Against all this, Defendants (at 55) say the ICR statute authorizes forgiveness implicitly because it permits the Secretary to create repayment plans that are "not to exceed 25 years." According to

Defendants, the "most natural interpretation" of that language is a plan that permits forgiveness. *Id.*

Nonsense. There are innumerable ways the Secretary can require payments that are based on income but still high enough for individuals to repay within 25 years. The Secretary could promulgate a plan stating that a borrower each year shall pay X% of annual income or 4% of the principal balance, whichever is higher. Similarly, the Secretary could permit lower payments for four years but require catch-up payments in the fifth to keep a borrower on track to repay. All these would be consistent both with the text permitting payments based on income and the text requiring that the overall "balance due" include "unpaid principal" and "any accrued interest." § 1087e(e)(5). Far from granting the Secretary authority, the 25-year text *limits* him, requiring that he promulgate payment amounts *high* enough for borrowers to repay within 25 years.

The "not to exceed" language cannot implicitly authorize forgiveness because the same text appears in four other repayment plans, including the 10-year standard repayment plan, see § 1078(b)(9)(A), and the Secretary admitted to the district court that he cannot forgive loans

under those plans.  Supp.App.043; R.Doc.22 at 43.[21]  When Congress "transplanted" that "not to exceed" language into the ICR statute, it brought "the old soil with it."  *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019).  Not even the Secretary thinks that language creates authority to forgive loans on the standard repayment plan, so the language is insufficient with respect to ICR as well.

**3.** And in stark contrast to the ICR provisions, other provisions in the HEA (passed both before and after the 1993 ICR amendments) expressly authorize forgiveness.  For example, amendments passed in 1986 expressly authorize forgiveness for teachers, military service members, and Peace Corps volunteers.  § 1087ee.  Indeed, the same exact section that includes the ICR provision includes express forgiveness for Public Service Loan Forgiveness borrowers—just not for ICR borrowers who are not in the PSLF program.  § 1087e(m).  And the IBR program, created in 2007, expressly permits forgiveness.  § 1098e(b)(7).  In fact, the IBR program creates the only vehicle for forgiveness for borrowers on ICR (other than PSLF).  ICR borrowers can obtain forgiveness, but only *after*

---

[21] https://storage.courtlistener.com/recap/gov.uscourts.moed.211135/gov. uscourts. moed. 211135.22.0.pdf

switching to IBR.  § 1098e(b)(7)(A), (b)(7)(B)(iv) (authorizing forgiveness for borrowers who have "made payments under an income-contingent repayment plan" but requiring them first to shift to IBR).[22]  "When Congress includes particular language in one section of a statute but omits it from a neighbor," as Congress did in the Higher Education Act, "we normally understand that difference in language to convey a difference in meaning." *Bittner v. United States*, 598 U.S. 85, 94 (2023).

Finally, Defendants' interpretation makes a mockery of the IBR program and its statutory history.  That program provides forgiveness to persons who have incomes satisfying the statutory definition of "partial financial hardship."  § 1098e(a)(3).  The Final Rule provides far more forgiveness and does not have those income eligibility requirements.  So the Final Rule provides benefits to *rich* borrowers that Congress did not even provide to *poor* borrowers.

---

[22] Defendants assert (at 43) that the 2007 amendments "reaffirmed" the idea that ICR includes forgiveness authority.  That is a strange way of describing a new bill that *departs* from ICR by creating express forgiveness authority for IBR and by letting ICR borrowers obtain forgiveness only if they first switch to IBR.  § 1098e(b)(7)(A), (b)(7)(B)(iv).  On the next page, Defendants say the 2007 amendments also included provisions that defined how to calculate the 25-year period.  That of course says nothing about forgiveness authority.

Congress spent years negotiating the specific payment provisions and forgiveness timeline in IBR and enshrined all those provisions into statute. The program required borrowers to pay 15% of their income above 150% of the federal poverty line. § 1098e(a)(3)(B), (b)(1). Then President Obama urged Congress to make the program more generous, which Congress did in 2010, decreasing payments to 10% above 150% of the poverty line and accelerating forgiveness from 25 years to 20 years. § 1098e(e).

"What chumps!" *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 825 (2015) (Roberts, C.J., dissenting). "Didn't they realize that all they had to do was" forgive whatever they wanted? *Id.* Of course not. They legislated. They authorized forgiveness—but only through bicameralism and presentment. They did the hard work Defendants refuse to do here. This history was long recognized on both sides of the political aisle *until* Defendants published the Final Rule. *See* Lauren Camera, *Pelosi: Biden Lacks Authority to Cancel Student Debt,* U.S. News & World Report (July 28, 2021) ("People think that the President of the United States has the power for debt forgiveness. He does not. . . . That has to be an act of

58

Congress. . . . The President can't do it.").[23]  This history also "underscores the implausibility of the Government's interpretation."  *Van Buren v. United States*, 593 U.S. 374, 394 (2021).

Unable to dispute any of this, Defendants press a superfluity argument of their own.  They contend (at 46) that requiring actual repayment in the ICR plan would make the "extended repayment plan" superfluous because that plan also runs for 25 years.  But even they admit that the payments in that plan are "fixed" or "graduated," meaning a person's current income is irrelevant to monthly payments.  The ICR plan, in contrast, permits the Secretary to allow payment amounts to vary month to month or year to year (so long as actual repayment still occurs).

After considering the text, the administrative panel and the district court easily concluded that "Congress has made it clear under what circumstances loan forgiveness is permitted, and the ICR plan is not one of those circumstances."  Inj. Op. 7 (quoting the district court).  Indeed,

---

[23] https://www.usnews.com/news/education-news/articles/2021-07-28/pelosi-biden-lacks-authority-to-cancel-student-debt

"the text of the HEA makes a showing [by Defendants] of even mere plausibility difficult." *Id.* at 8.

*    *    *

All these arguments apply just as much to forgiveness of interest as to forgiveness of principal. Defendants make no attempt to defend the district court's analysis about interest, which erroneously conflated interest "accrual" with interest "capitalization." App.367, R.Doc.35 at 42–43. As Defendants cannot deny, before the Eighth Circuit's order, federal officials were not requiring individuals to pay interest and were instead picking up the tab. That is forgiveness, and it is forbidden. § 1087e(e)(5) (the "balance due" "shall" include "accrued interest").

### b. Defendants' nontextual arguments fail.

Short on text, Defendants resort to flawed atmospherics. First, they assert (at 42–43) that "every Secretary of Education since" 1993 has understood the ICR statute to permit forgiveness. Even if that were true, there is no "adverse possession" rule letting agencies change the meaning of statutes simply by taking action that goes unchallenged. *See Career Colleges & Sch. of Texas v. U.S. Dep't of Edu.*, 98 F.4th 220, 241 (5th Cir. 2024). But it is also not true. The Defendant is able to identify just *two*

Secretaries out of nine who adopted this position before the Final Rule. The other seven never engaged in ICR rulemaking and so had no reason to assess the question. Similarly, Defendants stress (at 41) that "no court ha[s] ever questioned" ICR forgiveness before now, but Defendants are unable to cite even a single case where the issue was presented. *Every* court to address the issue has concluded that the ICR provision lacks forgiveness authority.

None of this is surprising. While the previous ICR plans were unlawful, the question was never litigated because those plans "were limited in scope." Inj. Op. 3. The question went unlitigated because no previous Secretary ever asserted unfettered authority to cancel every penny of every loan. This Secretary is the first.

Finally, Defendants suggest (at 61) the administrative panel acted improperly by describing Defendants' actions as a "hybrid plan." But that is how Defendants *themselves* described their actions. As Defendants acknowledged to the district court, its previous REPAYE plan was "fully replace[d]" by SAVE in the Final Rule. App.412, R.Doc.52 at 2. So when the district court "preliminarily enjoined [Defendants] from any further loan forgiveness for borrowers under the Final Rule's SAVE plan,"

App.387, R.Doc.36, Defendants tried to resurrect the now-defunct REPAYE plan and mix-and-match forgiveness from that nonexistent plan with the payment provisions in the new SAVE plan. It was Defendants who described this new plan as a "hybrid." App.414, R.Doc.52 at 4. The administrative panel rightly concluded that this hybrid was an aggressive attempt to "render[ ] the injunction largely a nullity." Inj. Op. 8.

### C. The revised payment amounts and other provisions that increase eligibility for forgiveness are unlawful.

Because the Secretary lacks authority to forgive student loan balances under the ICR program, it necessarily follows that the Secretary acted unlawfully when he slashed payments so low that monthly payments will *never* result in "repayment of such loan, including principal and interest." 20 U.S.C. § 1087e(d)(1)(D). The States do not dispute that the Secretary has a fair amount of discretion in setting payment amounts based on income, but that discretion has limits: namely, payment amounts must be large enough for borrowers to actually repay their loans within 25 years.

The Secretary has done the opposite. Under the Final Rule, *millions* of borrowers—57% of borrowers on the new plan—"pay" $0 per

month.  *See FACT SHEET: President Biden Cancels Student Debt for more than 150,000 Student Loan Borrowers Ahead of Schedule,* The White House (Feb. 21, 2024).[24]  That is not "repayment."  It is not even "partial repayment."  It is forgiveness.  Even for those who pay anything greater than $0, the typical borrower "repays" only 71 cents on the dollar. 88 Fed. Reg. 43,880.

The Secretary has thus failed to "establish procedures for determining the borrower's repayment obligation on that loan for such year, and such other procedures as are *necessary to implement effectively* income contingent repayment."  20 U.S.C. § 1087e(e)(1) (emphasis added).  Where forgiveness is off the table, procedures "necessary to implement effectively income contingent repayment," require payment amounts large enough for borrowers to repay fully within 25 years. Finding otherwise would lead to an absurdity: The Secretary, by promulgating formulas too low for borrowers to repay their loans, would push borrowers into *default* at the end of 25 years because the Secretary

---

[24] https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/21/fact-sheet-president-biden-cancels-student-debt-for-more-than-150000-student-loan-borrowers-ahead-of-schedule/

lacks authority to forgive unpaid balances and yet is telling borrowers *not* to repay their loans.

Similarly, all other provisions (such as the unemployment deferment credit and the exclusion of spousal income) necessarily depend on the Secretary having authority to forgive. If he cannot, those provisions that increase forgiveness eligibility must fall. That is especially true because, having shown that parts of the Rule are unlawful, "[t]he default rule is that vacatur is the appropriate remedy." *E.g.*, *Data Mktg. Partnership, LP v. U.S. Dept. of Labor*, 45 F.4th 846, 859 (5th Cir. 2022).

### D. The Final Rule is arbitrary and capricious because it deliberately underestimates the cost by $300 billion.

The trial court erred in rejecting the argument that the Final Rule's knowingly inaccurate cost estimate was arbitrary and capricious. App.376; R.Doc.35 at 51. Agency action is arbitrary or capricious if, among other things, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983), or otherwise did not "engage[ ] in reasoned decisionmaking," *Judulang v.*

*Holder*, 565 U.S. 42, 53 (2011).  At base, the "arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

The Final Rule includes a knowingly false cost estimate.  Specifically, the rule arrives at a $156 billion estimate by assuming Defendants would prevail before the Supreme Court in *Biden v. Nebraska*.  But the Supreme Court had *already* ruled against Defendants before they finalized or published this rule.  *See* Secretary Cardona Statement, *supra* (announcing he was "finaliz[ing]" the rule "today," June 30, 2023, in response to the Supreme Court).  Defendants plowed ahead with this estimate even though they knew it was false.

The trial court nonetheless concluded that this "was not unreasonable."  App.375; R.Doc.35 at 50.  But if a knowingly false cost estimate that downplays the true cost by $300 billion is not unreasoned decisionmaking, it is difficult to imagine what could be.  The trial court justified its decision by noting that "Congress has never required the Secretary to consider costs when promulgating rules for the ICR plans."  *Id.*  That is beside the point.  *Prometheus* requires "that agency action be reasonable and reasonably explained."  592 U.S. at 423.  Even if a cost

estimate is not required by statute, if the agency chooses to include a cost estimate, it must do so in a reasonable way. *Id.* It was demonstrably unreasonable to explain that Defendants were "confident" they would prevail in *Biden v. Nebraska* when they had already lost. 88 Fed. Reg. 43,875.

And even if the Higher Education Act does not itself compel consideration of cost, general principles of administrative law do. The requirement of "reasoned decisionmaking" typically compels consideration of cost. *See Michigan v. EPA*, 576 U.S. 743, 750 (2015); *see also Mingo Logan Coal Co. v. Env't Prot. Agency*, 829 F.3d 710, 733 (D.C. Cir. 2016) (Kavanaugh, J., dissent) ("absent a congressional directive to disregard costs, common administrative practice and common sense require an agency to consider the costs and benefits of its proposed actions, and to reasonably decide and explain whether the benefits outweigh the costs." (citing *Michigan*)). Absent a statutory exception, costs are an "important aspect of the problem"; thus EPA's mandate to consider whether a regulation was "appropriate" necessarily compelled "attention to cost." *Michigan*, 576 U.S. at 752. The ICR statute similarly uses the term "appropriate." 20 U.S.C. § 1087e(e)(4).

An accurate consideration of cost "reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions." *Michigan*, 576 U.S. at 753. "It also reflects the reality that 'too much wasteful expenditure devoted to one problem may well mean considerably fewer resources available to deal effectively with other (perhaps more serious) problems.'" *Id.* at 753–54 (citation omitted).

Just months ago, in fact, the Supreme Court blocked EPA action when EPA failed to update its cost estimates in light of changing circumstances. *Ohio v. EPA*, 144 S. Ct. 2040 (2024). EPA initially proposed a pollution-control measure jointly on 23 States, but then four States obtained court rulings preventing EPA from imposing the measure on them. *Id.* at 2049–51. EPA, however, declined to update its cost calculations in the final rule for the remaining States even though "commenters posed this concern" during the comment period. *Id.* at 2054. The Supreme Court held that this violated the APA. *Id.*

So too here. Commenters noted the concern that Defendants might not prevail in *Biden v. Nebraska*, 88 Fed. Reg. 43,875, and Defendants undoubtedly knew that was likely as this Court had already enjoined the

program and the Supreme Court had *rejected* Defendants' emergency motion to lift that injunction. Yet Defendants did not update their cost analysis after the Supreme Court rejected the $300 billion assumption on which it was based.

The district court's conclusion that any error on this front was harmless makes no sense. The Rule's cost is exactly how much debt the Rule would cancel, so it is impossible to tell whether the Rule achieves the stated objectives and cancels the "right" amount unless Defendants know how much it costs.

Hiding the ball also evades agency accountability before Congress. Under the Congressional Review Act (CRA), "major" rules are not permitted to take effect until 60 days after publication. 5 U.S.C. § 801(a)(3). The purpose of this law is to give Congress an opportunity to review the rule—and perhaps vote to repeal it—before the rule goes into effect. *Id.* § 801(a), (b). Indeed, the Act creates a privileged legislative vehicle, enabling members of Congress to quickly force a vote without a filibuster. *Id.* § 802(d). Defendants designated the Final Rule as "major," thus the CRA applies. 88 Fed. Reg. 43,867. An error that deliberately underestimates the true cost by more than $300 billion cannot be

harmless. The idea that no member of Congress would vote differently if they knew the cost was $300 billion higher is preposterous. Indeed, even with the deliberately low estimation, a resolution under the CRA to repeal this measure passed the House and failed to pass the Senate only by a *single* vote. Roll Call on S.J.Res. 43 (Nov. 15, 2023); Roll Call on H.J.Res. 88 (Dec. 7, 2023).[25]

## IV.  Plaintiffs Face Irreparable Harm, and the Equities Strongly Favor the States.

Absent immediate relief, Plaintiff States will suffer irreparable harm. This Court already ruled in the last student-loan case that debt forgiveness creates "irreversible impact," making the "equities strongly favor an injunction." *Nebraska v. Biden*, 52 F.4th at 1047. The equities more strongly favor relief than last time. In 2022, Defendants had not yet started forgiving loans when this Court entered a stay. Here, however, before the administrative panel granted an injunction pending appeal, Defendants were forgiving loans every day. Indeed, the administrative panel concluded that the "Government continue[d] to work the same irreparable harm on MOHELA that the district court

---

[25] https://www.senate.gov/legislative/LIS/roll_call_votes/vote1181/vote_118_1_00310.htm; https://clerk.house.gov/evs/2023/roll705.xml

sought to enjoin." Inj. Op. 8. This Court should again hold that Plaintiff States have clearly established irreparable harm. Defendants' counterarguments are neither new nor meritorious.

**1.** Defendants' argument on irreparable harm rests on the same meritless arguments raised against standing. It should be rejected for the same reasons. Missouri stands to lose hundreds of millions of dollars each year if the unlawful mass cancellation program continues. Indeed, Defendants admit (at 57) that the Final Rule will affect MOHELA's borrower count and thus the revenue it receives. They simply try to distinguish that loss from the first mass cancellation rule, by saying that it affects "fewer" borrowers. *Id.* To the contrary, forgiveness is available for borrowers into the 98th income percentile, and the Final Rule affects all *future* accounts, whereas the first mass cancellation attempt was a "one-time" forgiveness on existing accounts. If this Court does not confirm the administrative panel's injunction, then thousands of MOHELA accounts will immediately close, costing millions of dollars. As the administrative panel found, "the States cannot turn back the clock on any loans that have already been forgiven." Inj. Op. 9.

**2.** In contrast, Defendants will face no harm from an order enjoining their actions because "the government does not have an interest in the enforcement of [illegal agency action]." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). If Defendants prevail on appeal, they could simply forgive loans then. Nor will an injunction harm borrowers because their positions will remain the same—*i.e.* their student loan repayment obligations will not change. In response to the administrative panel's injunction, Defendants placed "all borrowers currently impacted by [the order] in administrative forbearance," so they are "not required to pay principal or interest" while litigation proceeds. Inj. Op. 9. If Defendants were to prevail on appeal, they could simply forgive loans then.

If anything, it is Defendants who are harming the public interest— not only through unlawful mass forgiveness, but also by misleading the public. Everyday Americans lack legal training to know whether these mass cancellation attempts are illegal, but because of that lack of clarity, "more than one-third, 36 percent [of borrowers], said they aren't making

consistent payments in hopes the debt will be fully forgiven."[26]   And according to the Congressional Budget Office, Defendants actions have already led to a $74 billion increase in the federal budget deficit.[27]   These are monumental harms to both borrowers and the public fisc.

**3.** Moreover, Defendants' actions in their relentless drive to cancel loans have been extraordinarily inequitable.   Defendants rushed the Final Rule in response to *Biden v. Nebraska*, declining to update the cost estimate that rested on the flawed assumption Defendants would prevail in that case.   Defendants knew that assumption was false and yet deliberately underestimated the cost of the rule by $300 billion.   Next, Defendants violated the Congressional Review Act, under which "major rules" are not permitted to take effect until 60 days after publication.   5 U.S.C. § 801(a)(3).   The Final Rule was labeled a major rule, 88 Fed. Reg. 43,867, but Defendants implemented parts of it the same month it was published.   Then, even though the Final Rule said Defendants would not start implementing the 10-to-19-year forgiveness provision until July 2024, Defendants announced in late February 2024 they had already

---

[26] https://www.newsweek.com/millions-not-paying-student-loans-hopes-forgiveness-1950125

[27] https://www.cbo.gov/publication/60419

started doing so. Worst of all, following the district court's injunction, the Secretary unlawfully tried to resurrect a now-defunct regulation, mixing and matching that old regulation with a new regulation to create a brand new "hybrid" plan never before seen—all without notice and comment and all to evade the district court's injunction, "render[ing] that injunction a nullity." Inj. Op. 4. And Defendants did so in violation of the plain text of the injunction, which enjoined *all* forgiveness provisions in the SAVE plan. Throughout all this, defendant Biden repeatedly boasted that the Supreme Court could not "stop me."

Defendants' inequitable conduct has continued into their third mass cancellation attempt, which is currently blocked by a TRO in the Southern District of Georgia. Missouri and six other States uncovered documents revealing that even while Defendants were telling the public they would publish their third mass cancellation rule in October, they secretly were telling loan servicing organizations the rule would be published a month earlier, in September, and that Defendants were going to immediately force forgiveness at that time. Indeed, at a September 18 TRO/PI hearing, Defendants conceded that they never planned to comply with the 60-day waiting period required by the Congressional Review

Act.  Instead, they admitted that they planned to forgive 72 hours after publication.  The States' unrebutted documents revealed that Defendants had planned to publish the rule on Friday, September 6, and immediately forgive $73 billion the following Monday, before anybody could sue. *Missouri v. Dep't of Educ.*, Supp.App.218–19; R.Doc.5 at 15–16; Supp.App.273; R.Doc.45 at 8.

**4.** No better is Defendants' argument about delay.  Defendants suggest the clock began in July 2023, when the rule was published.  But it was not scheduled to go into full effect until July 2024.  "[D]elay is only significant if the harm *has occurred* and the parties cannot be returned to the status quo." *Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 998 (8th Cir. 2023) (emphasis added). While *some* harm occurred between late February (when Defendants first announced loans had been forgiven) and early April (when Plaintiffs sued), the vast majority of the harm is future harm.  Here, the States properly sought only prospective relief in their preliminary-injunction motion—three months before the rule was scheduled to go into full effect.  The harm from the loss of future accounts had not yet occurred.

Had the States sued in July 2024, Defendants no doubt would have argued the injury was not sufficiently imminent.[28]  Instead, for five months after the Final Rule was published, the Missouri Attorney General's Office sought non-litigation remedies by participating in a negotiated rulemaking process to alter this Final Rule.  Supp.App.129; R.Doc.26 at 56.  That attempt was unsuccessful, but there is no delay where a party "pursued non-litigation avenues first."  *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014).

Thus, at the earliest, the clock began ticking on February 21, 2024, when Defendants first announced they had already cancelled $1.2 billion in student loans even though forgiveness was slated initially to begin four months later.  The States launched their lawsuit just over a month later (and just days after receiving the evidence needed to seek a preliminary injunction—evidence produced in response to compulsory process).  The district court was correct in finding that any purported "delay does not

---

[28] Defendants mischaracterize (at 58) the States' argument by quoting the district court's misremembering of the States' argument, instead of the argument itself.  Plaintiff States never argued that an earlier suit "would have been dismissed as unripe."  App.381; R.Doc.35, at 56. Instead, the States argued, as they do here, that "*Defendants no doubt would have argued* the injury was not sufficiently imminent." Supp.App.128; R.Doc.26 at 55 (emphasis added).

undermine a finding that they are facing irreparable harm." App.381; R.Doc.35 at 56. This Court should find the same.

## V. The Scope of Relief This Court Has Twice Ordered Is Appropriate Here Too.

Defendants raise the same scope-of-injunction arguments they have twice raised to the Supreme Court. The Supreme Court rejected those arguments both times. This Court should too.

**1.** Insisting that the injunction is too broad, Defendants ignore that the administrative panel already concluded that this scope of relief is "necessary to provide complete relief to the plaintiffs." Inj. Op. 9 (citation omitted). In so finding, the Court followed the well-established rule— common, for example, in nuisance actions—that relief can extend incidentally to nonparties if necessary to provide complete relief to the plaintiff. *Cf.*, *Gill v. Whitford*, 585 U.S. 48, 67 (2018) ("[T]he only way to vindicate an individual plaintiff's right to an equally weighted vote was through a wholesale 'restructuring of the geographical distribution of seats in a state legislature.'" (citation omitted)).

What is true for nuisance actions is also true here. MOHELA is a nationwide loan servicer with 8 million accounts. These accounts are dynamic. For example, in 2022, about two million accounts were

transferred from one servicer to MOHELA.  Earlier this year, about 1.5 million were transferred out.  In light of the dynamic, nationwide nature of MOHELA's practice, an injunction barring implementation of the whole rule is necessary to give the States complete relief.

It is far from clear that any partial injunction can afford the States adequate relief.  Defendants provide no answer.  The administrative panel could not, for example, have limited relief to accounts currently held by MOHELA.  That would permit Defendants to simply transfer accounts before forgiving the balances.  In fact, Defendants now (for the first time) assert "unilateral[ ]" authority to shift accounts between borrowers.  Br. 36.  Thus any relief limited to MOHELA or the States would permit Defendants to easily evade the injunction.

Equally as important, the Supreme Court has twice rejected Defendants' scope-of-injunction position.  *E.g.*, App. to Vacate, No. 22A444 at 32–35; App. To Vacate, No. 24A173 at 32–34.  And on remand last year, Defendants expressly stipulated that its rule be "vacated and

set aside as null and void." *Biden v. Nebraska*, No. 4:22-cv-01040, Joint Stipulation (Aug. 15, 2023).[29]

Second, an injunction of the entire Final Rule is wholly appropriate because Defendants will exploit any partial injunction to continue unlawfully forgiving student loans. Despite the district court expressly enjoining Defendants "from *any* further loan forgiveness for borrowers under the Final Rule's SAVE plan," App.387, R.Doc.36, Defendants responded by forgiving loans under what Defendants themselves described as a "hybrid" plan that mixed and matched various provisions from various regulations in a combination no borrower had ever before received. App.414, R.Doc.52 at 4. Defendants' actions were flagrantly unlawful not only because Defendants promulgated a new plan without notice and comment, but also because they violated the plain text of the district court's order, which expressly enjoined Defendants "from *any* further loan forgiveness for borrowers under the Final Rule's SAVE plan"—*i.e.*, any of the three forgiveness provisions in that plan. App.387,

---

[29] https://storage.courtlistener.com/recap/gov.uscourts.moed.198213/gov.uscourts.moed.198213.75.0.pdf

R.Doc.36. Absent an injunction of the entire Final Rule, it is highly likely Defendants will resume these flagrant violations.

Finally, Defendants harp on the limits of *equitable* remedies, citing *Labrador v. Poe*, 144 S. Ct. 921 (2024), but ignore that (unlike *Poe*) this is an APA case with available statutory remedies, 5 U.S.C. §§ 705, 706. The settled ruled is that each of these provisions "is not party-restricted and allows a court to 'set aside' an unlawful agency action" in its entirety. *Career Colleges*, 98 F.4th at 255 (collecting cases). For example, when the Supreme Court found in 2020 that a regulation "violated the APA," the Supreme Court concluded that the regulation in its entirety "must be vacated." *DHS v. Regents of the Univ. of Cal.*, 591 U.S 1, 9 (2020) (emphasis added). Defendants cite Supreme Court concurrences criticizing the settled rule, but until the Supreme Court adopts a different rule, this Court is bound to follow the current one: "nothing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited to [Plaintiff] or its members." *Career Colleges*, 98 F.4th at 255.

**2.** Defendants in effect also seek to dismiss the President as a defendant. As the district court concluded, that is improper at this time.

Declaratory relief is plainly available against the President. *Clinton v. City of New York*, 524 U.S. 417, 421, 425 n.9 (1998). Injunctive relief is available less often, but is permitted where an injury might not be "redressed fully by injunctive relief against the remaining Defendants," *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017), *vacated on other grounds*, 583 U.S. 941 (2017); *accord Citizens for Responsibility & Ethics in Wash. v. Trump*, 953 F.3d 178, 199 n.12 (2d Cir. 2019). As the district court concluded, "Plaintiffs specifically point to statements made by President Biden indicating his intent to, in Plaintiffs' words, 'evade the Supreme Court.'" App.365, R.Doc. 35 at 40. The extraordinary means by which Defendants have relentlessly tried to mass cancel loans (both in this case and with their third mass-cancellation rule) refute Defendants' request here.

## CONCLUSION

The States respectfully request that the Court confirm the administrative panel's injunction and stay or preliminarily enjoin Defendants from implementing the Final Rule.

Dated: September 20, 2024

Respectfully submitted,

*/s/ Joshua M. Divine*
Joshua M. Divine

TIM GRIFFIN
  *Attorney General of Arkansas*
NICHOLAS J. BRONNI
  *Solicitor General*
DYLAN L. JACOBS
  *Deputy Solicitor General*
Office of the Arkansas Attorney
General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-3661
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

ASHLEY MOODY
  *Attorney General of Florida*
JAMES H. PERCIVAL
  *Chief of Staff*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
james.percival@myfloridalegal.com

DREW H. WRIGLEY
  *Attorney General of North Dakota*
PHILIP AXT
  *Solicitor General*
Attorney General's Office
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
(701) 328-2210
pjaxt@nd.gov

ANDREW BAILEY
  *Attorney General of Missouri*
JOSHUA M. DIVINE, #69875MO
  *Solicitor General*
REED C. DEMPSEY #1697941DC
  *Deputy Solicitor General*
SAMUEL FREEDLUND, #73707MO
  *Deputy Solicitor General*
MISSOURI ATTORNEY GENERAL'S
OFFICE
Post Office Box 899
Jefferson City, MO 65102
(573) 751-1800
josh.divine@ago.mo.gov
reed.dempsey@ago.mo.gov
samuel.freeland@ago.mo.gov

CHRISTOPHER M. CARR
  *Attorney General of Georgia*
STEPHEN J. PETRANY
  *Solicitor General*
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

DAVE YOST
    *Attorney General of Ohio*
T. ELLIOT GAISER
    *Solicitor General*
MATHURA J. SRIDHARAN
    *Deputy Solicitor General*
Office of the Attorney General
365 East Broad Street
Columbus, Ohio 43215
Phone: (614) 466-8980
thomas.gaiser@ohioago.gov

GENTNER DRUMMOND
    *Attorney General*
GARRY M. GASKINS, II
    *Solicitor General*
Office of the Attorney General
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
gentner.drummond@oag.ok.gov
garry.gaskins@oag.ok.gov

## CERTIFICATE OF COMPLIANCE

This filing complies with the type-volume limit of Fed. R. App. P. 28.1(e) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 15,299 words as determined by the word-counting feature of Microsoft Word 2016, which is less than the 15,300 words permitted by Rule 28.1.

This filing also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word 2016 in 14-point proportionally spaced Century Schoolbook font.

And this filing complies with the electronic-filing requirements of Local Rule 28A(h)(2) because it was scanned for viruses using Windows Defender and no virus was detected.

*/s/ Joshua M. Divine*
Joshua M. Divine

## CERTIFICATE OF SERVICE

I certify that on September 20, 2024, I electronically filed the fore-going motion with the Clerk of the Court by using the CM/ECF system, and that the CM/ECF system will accomplish service on all parties repre-sented by counsel who are registered CM/ECF users. *See* Fed. R. App. P. 25(c)(2).

*/s/ Joshua M. Divine*
Joshua M. Divine